**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| ARTUSO PASTRY FOODS CORP., individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>   v.<br><br>PACKAGING CORPORATION OF AMERICA, INTERNATIONAL PAPER COMPANY, SMURFIT WESTROCK PLC, SMURFIT KAPPA NORTH AMERICA LLC, WESTROCK CP, LLC, GEORGIA-PACIFIC LLC, CASCADES INC., CASCADES USA INC., CASCADES HOLDING US, INC., PRATT INDUSTRIES, INC., GRAPHIC PACKAGING INTERNATIONAL, LLC, AND GREIF INC.,<br><br>        Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

JURISDICTION AND VENUE ......................................................................................... 2

THE PARTIES..................................................................................................................... 3

    A.    Plaintiff ............................................................................................................... 3

    B.    Defendants ........................................................................................................ 4

    C.    Agents and Co-Conspirators ....................................................................... 8

FACTUAL ALLEGATIONS ............................................................................................ 9

    A.    The Market for Containerboard Products ............................................... 9

    B.    Defendants' Participation in the Containerboard Products Market ..................... 11

    C.    Defendants' Parallel Conduct ................................................................... 13

            1.    Defendants Engaged in Identical and Near-Identical Price Increases During the Relevant Period........................................................ 13

            2.    Defendants Engaged in Capacity Restrictions Against Their Unilateral Self Interests and Adopted a "Value Over Volume" Strategy ................. 19

            3.    Defendants' Price Increases and Output Restrictions Lacked Justification ............................................................................................... 22

            4.    Defendants' Coordinated Parallel Price Increases Substantially Boosted Their Revenue and Profitability During the Class Period ....................... 27

    D.    Additional Plus Factors Corroborate Defendants' Conspiracy to Fix Containerboard Product Prices ........................................................................ 28

            1.    The Containerboard Products Industry is Consolidated .......................... 28

            2.    Defendants are Recidivist Antitrust Violators ......................................... 30

            3.    Defendants' Parallel Price Increases During the Class Period Are Against Their Unilateral Self-Interest .................................................................. 33

            4.    Defendants Have Numerous Opportunities to Collude ............................ 34

            5.    The Containerboard Products Industry Has High Barriers to Entry ........ 37

            6.    Containerboard Products Have Inelastic Demand .................................... 38

i

7.      Defendants' Containerboard Products Have a High Degree of
        Interchangeability ....................................................................................... 39

TOLLING OF THE STATUTE OF LIMITATIONS.................................................................. 39

ANTICOMPETITIVE EFFECTS................................................................................................ 40

CLASS ACTION ALLEGATIONS ........................................................................................... 40

CLAIM FOR RELIEF ................................................................................................................ 43

REQUEST FOR RELIEF ........................................................................................................... 44

JURY TRIAL DEMAND ........................................................................................................... 44

Plaintiff Artuso Pastry Foods Corp., ("Plaintiff") on behalf of itself and all others similarly situated, brings this class action complaint for damages and injunctive relief against Defendants Packaging Corporation of America; International Paper Company; Smurfit Westrock plc; Smurfit Kappa North America LLC; WestRock CP, LLC; Georgia-Pacific LLC; Cascades Inc.; Cascades USA Inc.; Cascades Holding US, Inc.; Pratt Industries, Inc.; Graphic Packaging International, LLC; and Greif Inc. (collectively, "Defendants") for violations of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

## INTRODUCTION

1.      This case arises from a *per se* unlawful conspiracy among the Defendants to fix, raise, and maintain supracompetitive prices for containerboard sheets, linerboard sheets, and finished packaging products made from containerboard and/or linerboard (collectively, "Containerboard Products") in the United States.

2.      Defendants, leading manufacturers of Containerboard Products, engaged in a contract, combination, or conspiracy to raise prices of Containerboard Products between November 1, 2020 and the Present (the "Class Period") through at least seven rounds of parallel price increases on containerboard and linerboard that raised prices of Containerboard Products by more than 30% during the Class Period. Defendants adopted a "value over volume" strategy that raised prices of Containerboard Products while reducing output. Defendants' conspiracy was facilitated by a consolidated market structure, vertical integration and ample opportunities to collude.

3.      The containerboard industry is no stranger to illegal collusion. In fact, many of the Defendants (or their predecessors) are recidivist antitrust violators with a history of anticompetitive conduct, in this market, dating back 85 years.

1

4.      Defendants' conspiracy resulted in higher prices of Containerboard Products than would have existed in a competitive market, resulting in substantial profits to Defendants at the expense of purchasers of Containerboard Products.

5.      During the Class Period, Defendants engaged in numerous unprecedented and unjustified price increases, often implemented at the exact same time and for the exact same increase.

6.      The Containerboard Products market is particularly susceptible to collusion due to its high concentration, significant barriers to entry, inelastic demand, and the fungible nature of Containerboard Products. These market characteristics enabled the Defendants to effectuate their conspiracy without fear of losing market share.

7.      As described further herein, there were no changes to economic factors such as input costs or demand that could plausibly account for the magnitude of the price increases in the Containerboard Products market. The uniformity and lack of justification for these increases among Defendants further suggest the absence of any non-collusive explanation.

8.      Defendants' conspiracy has unreasonably restrained trade in violation of Section 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.  As a direct result of Defendants' conspiracy, Plaintiff and the Class have each paid artificially high prices for Containerboard Products.  Accordingly, Plaintiff and members of the Class seek to recover treble damages, injunctive relief, and other relief as direct purchasers under the federal antitrust laws.  Plaintiff demands a trial by jury.

## JURISDICTION AND VENUE

9.      The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d), 1337(a), and 1367.  The Court has jurisdiction over Plaintiff's claim for injunctive relief pursuant

to Section 16 of the Clayton Act, 15 U.S.C. § 26.

10.     This Court also has subject matter jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because this is a proposed class action in which: (1) there are at least 100 Class members; (2) the combined claims of Class members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs; and (3) Defendants and at least one Class member are domiciled in different states.

11.     This Court has personal jurisdiction over Defendants because they purposefully directed their business activities toward this jurisdiction and had substantial contacts with this jurisdiction, and because Plaintiff's claims for relief arise from the illegal acts Defendants committed within this jurisdiction.

12.     This Court also has personal jurisdiction over Defendants because they maintain sufficient minimum contacts with the United States and the State of Illinois, and a substantial part of the events and conduct giving rise to Plaintiff's and Class members' claims occurred in the State of Illinois.

13.     Venue is proper in this district under 28 U.S.C. §§ 1391(a), (b), (c), and (d), and 15 U.S.C. §§ 15(a) and 22 because Defendants transacted business in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.  During the Class Period, Defendants transacted business in this District, a substantial portion of the activity at issue in this case occurred in this District, and Defendant Packaging Corporation of America is headquartered in this District.

## THE PARTIES

### A.     Plaintiff

14.     Plaintiff **Artuso Pastry Foods Corp.** ("Artuso Pastry") is a New York corporation headquartered in Mount Vernon, New York.  Artuso Pastry purchased Containerboard Products

directly from Defendant WestRock CP, LLC, a subsidiary of Defendant Smurfit Westrock plc, during the Class Period and paid an artificially high price for such Containerboard Products.

### B. Defendants

15. Defendant **Packaging Corporation of America** ("PCA") is a Delaware corporation with its principal place of business at 1 North Field Court, Lake Forest, Illinois. Packaging Corporation of America is the third largest producer of Containerboard Products in North America. In 2024, PCA had $8.4 billion in revenue, with $7.7 billion attributable to Containerboard Products. PCA is publicly traded and listed on the NYSE. PCA sells Containerboard Products throughout the United States.

16. During the Relevant Period, PCA outperformed the broader stock market. In fact, PCA's 2024 10-K touts its outsized returns compared to the S&P 500 index during the Relevant Period:



**COMPARISON OF 5 YEAR CUMULATIVE TOTAL RETURN\***
**Among Packaging Corporation of America, the S&P 500 Index, and the S&P Midcap 400 Index**

*\$100 invested on 12/31/19 in stock or index, including reinvestment of dividends. Fiscal year ending December 31.

17. Defendant **International Paper Company** ("International Paper") is a New York

corporation headquartered at 6400 Poplar Avenue, Memphis, Tennessee. International Paper stock is traded on the NYSE. International Paper's 2024 revenue attributable to Industrial Packaging (Containerboard Products) totaled $13.4 billion. International Paper produces Containerboard Products in locations throughout the U.S., including at locations in this district such as the Fox Valley Container Plant and Aurora Corrugated Sheet Plant in Aurora, Illinois, the Montgomery Container Plant in Montgomery, Illinois, the Des Plaines Bulk Container Plant in Des Plaines, Illinois, the Northlake Container Plant in Northlake, Illinois and the Bedford Park South Graphics Sheet Plant in Bedford Park, Illinois. International Paper also sells Containerboard Products throughout the United States, including in this jurisdiction.

18.     International Paper has a U.S. production capacity of 13 million tons annually for Containerboard Products. 75% of its production is converted into corrugated packaging and other packaging.

19.     Defendant **Smurfit Westrock plc** is an Ireland public limited company headquartered at Beech Hill, Clonskeagh, Dublin 4, D04 N2R2, Ireland. Smurfit Westrock plc was created from the 2024 merger of Smurfit Kappa Group plc ("Smurfit Kappa") and WestRock Company ("WestRock"). Smurfit Westrock plc stock is traded on the NYSE. Smurfit Westrock has approximately 100,000 employees located in 40 countries, including in the United States. Smurfit Westrock plc operates as an integrated global entity and touts that it "infuse[s] [its] values through our ways of working and communication across the organization" through global employee surveys and quarterly global town halls with senior leadership.

20.     Smurfit Westrock's North American headquarters are located in Atlanta, Georgia. Smurfit Westrock describes itself as "one of the largest integrated producers of linerboard, white-top linerboard and containerboard and kraft paper in North America (including the U.S.,

Canada and Mexico)." In 2024, its North American net sales exceeded $10 billion.

21.     Defendant **Smurfit Kappa North America LLC** is a Delaware Limited Liability Company with its principal place of business at 125 E. John W. Carpenter Freeway, Suite 1500, Irving, TX 75062. Upon information and belief, Smurfit Kappa North America, LLC is a subsidiary of Smurfit Westrock plc.

22.     Defendant **WestRock CP, LLC** is a Delaware Limited Liability Company with its principal place of business at 504 Thrasher Street, Norcross, GA 30071, United States. WestRock CP, LLC is a subsidiary of Smurfit Westrock plc. WestRock CP, LLC manufactures corrugated and consumer packaging products, offering merchandising displays, paperboards, sheets, and containers. WestRock CP, LLC sells its products globally, including in the United States. Smurfit Westrock plc and Smurfit Kappa North America, LLC and WestRock CP, LLC shall be referred to herein as "Smurfit Westrock."  Smurfit Westrock and/or its subsidiaries have over 250 locations in the U.S., including a sales office, consumer packaging plant, folding carton plant and tube plant in this district. Smurfit Westrock sells Containerboard Products throughout the United States.

23.     Defendant **Georgia-Pacific LLC** ("Georgia-Pacific") is a Delaware Limited Liability Company headquartered at 133 Peachtree Street NE, Atlanta, GA, 30303, USA. Georgia-Pacific is privately held and owned by Koch, Inc. Georgia-Pacific describes itself as "one of the largest producers of containerboard and corrugated packaging" and "one of the largest suppliers of containerboard to the independent box market."  Georgia-Pacific sells Containerboard Products throughout the United States.

24.     Defendant **Cascades Inc.** is a Canadian corporation headquartered at 404 Marie-Victorin Boulevard, Kingsey Falls, Quebec, Canada. Cascades, Inc. "is a paper and packaging company that produces, converts and sells packaging and tissue products composed

primarily of recycled [fibers]." In 2024, 31% of its facilities and 25% of its employees were located in the United States. Cascades, Inc. is a publicly held company that owns 100% of Cascades USA Inc. Cascades, Inc. has 9,700 employees and 68 operating facilities across Canada and the United States. 21 of these facilities and 2,400 employees are located in the United States. During the Class Period, Cascades, Inc. and/or its wholly owned subsidiaries or affiliates sold Containerboard Products in interstate commerce directly to purchasers in the United States.

25.     Defendant **Cascades USA Inc.** is a Delaware corporation with its principal executive offices located at 4001 Packard Road, Niagara Falls, New York. Cascades USA Inc. is a wholly-owned subsidiary of Cascades Inc.

26.     Defendant **Cascades Holding US, Inc.** is a Delaware Limited Liability Company with its principal executive offices located at 4001 Packard Road, Niagara Falls, New York. Cascades Holdings, LLC is a wholly-owned subsidiary of Cascades USA Inc. Cascades, Inc., Cascades USA Inc. and Cascades Holding US, Inc. shall be referred to collectively herein as "Cascades."  Cascades sells Containerboard Products throughout the United States.

27.     Defendant **Pratt Industries, Inc.** ("Pratt") is a Delaware Corporation headquartered at 4004 Summit Boulevard NE, Suite 1000, Atlanta, GA. Pratt is privately held and describes itself as the "fifth largest corrugated packaging company in the US." Pratt manufactures Containerboard Products at locations throughout the United States, including 21 corrugating plants and 26 converting plants. Pratt sells Containerboard Products throughout the United States.

28.     Defendant **Graphic Packaging International, LLC** ("Graphic Packaging") is a Delaware Corporation headquartered at 1500 Riveredge Parkway, Suite 100, Atlanta, GA. Graphic Packaging stock is publicly traded on the NYSE. Graphic Packaging primarily sells finished packaging to consumer packaged goods companies, and the majority of paperboard it produces is

7

consumed internally. Graphic Packaging manufactures Containerboard Products in the United States. Graphic Packaging has business operations in this district including plants located in Carol Stream, Illinois and Chicago, Illinois. Its customers include multinational consumer companies including The Coca Cola Company, General Mills, Inc., Nestle USA, Inc., Kimberly Clark Corporation, McDonald's, Chipotle, and Colgate. Graphic Packaging sells Containerboard Products throughout the United States.

29. Defendant **Greif Inc.** ("Greif") is a Delaware Corporation headquartered at 425 Winter Rd, Delaware, OH. Greif stock is publicly traded on the NYSE. Greif is a global producer of Containerboard Products including finished packaging and containerboard sheets, with operations in over 35 countries. Greif has business operations in this district including plants located in Alsip, Illinois, Lockport, Illinois and South Holland, Illinois. Greif sells Containerboard Products throughout the United States.

### C. Agents and Co-Conspirators

30. The anticompetitive and unlawful acts alleged against the Defendants in this Complaint were authorized, ordered, or performed by Defendants' respective officers, agents, employees, or representatives, while they were actively engaged in the management, direction, or control of Defendants' businesses or affairs.

31. Each corporate Defendant's agents operated under the authority and apparent authority of their respective principals.

32. Each corporate Defendant, through its respective subsidiaries, affiliates, and agents, operated as a single unified entity.

33. Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

34.     Each Defendant acted as the principal or agent of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

35.     When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, it is to be understood that Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all the Defendant companies within that family.

36.     Furthermore, to the extent that subsidiaries within corporate families distributed the Containerboard Products discussed in this Complaint, these subsidiaries played a significant role in the conspiracy because Defendants sought to ensure that the prices paid for such products would not undercut their pricing agreements.  Thus, all Defendants' entities within the corporate families were active, knowing participants in the conspiracy to maintain supracompetitive prices.

## FACTUAL ALLEGATIONS

### A.     The Market for Containerboard Products

37.     Used in everything from ordering a pizza, moving a house, sending or receiving parcels, or storing files (in bankers' boxes), it is no surprise that Americans consume tens of millions of Containerboard Products every day.

38.     Containerboard, which is comprised of both corrugating medium and linerboard, is the principal raw material used to manufacture corrugated products such as cardboard boxes and product displays. As used herein, "Containerboard Products" include corrugating medium, linerboard, and packaging products made from corrugating medium and/or linerboard, such as cardboard boxes and product displays.

39.     Most packaging in the U.S. is made from Defendants' fiber-based materials made from new or recycled wood pulp. Defendants process new or recycled wood pulp to make sheets of linerboard and corrugating medium.

40. Linerboard is a strong, smooth packaging material, as shown below. Linerboard can be made from virgin or recycled fiber, or a blend. Two common varieties of linerboard are "white top" linerboard, which is designed for printing (such as for customized boxes or packaging), and kraft linerboard, which is made from approximately 80% virgin wood fiber and uncoated.



Linerboard

**Figure 1.**

41. Corrugating medium is a wavy material used as an inner layer for most cardboard boxes:



Corrugating Medium

**Figure 2.**

42. Defendants combine linerboard and corrugating medium to make containerboard, as shown below:



Containerboard

**Figure 3.**

43.     While Defendants sell linerboard, corrugating medium, and containerboard in bulk rolls or sheets, they primarily sell containerboard and corrugated medium as finished products, such as cardboard boxes and merchandise displays.

44.     Because containerboard and linerboard are used in the manufacture of finished packaging products, such as cardboard boxes, an increase in the price of containerboard or linerboard results in an increase in the price of finished packaging products.

**B.      Defendants' Participation in the Containerboard Products Market**

45.     Defendants control the vast majority of the U.S. market for Containerboard Products, including corrugating medium and linerboard sheets and finished containerboard products.

46.     As shown in a 2022 International Paper investor presentation, International Paper, WestRock (predecessor to Defendant Smurfit Westrock), PCA, Georgia-Pacific, and Pratt had a staggering combined 74% market share as of 2022, with significant consolidation in the industry over the past 30 years.



1995 v. 2022 Market Shares

**Figure 4.**

47.     Indeed, Defendants' collective current market share is even larger as a result of the Smurfit Westrock merger in 2024 and International Paper's acquisition of DS Smith in 2025. Upon information and belief, Defendants presently control 85% or more of the Containerboard Products market.

48.     This type of market concentration, with a small group of competitors controlling the vast majority of commerce, renders a market more susceptible to collusion.  It is easier to coordinate and agree on prices, ensure the conspiracy remains concealed, and to police adherence to the conspiracy by identifying and punishing defectors when there are fewer participants. *See* George A. Hay, *Oligopoly, Shared Monopoly, and Antitrust Law*, 67 Cornell L. Rev. 439, 444 (1982).

49.     Unsurprisingly, the Containerboard Products cartel was able to dramatically

increase prices in lockstep.

### C.    Defendants' Parallel Conduct

#### 1.    Defendants Engaged in Identical and Near-Identical Price Increases During the Relevant Period

50.    During the 2010s, Containerboard Products' prices were relatively stable.  Over the last five years, however, the prices of Containerboard Products rose dramatically, driven by Defendants' lock-step price increases.

51.    The chart below shows the change in price of corrugated and solid fiber boxes during the Relevant Period, which increased a staggering **33%** between November 2020 and September 2022:



**Figure 5.**

52.    A similar drastic increase beginning in 2020 is seen for (a) corrugated paperboard (containerboard) and (b) paperboard excluding corrugated paperboard (linerboard):



**Figure 6.**



**Figure 7.**

53.     Since at least 2020, Defendants have coordinated price increases to boost their profits at the expense of their customers.  During the Class Period, Defendants publicly announced at least seven rounds of coordinated parallel price increases on linerboard and corrugating medium. Typically, these price increase announcements were made one to two months before the effective date.

54.     The following table summarizes Defendants' announced price increases on Linerboard and Corrugating Medium between 2020 and the Present:

| Defendant | Announcement Date | Effective Date | Price Increase | |
|---|---|---|---|---|
| | | | Linerboard | Corrugating Medium |
| **2025** | | | | |
| Greif | 12/5/2024 | 1/1/2025 | $70 | $100 |
| Smurfit Westrock | 11/27/2024 | 1/1/2025 | $60 (unbleached kraft & recycled) $70 (white top, West Region) $50 (white top, East Region) | $80 |
| International Paper | 11/25/2024 | 1/1/2025 | $70 | $90 |
| Georgia-Pacific | 11/25/2024 | 1/1/2025 | East region $60 (kraft) $60 (white top) $90 (recycled) West region $80 (kraft) $90 (white top) $90 (recycled) | $90 |
| PCA | 11/20/2024 | 1/1/2025 | $70 | $90 |
| **2024** | | | | |
| Cascades | 5/2024 | 6/3/2024 | $60 | $80 |
| Georgia-Pacific | 5/2024 | 6/1/2024 | $50 | $80 |
| Pratt | 5/2024 | 6/1/2024 | $50 | $80 |
| WestRock | 5/2024 | 6/1/2024 | $50 | $80 |
| International Paper | 5/2024 | 6/1/2024 | $50 | $80 |

| | | | | |
|---|---|---|---|---|
| International Paper | 12/2023 | 1/1/2024 | $70 $50 (white-top) | $110 |
| WestRock | 12/2023 | 1/1/2024 | $70 $30 (white-top) | $110 |
| Cascades | 12/2023 | 1/1/2024 | $70 $50(white-top) | $110 |
| PCA | 12/2023 | 1/1/2024 | $70 | $100 |
| Pratt | 12/2023 | 1/1/2024 | $75 | $110 |
| **2022** | | | | |
| International Paper | 1/2022 | 3/1/2022 | $70 | $70 |
| WestRock | 1/2022 | 3/1/2022 | $70 | $70 |
| PCA | 1/2022 | 3/1/2022 | $70 | $70 |
| Cascades | 1/2022 | 3/1/2022 | | $40 |
| **2021** | | | | |
| Industry-wide | | 10/1/2021 | $50 | |
| WestRock | 6/11/2021 | 7/15/2021 | $50 | $70 |
| Cascades | 2/2021 | 3/1/2021 | $60 | $70 |
| International Paper | 2/2021 | 3/1/2021 | $60 | $60 |
| Greif | 2/2021 | 3/4/2021 | $60 | $70 |
| PCA | 2/2021 | 3/1/2021 | $70 | $70 |
| **2020** | | | | |
| WestRock | 9/30/2020 | 11/1/2020 | $50 | $50 |
| PCA | 9/25/2020 | 11/1/2020 | $50 | $50 |
| Georgia-Pacific | 9/25/2020 | 11/1/2020 | $50 | $50 |
| Pratt | 9/25/2020 | 11/1/2020 | $50 | $50 |
| Cascades | 9/25/2020 | 11/1/2020 | $50 | $50 |
| International Paper | 9/25/2020 | 11/1/2020 | $50 | $50 |

16

55.     On September 25, 2020, International Paper announced a $50 increase on linerboard and corrugating medium. The same day, PCA, Georgia-Pacific, Pratt, and Cascades announced an identical $50 increase. Just five days later, WestRock announced an identical increase. These six producers comprise over 85% of the U.S. Containerboard Products market and this price increase was the first in more than two and a half years.

56.     Defendants continued to implement parallel price increases throughout 2021. In early February 2021, PCA and Greif announced price increases of $70 per ton on corrugating medium and $60–$70 per ton on linerboard. The following week, International Paper and Cascades issued similar price increases with all four companies setting effective dates in early March 2021. The pricing actions were nearly identical in timing, scope, and product coverage.

57.     In June 2021, WestRock announced a $50 per ton increase on all linerboard products and a $70 per ton increase on certain corrugating medium grades, effective mid-July. Industry reports indicate that other major producers took similar actions, constituting the third industry-wide price increase "in 10 months from November 2020 to August 2021 in what likely was the fastest price run-up ever in US and North American industry history." The coordinated price increases led to a $50 per ton rise in linerboard prices by October 2021.

58.     The trend continued in 2022. In late January, the three largest containerboard producers in North America—International Paper, WestRock, and PCA—each announced $70 per ton price increases. Cascades also raised prices, planning a $40 per ton increase on corrugating medium. All increases took effect on March 1, 2022, reflecting the continued parallelism in pricing behavior.

59.     After a two-year lull in major price increases, the coordinated pattern resumed in December 2023, when Pratt, Cascades, WestRock, International Paper, and PCA simultaneously

announced significant hikes on both linerboard and corrugating medium. Linerboard increases ranged from $70 to $75 per ton, while corrugating medium rose by $100 to $110 per ton. All companies uniformly set January 1, 2024, as the effective date. Again, the increases closely aligned in scope, timing, and implementation.

60.     The following spring, in May 2024, five major producers—International Paper, WestRock, Georgia-Pacific, Cascades, and Pratt—announced a new wave of coordinated price increases, scheduled to take effect in early June. International Paper announced a $50 per ton increase on linerboard and an $80 per ton increase on corrugating medium, effective June 1. In May 2024, a corrugated packaging market analyst at Bloomberg Intelligence remarked, "Traditionally, once one player moves, the rest follow." He added, "I feel very confident that we'll see the rest of them in the next few weeks join the ranks." Indeed, this occurred. WestRock, Georgia-Pacific, and Pratt each announced matching increases of $50 per ton on linerboard and $80 per ton on medium, also effective June 1. Cascades announced slightly higher increases—$60 per ton for linerboard and $80 per ton for medium—effective June 3. Despite minor differences, the lockstep movements further reinforced a repeated pattern of parallel pricing.

61.     Less than six months later, between November 20 and December 5, 2024, five major containerboard producers—PCA, International Paper, Georgia-Pacific, Smurfit Westrock, and Greif—announced significant price increases, all effective on January 1, 2025. PCA and International Paper each announced a $70 per ton increase on linerboard and a $90 per ton increase on corrugating medium. Georgia-Pacific's increases generally aligned with the $90 per ton increase on corrugating medium and ranged from $60 to $90 per ton on linerboard, depending on grades and regions. Smurfit Westrock announced a $60 per ton increase for unbleached kraft and recycled linerboard, along with tiered white-top increases of $70 per ton in the West and $50 per

ton in the East. Greif, the final major producer to announce, implemented a $70 per ton increase on linerboard and a $100 per ton increase on medium. Though the announced amounts varied slightly, the producers acted within a narrow window and set uniform effective dates, again reflecting a closely aligned pattern of parallel pricing behavior.

> **2.  Defendants Engaged in Capacity Restrictions Against Their Unilateral Self Interests and Adopted a "Value Over Volume" Strategy**

62.    On October 6, 2022, WestRock announced that it would permanently close its corrugated medium manufacturing operations in St. Paul, Minnesota by early November 2022, resulting in the elimination of 200,000 annual tons of corrugating medium.

63.    On August 23, 2023, WestRock announced that it would permanently cease operations at its paper mill in Tacoma, Washington, eliminating production of approximately 600,000 annual tons of pulp and 25,000 annual tons of specialty-grade capacity.

64.    On October 18, 2023, International Paper announced that it would permanently close its containerboard mill in Orange, Texas and permanently cease production on two of its pulp machines the #20 machine in Riegelwood, North Carolina, and the #4 machine in Pensacola, Florida. The permanent closure of the Orange, Texas containerboard mill resulted in a reduction of International Paper's containerboard capacity by approximately 800,000 tons, leaving a total containerboard production capacity of 13 million tons. The reduction of its pulp machines reduced its pulp capacity by 500,000 tons, leaving a total pulp capacity of 2.7 million.

65.    On January 29, 2025, Greif announced that it would permanently cease production on the Number 1 Paperboard Machine (A1), a non-integrated uncoated recycled paperboard asset, in Austell, Georgia, by the end of March and permanently close its containerboard and uncoated recycled paperboard mill in Fitchburg, Massachusetts, by the end of May. These closures collectively reduced Greif's containerboard capacity by 100,000 tons and its uncoated recycled

paperboard (a type of linerboard) capacity by 90,000 tons.

66.     On February 13, 2025, International Paper announced that it would be shutting down its Red River Containerboard Mill, decreasing capacity by approximately 814,000 tons annually.

67.     On April 30, 2025, Smurfit Westrock announced that it would close its coated recycled board mill in St. Paul, Minnesota, and stop production at its containerboard mill in Forney, Texas, reducing containerboard and coated recycled board ("CRB") (a type of linerboard) capacity by more than 500,000 tons.

68.     On May 1, 2025, Greif announced that it would permanently close its paperboard mill in Los Angeles by June 2025, removing 50,000 tons of CRB and 22,000 tons of Uncoated Recycled Paperboard ("URB") linerboard from the market.

69.     From 2021 to 2024, International Paper's total capacity fell from 13,805,000 short tons to 12,984,000 short tons.

70.     International Paper explicitly acknowledged its change in strategy to sacrifice volume in favor of prices on its 2023 Q4 earnings call on February 2, 2024. On that call, International Paper's CEO and Chairman of the Board Mark Sutton explained regarding the packaging business, "*[w]e are focusing on value over volume.* Therefore, we may trail the industry for the next few quarters when measuring unit volume growth, but we expect to grow at or above market thereafter, and we expect our earnings to improve through this process."

71.     Further, International Paper's 2024 Annual Report explained, "[o]ur Go-to-Market value over volume reset was largely complete in 2024 and we expect the final unfavorable impacts to volume to be behind us later in 2025."

72.     Likewise, Greif also acknowledged that it is pursuing value over volume.

Commenting on its 2022 financial results, President and CEO Ole Rossgard commented that "[w]e believe these outstanding results are driven by the high engagement among our teams, our focus on delivering legendary customer service and *our consistent commitment to a value-over-volume approach*[.]" On its Q1 2025 conference call on February 28, 2025, Rossgard explained, "[a]nd with regard to competition, *basically we focus on value over volume*, and that's, that serves us well in times like this when you, have, more macroeconomic, parameters or in the market, then, that competition tends to be more hungry for volume, and if we can. Get a fair price for what we do and the service we provide. We walk away. Those customers, tend to come back to us because our service and our product quality is very high compared to a local player who wants some volume."

73.     Similarly, on its Q1 2025 conference call, Smurfit Westrock acknowledged its value over volume strategy. Kenneth Bowles, Group CFO, commenting on the company's financial growth, explained "[t]he performance reflects not only our relentless focus on cost, quality and efficiency, but the incremental benefits of our synergy program and some early-stage benefits of our operational changes, including our operating model and all underpinned by *our strategy of value over volume.*" Anthony Smurfit, Group CEO, commented "we still feel very comfortable and happy *with our value over volume approach*."

74.     The "value over volume" approach would be irrational in a competitive market, where increased prices would drive customers to competitors.

75.     Indeed, the only way a company could be confident that their "value over volume" approach would succeed is if it knew that its competitors were also raising prices, and their consumers would have nowhere to turn for lower priced Containerboard Products.

### 3. Defendants' Price Increases and Output Restrictions Lacked Justification

76.     Defendants' successful lock-step price increases during the Relevant Period lacked justification and are unlikely to occur absent an agreement.  In a commodity market such as Containerboard Products, manufacturers must balance increasing prices with the risk of losing sales volume to stay competitive.  For example, if faced with rising input costs, Containerboard Companies would need to choose between raising prices and risking losing customers to competitors offering lower prices.

77.     By 2020, Defendants started to engage in frequent lock-step price increases. On September 25, 2020, each Defendant announced a $50 price increase on both linerboard and corrugating medium, with the exception of WestRock, which announced five days later. This was immediately following the Fastmarkets RISI Asian Conference, attended by both Smurfit Kappa and WestRock.

78.     In February 2021, International Paper, Cascades, PCA, and Greif announced a $60-70 price increase for both linerboard and corrugating medium. Later that same year in October, the industry, which upon information and belief included all Defendants, announced another $50 price increase on linerboard.

79.     In January 2022, International Paper, WestRock, PCA, and Cascades again announced a price increase—$70 on linerboard and $40 on corrugating medium. 2023 again saw simultaneous price increases when Defendants, with the exception of Georgia-Pacific and Greif, each announced the most extreme price increases yet in December, just three weeks after the 2023 Fastmarkets Forest Products International Containerboard Conference. In attendance were: Cascades Containerboard Packaging's Vice President of Sales; the Sales Manager for International Paper; Smurfit Kappa's CEO of The Americas, Director of Export Containerboard Sales, Chief

Financial Officer, Head of Pulp and Paper Sourcing, and Vice-President Sales and Marketing for Paper & Board; Greif's Vice President and Director Sales/Marketing for Containerboard; PCA's Vice President of Containerboard Sales and Director of Containerboard Sales; and WestRock's CEO and Director of Corporate Strategy. International Paper, WestRock, PCA, Pratt, and Cascades all announced a $100-110 price increase for corrugating medium and a $70-75 price increase for linerboard.

80.     May 2024 saw price increases announced by Cascades, Georgia-Pacific, Pratt, WestRock, and International Paper increasing linerboard by $50-60, and increasing corrugating medium by $80.

81.     November and early December 2024 saw another round substantial price increases by Greif, Smurfit Westrock, Georgia-Pacific, PCA, and International Paper, with linerboard increasing between $60 and $90 and corrugating medium increasing between $80 and $100.

82.     Demand for corrugated boxes between 2019 and 2021 increased slightly with U.S. corrugated box shipments increasing 6%. Prices drastically outpaced the modest increase in demand, with no less than three industry-wide price increases in 10 months. During this period, prices for linerboard and corrugating medium increased 15 and 20%, respectively, in what was called "the fastest price run-up ever in US and North American industry history."

83.     Between 2021 and 2023, demand for corrugated boxes decreased, before leveling off in 2024 and 2025. Yet price increases continued. From 2021 to 2025, six price increases were announced. By the end of 2024, the average linerboard selling price had increased from $734/short ton in 2019 to $885/short ton. The average selling price of corrugating medium had increased from $638/short ton to $773/short ton during the same period.

84.     Raw material costs also fail to explain the price increases between 2019 and 2024.

The price of Old Corrugated Cardboard ("OCC"), a main input in Containerboard Products, in 2024 was similar to its 2018 price, as shown in Figures 8 and 9 below.

**Reference Prices – Fiber Costs in North America**



**Figure 8.**

**Reference Prices – Fiber Costs in North America**



**Figure 9.**

85. Demand for corrugated boxes increased slightly from 2019 to 2020, and from 2020 to 2021, before dropping 3.8% from 2021 to 2022, falling another 5% between 2022 and 2023, and remaining stable in 2024. As shown below, the demand for cardboard boxes in 2023 and 2024

24

was below that of 2019.



**Figure 10.**

86.    Between 2019 and 2021, total U.S. corrugated box shipments increased by a mere 6%, while prices for linerboard and corrugating medium increased by a staggering 15 and 20%, respectively, as shown in the chart below. Despite a decrease in demand in 2023-2024, prices remained elevated far above 2019-2020 levels.



**Figure 11.**

25

87.    In its 2022 10-K, Cascades falsely claimed that its price increases were due to "demand dynamics, as a result of the COVID-19 pandemic," when in fact, the price increases were due to Defendants' unlawful conspiracy.

88.    Cascades' 2021 and 2024 10-Ks further show that Containerboard Products prices remained inflated above 2019 levels despite a drop in demand in 2023 to below 2019 levels, which remained flat into 2024.



**Figure 12.**

89.    Likewise, throughout the Relevant Period, the containerboard industry had a high capacity utilization rate, ranging from a low of 87% in 2023 to a high of 95% in 2021.



**Figure 13.**

26

90.    Despite this high capacity utilization, Defendants closed Containerboard Products manufacturing facilities during the Relevant Period.

### 4.    Defendants' Coordinated Parallel Price Increases Substantially Boosted Their Revenue and Profitability During the Class Period

91.    Throughout the Class Period, Defendants reaped the benefits of high profits, proving that their price increases were not the result of any passed on increased input costs.

92.    For example, International Paper's 2024 Annual Report explained that its North American Packaging Solutions' segment had flat sales from 2023 to 2024, $14.293 billion in both years, yet boosted its profit from $839 million to $891 million. It explained that its "[s]ales volumes decreased in 2024 compared with 2023 for corrugated boxes reflecting the impact of our box go-to-market strategy" referring to its "value over volume" pricing strategy.

93.    Both International Paper and PCA's stock price vastly exceeded the S&P 500 index in 2024 as shown in the chart below:



**Figure 14.**

27

**D. Additional Plus Factors Corroborate Defendants' Conspiracy to Fix Containerboard Product Prices**

94.    Plus factors are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action," and support an inference of a conspiracy. William E. Kovacic, *Plus Factors and Agreement in Antitrust Law*, 110 MICH. L. REV. 393, 393 (2011). Indeed, "[d]etecting a cartel is much like diagnosing whether a disease is present. The plus factors are symptoms that can make the diagnosis more reliable." *Id.* at 426.

95.    Defendants' unlawful agreement to fix, raise, maintain and/or stabilize prices of Containerboard Products is supported by the following plus factors: (i) a consolidated industry; (ii) that Defendants are recidivist antitrust violators; (iii) each Defendant acting against its unilateral self-interest; (iv) Defendants' opportunities to conspire; (v) a market characterized by high barriers to entry; (vi) price inelasticity; and (vii) that Containerboard Products are interchangeable products.

96.    In fact, academics have long recognized that the Containerboard Products industry is susceptible to collusion. Economists Haizheng Li and Jifeng Luo ("Li and Luo") from the Georgia Institute of Technology concluded in a 2008 paper, *Industry consolidation and price in the US linerboard industry*, 14 J. of Forest Econ. 93, 98 (2008) that:

> The linerboard industry is very capital intensive and thus entry is restricted because of the large amount of capital and the long-term nature of investment…Firms may have similar cost curves if the equipment used is similar. Additionally, the demand for containerboard is relatively inelastic because of no major substitutes. Therefore, the US linerboard industry may have a certain degree of oligopolistic structure such that leading producers can exercise some pricing power, for example, through either barometric price leadership or collusive price leadership.

**1. The Containerboard Products Industry is Consolidated**

97.    The Containerboard Products industry has historically been considered

28

concentrated, and this trend has only continued since the 1900s. In the mid-1990s, five firms controlled approximately 42% of the market. Ten firms controlled 66% of the market.

98.     Beginning in 1999, the next decade saw a series of mergers and acquisition within the industry exacerbated this concentration. By 2009, the composition of the industry market share went from 42% concentrated among the top five companies, to 74% of market share concentrated among the top five companies: International Paper, Smurfit-Stone, Temple-Inland, Georgia-Pacific, and PCA.

99.     PCA acquired Pactiv Corporations (f/k/a Tenneco Packaging); Midland Container Corp., and Acorn Corrugated Box Co.

100.     Temple-Inland (later acquired by International Paper in 2012) acquired corrugated packaging operations of Chesapeake Corporation, Elgin Corrugated Box Company, ComPro Packaging LLC, Gaylord Container Corporation, and acquired a 50% interest in PBL, a joint venture manufacturing containerboard.

101.     Georgia-Pacific bought the assets of Temple-Inland's corrugated box plants in 2005. Georgia-Pacific also acquired Smurfit-Stone's Brewton, Alabama linerboard mill, and was later purchased by Koch Industries in 2005.

102.     International Paper acquired Box USA, as well as Weyerhauser's Packaging Business which held 7% market share in 1999.

103.     Smurfit-Stone (later merged with WestRock) acquired Stevenson Mill containerboard mill and related corrugated container assets, and control of Smurfit-MBI (15 corrugated container plants in Canada), and later Jefferson Smurfit Group merged with Kappa Packaging. Smurfit-Stone also acquired Calpine Corrugated LLC.

104.     In the sixteen years between 2009 and 2025, the mergers and acquisitions continued

to further concentrate the industry.

105.     In 2011, RockTenn Co. purchased Smurfit-Stone Container Corp., making it the second largest containerboard producer in North America. In 2015, RockTenn merged with MeadWestvaco creating WestRock, a $16 billion company, the second largest in the industry at the time, just behind International Paper whose market capitalization was $23 billion.

106.     In 2011, International Paper acquired Temple-Inland, who held 29% market share and 10% market share in 2009, respectively.

107.     WestRock then acquired KapStone paper and Packaging Corporation in 2018, integrating the corrugated businesses, and strengthening WestRock's position on the West Coast.

108.     In 2024, after beginning discussions in 2019, WestRock and Smurfit Kappa merged to form Smurfit Westrock.

109.     In 2024, International Paper also agreed to acquire DS Smith, a London-based containerboard company with approximately 13% of its containerboard capacity in North America.

110.     On July 1, 2025, PCA announced an agreement to purchase Greif, Inc.'s containerboard business for $1.8 billion in cash, which will further consolidate the industry.

111.     International Paper has an estimated market share of 30% in North American containerboard. Smurfit Westrock's estimated market share in North American Containerboard Products is 20%. PCA has an estimated market share of 10% (before its acquisition of Greif).

### 2.  Defendants are Recidivist Antitrust Violators

112.     The Containerboard Products industry has a notorious history of antitrust violations in the United States and elsewhere spanning 85 years.

113.     On April 23, 1940, a consent decree was entered in *U.S. v. National Container Association, et al.*, No. 8-318 (S.D.N.Y.) that enjoined Defendant Containerboard Products

manufacturers from "agreeing, combining, or conspiring among themselves or with any other manufacturer of corrugated or solid fibre shipping containers" and prohibited joint agreements to limit production or fix prices for such containers.

114.    Nearly thirty years later, in *U.S. v. Container Corp. of America*, 393 U.S. 333 (1969) the Supreme Court held that defendant manufacturers of corrugated containers violated Section 1 of the Sherman Act after being charged with conspiring to restrain price competition in sale of corrugated containers in the Southeastern United States from January 1, 1955 to October 14, 1963.

115.    In that same time period, International Paper, PCA, and Georgia-Pacific were Defendants in an alleged nationwide class action price-fixing conspiracy among manufacturers of folding cartons from 1960 to 1974. *See In re Folding Carton Antitrust Litig*., 75 F.R.D. 727 (N.D. Ill. 1977), 557 F. Supp. 1091, 1093 (N.D. Ill. 1983), and 687 F. Supp. 1223 (N.D. Ill. 1988). Prior to trial, the class settled for approximately $200 million.

116.    In 1978, a federal grand jury in the Southern District of Texas indicted 14 companies and 26 individuals, including International Paper, Weyerhaeuser Corporation, and Stone Container Corporation (a predecessor to Smurfit Westrock) for participating in a conspiracy east of the Rocky Mountains to fix prices of corrugated containers and sheets. *See United States v. International Paper Co.*, No. H-78-11 and *United States v. Boise Cascade Corp*., No. H-78-12. International Paper, Weyerhaeuser Corporation, and Stone Container Corporation and almost all of the other defendants pleaded nolo contendere; those that did not were acquitted at trial.

117.    PCA, International Paper, Stone Container Corporation, and Georgia-Pacific were also involved in a price fixing cartel relating to corrugated containers and corrugated cardboard sheets from 1964-1975. Those firms that did not settle went to trial and most settled before a verdict

was rendered; the sole defendant remaining at the time of the verdict was found liable for participating in a price fixing conspiracy over corrugated containers and corrugated sheets from 1964-1975. *See In re Corrugated Container Antitrust Litig.*, 556 F. Supp. 1117, 1125 (S.D. Tex. 1982).

118.     In 1998, Stone Container Corp. (a predecessor of Smurfit Westrock) entered into a consent agreement with the Federal Trade Commission ("FTC") in which it pledged to refrain from "[e]ntering into, attempting to enter into, adhering to, or maintaining any combination, conspiracy, agreement, understanding, plan or program with any manufacturer or seller of linerboard to fix, raise, establish, maintain or stabilize prices or price levels, or engage in any other pricing action with regard to sales of linerboard to third parties." *See In the Matter of Stone Container Corp.*, 125 F.T.C. 853, 856 (1998).

119.     Smurfit-Stone (a predecessor to Smurfit-Westrock), International Paper, Georgia-Pacific, and PCA participated in a price-fixing cartel of containerboard from 1993-1995. *See In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. 2002). As part of the conspiracy, these firms increased the "downtime" of linerboard machines, reducing production and inventory. At the same time, they purchased substantial amounts of containerboard from one another, protecting market shares, causing an artificial shortage and an increase in the price of linerboard. At the peak of the cartel's efficacy in 1995, the price of linerboard peaked at $530/ton. The class action claims were settled in 2003 for over $200 million.

120.     Additionally, a class action antitrust case in this district, *Kleen Prods. LLC v. Packaging Corp. of America*, No. 10-cv-05711 (N.D. Ill.) alleged that Defendants PCA, International Paper, Cascades, Georgia-Pacific, and Smurfit-Stone, and others colluded to fix prices of containerboard products through coordinated capacity restraints (output restrictions) and

price increases. International Paper settled claims against it for $354 million.

121.    In 2019, containerboard companies including Smurfit Kappa Italia S.p.A.,
International Paper Italia S.r.l., and DS Smith's Italian subsidiary were fined 287 million euros for
antitrust violations by the Italian Competition Authority ("ICA"). The ICA found two agreements.
The first was a "single, complex and continuous agreement between 2005 and 2017, to share the
market and jointly define sales prices and other commercial parameters, such as payment terms"
that involved Smurfit Kappa, DS Smith and others.  The second was a "a single, complex and
continous [sic] agreement between 2005 and 2017, to share the market and jointly define sales
prices and other commercial parameters, such as payment terms" that involved Smurfit Kappa, DS
Smith, International Paper and others. DS Smith, which was acquired by International Paper in
2025, was a leniency applicant and avoided a fine.  Smurfit Kappa was fined 124 million euros
and International Paper was fined 29 million euros. Both fines were slightly reduced on appeal and
are pending further appeal.

### 3.    Defendants' Parallel Price Increases During the Class Period Are Against Their Unilateral Self-Interest

122.    Defendants' parallel price increases during the Class Period serve as a textbook
example of behavior contrary to their individual self-interest.

123.    Defendants' Containerboard Products pricing diverged from that which would be
expected in a competitive market.

124.    Defendants' price increases were inconsistent with their respective unilateral self-
interest. As outlined below, Containerboard Products are commodity-like in nature, characterized
by limited product differentiation and high price sensitivity. In a competitive market absent
coordination or legitimate factors supporting a price increase, a manufacturer that substantially
raised its prices would not expect rivals to follow suit. Instead, those competitors would be

incentivized to undercut the price and capture that manufacturer's customers. In other words, it would be economically irrational for any individual manufacturer to significantly increase its prices for Containerboard Products without assurance that other manufacturers would do the same—implying agreement or concerted conduct.

125.     Moreover, Defendants' decision to reduce output capacity while operating at elevated capacity utilization rates—typically between 85% and 95%—defies economic logic. Under normal market conditions, such high utilization levels indicate sufficient demand and efficient production. A unilateral decision to cut output under these circumstances would generally be against a firm's unilateral self-interest, as it entails forfeiting revenue and market share while fixed costs remain unchanged. This dynamic is especially pronounced in the Containerboard Products industry, where production assets are highly capital-intensive and demand exhibits limited elasticity. Defendants' parallel actions—curtailing capacity and embracing a "value over volume" strategy, particularly when implemented alongside price increases—cannot be reasonably attributed to independent decision-making. Instead, such synchronized conduct suggests coordination inconsistent with competitive behavior.

### 4.     Defendants Have Numerous Opportunities to Collude

126.     Courts have found that industries in which competitors participate in trade associations, joint ventures, and frequently communicate with each other are susceptible to collusion because these contacts provide forums for the conspirators to exchange sensitive information such as pricing and outputs.  Defendants are members of multiple trade organizations in the Containerboard Products market.

127.     At least throughout the Class Period, Defendants had numerous opportunities to collude and fix the prices of Containerboard Products through industry association meetings,

events, and public communications.

128.    RISI, Inc., acquired by Fastmarkets in 2017, provides cross-commodity price reporting for a variety of markets. The Forest products sector includes reporting related to the containerboard market, as well as the related paper packaging, pulp, recovered paper markets. RISI holds several industry conferences, including the International Containerboard Conference, the Forest Products North America Conference (f/k/a RISI North America), the Asian Recycled Fiber and Containerboard Conference, and the International Woodfiber Resource and Trade Conference. In 2024, International Containerboard Conference and Forest Products North America Conference were held in tandem, with executives from Graphic Packaging, Smurfit Westrock, Cascades, and Greif attending both.

129.    The International Corrugated Case Association ("ICCA") is an industry group that facilitates the advancement of the corrugated packaging industry. Executives of Cascades, Georgia-Pacific, International Paper, PCA, Pratt, and Smurfit Westrock are all leadership members of ICCA. Members receive access to industry statistics, including information related to production and shipments reported quarterly by country/region.

130.    The World Containerboard Organisation ("WCO") in another industry group that is "a major source of information to containerboard manufacturers globally[.]" Members include Cascades, Georgia-Pacific, International Paper, PCA, Pratt, and Smurfit Westrock. Members have access to industry statistics, analyses, and market surveys on the development of shipments and consumption, production and capacity utilization. The WCO also serves to "coordinate[] the industry position" and "liase[] with national and international trade associations."

131.    ICCA and WCO co-sponsor the 2023 biennial Global Summit, held in Banff, Alberta, Canada, alongside the Fiber Box Association Annual Meeting. More recently, the ICCA

and WCO held the 2025 biennial Global Summit in Osaka, Japan.

132.    The Technical Association of the Pulp and Paper Industry ("TAPPI"), the "leading association for the worldwide pulp, paper, packaging, tissue and converting industries[,]" is another industry group with a Corrugated Packing division. The Corrugated Packaging Council currently includes: Keith Hamilton, President of Georgia-Pacific Corrugated; Ell Townsend, Senior Director Process Technology of PCA and past council chair; Bert Hurler, Manager Engineering and Capital Purchasing of International Paper; Michael D. Martin, VP Engineering Services at Smurfit Westrock; Josh Reich, Sales and Customer Service Manager at Greif; and Lena Decker, Sales Representative of PCA. TAPPI holds the CorrExpo and SuperCorrExpo (in conjunction with the Independent Packaging Association, "AICC"). CorrExpo "is all about connections[,]" "the ultimate platform for forging connections within the corrugated packaging industry[.]" SuperCorrExpo "is considered one of the most influential corrugated packaging-focused trade shows in the Western Hemisphere[.]"

133.    The Fibre Box Association ("FBA") is a Containerboard Products trade organization. Its eight-person Executive Committee includes Cathy Foley, Executive Vice President of Industry Relations and Supply Chain at Pratt; Tim Bergwall, Senior Vice President and Chief Commercial Officer at Greif; Don Sparaco, President of U.S. and Canada Corrugated Packaging at Smurfit Westrock; and Keith Townsend, International Paper's Vice President and General Manager of the North American Container East Area. Additionally, Bergwall is Chairman, while Foley, Townsend, Sparaco are members of FBA's Board of Directors. Also on the FBA Board of Directors are Ray Shirley, Vice President of Corporate Technology & Engineering at PCA, Bruce Frederick, Vice President of Commercial Excellence and Packaging at Georgia-Pacific. The FBA hosts industry events including an annual meeting attended by numerous

industry participants. In 2025, the FBA Annual Meeting was held at the Ritz-Carlton Vanderbilt Beach in Naples, Florida, and attended by executives from Pratt, Smurfit Westrock, International Paper, Georgia-Pacific, Cascades, and Greif. The FBA requires that its members adhere to Antitrust Guidelines that mandate that its members do not discuss prices, pricing, capacity or production levels. The FBA also collects and distributes data concerning its members shipments, consumption and inventory.

134.    The American Forest & Paper Association ("AFPA") is a trade organization representing forest and building product industries as well as pulp, paper and paperboard manufacturers. Its members include Defendants Greif, Graphic Packaging, International Paper, PCA, Pratt, and Smurfit Westrock. AFPA touts that its members make up approximately 87% of the pulp, paper, paper-based packaging and tissue products made in the U.S. The AFPA's Chair is Mark W. Kowlzan, Chairman and CEO of PCA, and its First Vice Chair is Mike Doss, President and CEO of Graphic Packaging. Its directors include Mike Doss, along with Christian Fischer, President and CEO of Georgia-Pacific; Brian McPheely, Global CEO of Pratt; Ole Rosgaard, President and CEO of Greif; Laurent Sellier, President and Chief Executive Officer North America of Smurfit Westrock; and Andy Silvernail, Chairman and CEO of International Paper. AFPA members have access to industry research, networking events, and legislative advocacy opportunities.

### 5.    The Containerboard Products Industry Has High Barriers to Entry

135.    Containerboard Products manufacturers face significant entry and exit barriers, a characteristic that leads to further market concentration. Christopher R. Leslie, *The Probative Synergy of Plus Factors in Price-Fixing Litigation*, 115 Nw. U. L. Rev. 1581, 1590 (2021).

136.    There are three significant barriers to entry to the Containerboard Products industry: (1) capital-intensive start-up costs; (2) access to a reliable supply of raw materials; and (3) high

transportation costs. The equipment used to manufacture Containerboard Products is both highly specialized and very expensive. The "linerboard industry is very capital intensive. . . entry is restricted because of the large amount of capital and the long-term nature of investment." Li & Luo, *supra*, at 98. Consequently, large capital investments prohibit new entrants.

137.     As to exit barriers, because a huge investment is required to set up a production facility with the specialized tools to manufacture Containerboard Products, it is extremely difficult to exit from the industry.  Thus, consolidation is more likely than companies going out of business.

138.     Because of these high barriers to entry and exit, the industry is more conducive to collusion.  To maximize long-term profits, the cartel-fixed price must be sufficiently high to warrant participation in a criminal conspiracy but not so high as to lure new competitors into the market.  When a market is protected by high barriers to entry and exit, conspirators are better able to fix a high price with less worry that new firms will come into the market and bid the price down. In contrast, firms may not bother to conspire to fix prices if new entrants cannot be excluded from the market.

### 6.     Containerboard Products Have Inelastic Demand

139.     The price elasticity of demand refers to the relationship between the price and demand for a good.  Where consumers will purchase as much as they need of a product regardless of price, demand is considered inelastic.  A market with inelastic demand is more susceptible to collusion and price-fixing because competitors can raise their prices without suffering a significant decrease in sales or profit.

140.     Containerboard Products are highly inelastic. Li and Luo estimated the price elasticity of demand for linerboard to be 0.18. This means that a one percent increase in linerboard price would result in just a 0.18% decrease in the quantity demanded. When elasticity is this low, concerted price increases are likely to be profitable and sustainable because purchasers will

continue to buy despite price increases. *See* N. Gregory Mankiw, *Principles of Economics* 94 (5th ed. 2009).

141.     Furthermore, there is no cross-elasticity of demand as no reasonable substitutes for Containerboard Products exist.  Consequently, buyers will not be induced to buy more or fewer Containerboard Products through price changes.  Because the price for Containerboard Products is highly inelastic, Defendants were able to collectively raise prices to supracompetitive levels without losing revenue.

### 7.     Defendants' Containerboard Products Have a High Degree of Interchangeability

142.     In the U.S., Containerboard Products are essentially commodity items. Containerboard Products are commodity-like products. Containerboard sheets and linerboard sheets from one manufacturer are interchangeable with another manufacturer's containerboard or linerboard sheets. Likewise, finished boxes come in standard sizes and are interchangeable with each other.

143.     When products are interchangeable, the primary way manufacturers compete is on price.  The avoidance of price-based competition is the primary motivation for forming a cartel. Thus, cartels are more likely when the participants sell interchangeable products.  Where a product, like Containerboard Products, is interchangeable, economics suggests that cartel behavior is facilitated because, amongst other things, cartel members can more easily monitor and detect defections from a price-fixing agreement. *See* Leslie, *supra*, at 1592 ("[A] standardized product facilitates price fixing by making coordination more straightforward and enabling price fixers to more easily detect cheating on the cartel agreement.").

### TOLLING OF THE STATUTE OF LIMITATIONS

144.     The applicable statutes of limitation have been tolled as a result of Defendants'

knowing and active concealment and denial of the facts alleged herein.

145.    Moreover, Defendants' secret price-fixing agreements were inherently self-concealing.  Defendants also engaged in affirmative acts designed to mislead and conceal their illegal conduct and made pretextual statements as to the reasons for their price increases.

146.    For example, in its 2022 10-K, Cascades falsely claimed that its price increases were due to "demand dynamics, as a result of the COVID-19 pandemic," when in fact, the price increases were due to Defendants' unlawful conspiracy.

## ANTICOMPETITIVE EFFECTS

147.    Defendants' anticompetitive conduct had the following effects, among others: (a) competition among the Defendants has been restrained with respect to Containerboard Products; (b) the price of Containerboard Products has been fixed, stabilized, or maintained at artificially high levels; and (c) purchasers of Containerboard Products, including Plaintiff and the Class, have been deprived of the benefit of free and open competition.

148.    Defendants' violations of the antitrust laws have caused Plaintiff and the Class to pay higher prices for Containerboard Products than they would have in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, Plaintiff and members of the Class have suffered damages in the form of paying supracompetitive prices for Containerboard Products in the United States.  This is an injury of the type that the antitrust laws were meant to punish and prevent.  Defendants' price fixing conspiracy is per se unlawful.

## CLASS ACTION ALLEGATIONS

149.    Plaintiff brings this lawsuit under Fed. R. Civ. P. 23(a), (b)(2) and (b)(3) as representatives of the following class (the "Class"):

> All persons who purchased Containerboard Products directly from one or more Defendants within the United States and its territories from November 1, 2020 until the present ("Class Period").

150. Excluded from the Class are (1) any Judge or Magistrate presiding over this action and any members of their immediate families; (2) all jurors assigned to this case; (3) Defendants, Defendants' subsidiaries, affiliates, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest, and their current or former employees, officers, and directors; and (4) Plaintiff's counsel and Defendants' counsel.

151. Plaintiff reserves the right to modify, change, or expand the Class definition based upon discovery and further investigation.

152. **Numerosity:** The Class consists of at least hundreds of thousands of individuals, making joinder impractical.

153. **Commonality and Predominance:** Common questions of law and fact exist with respect to each of the claims and predominate over questions affecting only individual Class members. Questions common to the Class include, but are not limited to:

    a. Whether Defendants combined and/or conspired to fix, raise, maintain, and/or stabilize prices of Containerboard Products at any time during the Class Period;

    b. Whether Defendants fixed, raised, maintained and/or stabilized prices of Containerboard Products sold to purchasers in the United States at any time during the Class Period, or committed other conduct in furtherance of the conspiracy alleged herein;

    c. Whether Defendants engaged in conduct that violated Sections 1 and 3 of the Sherman Act;

    d. Whether Defendants fraudulently concealed their conduct from purchasers of Containerboard Products in the United States;

    e. Whether Defendants' conduct caused the prices of Containerboard Products sold

directly to Plaintiff and other members of the Class to be higher than the prices that would have prevailed in a competitive market as a result of their restraint of trade;

    f.   Whether Plaintiff and other members of the Class were injured by Defendants' conduct and, if so, the determination of the appropriate Class wide measure of damages; and

    g.   Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief.

154.    **Typicality**: Plaintiff's claims are typical of the claims of Class members in that Plaintiff, like all Class members, has been injured by Defendants' misconduct—contracting, combining, or conspiring to fix, maintain, or raise the prices of Containerboard Products.

155.    **Adequacy of Representation:** Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions, including antitrust class actions. Plaintiff does not have any interests antagonistic to those of the Class.

156.    **Superiority:** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class-wide damages are essential to induce Defendants to comply with federal and state law. Moreover, because the amount of each individual Class member's claim is small relative to the complexity of the litigation, and because of Defendants' financial resources, Class members are unlikely to pursue legal redress individually for the violations detailed in this complaint. A class action will allow these claims to be heard where they would otherwise go unheard because of the expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

157.    **Injunctive relief:** Defendants have acted or refused to act on grounds generally

applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the class as a whole.

## CLAIM FOR RELIEF

### Violation of the Sherman Act, 15 U.S.C. §§ 1, 3
### (Against All Defendants)

158.    Plaintiff hereby repeats and incorporates by reference each preceding paragraph as though fully set forth herein.

159.    Defendants entered into and engaged in a continuing combination, contract, or conspiracy in restraint of trade or commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) by artificially raising, fixing, maintaining, or stabilizing the price of Containerboard Products sold within the United States.

160.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, or maintain the prices of Containerboard Products at artificially high levels.

161.    Defendants' activities constitute a *per se* violation of Sections 1 and 3 of the Sherman Act.

162.    Defendants' anticompetitive and unlawful conduct has proximately caused injury to Plaintiff and members of the Class by restraining competition and thereby raising, maintaining, and/or stabilizing the price of Containerboard Products at levels above the prices that would have prevailed in a competitive market.

163.    For this conduct, Plaintiff and members of the Class are entitled to treble damages, injunctive relief, and attorneys' fees and costs pursuant to Section 4 and 16 of the Clayton Act, 15 U.S. Code §§ 15 & 26.

## REQUEST FOR RELIEF

Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court:

A.      Certify this case as a class action, and appoint Plaintiff as Class representative and the undersigned attorneys as Class Counsel;

B.      Enter judgment in favor of Plaintiff and the Class;

C.      Award all damages to which Plaintiff and Class members are entitled, including treble damages under the Clayton Act;

D.      Award Plaintiff and Class members pre- and post-judgment interest as provided by law;

E.      Enter injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff and Class members, including enjoining and restraining Defendants, their affiliates, successors, transferees, assignees, and other offices, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F.      Award Plaintiff and Class members reasonable litigation expenses and attorneys' fees as permitted by law; and

G.      Award such other and further relief as the Court deems necessary and appropriate.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all issues triable as of right.

Date: July 29, 2025

Respectfully submitted,

/s/ Gary D. McCallister
Gary D. McCallister ARDC No. 6219649
McCallister Law Group, LLC
777 North Michigan Avenue
#3502
Chicago, Illinois 60611
Phone: 312-345-0611
Fax: 312-345-0612
gdm@mccallisterlawgroup.com

/s/ Eric I. Unrein  ARDC No. 6239373
Cavanaugh, Biggs & Lemon, PA
3200 SW Huntoon Street
Topeka, Kansas 66604
Phone: 785-440-4000
Fax: 785-440-3900
eunrein@cavlem.com

/s/ Vincent Briganti
Vincent Briganti (*pro hac vice* forthcoming)
Margaret MacLean (*pro hac vice* forthcoming)
Raymond Girnys (*pro hac vice* forthcoming)
Nicole A. Veno (*pro hac vice* forthcoming)
Katherine Boyd (*pro hac vice* forthcoming)
Xin Huang (*pro hac vice* forthcoming)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Phone: (914) 997-0500
Fax: (914) 997-0035
vbriganti@lowey.com
mmaclean@lowey.com
rgirnys@lowey.com
nveno@lowey.com
kboyd@lowey.com
xhuang@lowey.com

45

/s/ *Christopher M. Burke*
Christopher M. Burke (*pro hac vice*
forthcoming)
Yifan (Kate) Lv (*pro hac vice* forthcoming)
**BURKE LLP**
402 West Broadway, Suite 1890
San Diego, CA 92101
Phone: (619) 369-8244
cburke@burke.law
klv@burke.law