## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| ARTUSO PASTRY FOODS CORP., individually and on behalf of all others similarly situated, | Case No. 1:25-cv-08856 |
| Plaintiff, |  |
| v. | Hon. Mary M. Rowland |
| PACKAGING CORPORATION OF AMERICA, INTERNATIONAL PAPER COMPANY, SMURFIT KAPPA NORTH AMERICA LLC, WESTROCK CP, LLC, GEORGIA-PACIFIC LLC, CASCADES INC., CASCADES USA INC., CASCADES HOLDING US, INC., PRATT INDUSTRIES, INC., AND GREIF INC. |  |
| Defendants. |  |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
## <u>DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM</u>

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.    FACTUAL BACKGROUND.................................................................................3

    A.  The Containerboard Products Industry ..........................................................3
    B.  Defendants' Coordinated Price Increases .......................................................4
    C.  Defendants' Capacity Restrictions..................................................................6
    D.  Defendants' "Value Over Volume" Strategy..................................................7
    E.  Prior Industry Collusion .................................................................................8

III.   LEGAL STANDARD.......................................................................................... 10

IV.   ARGUMENT .......................................................................................................11

    A.  Plaintiff Plausibly Alleges an Agreement .....................................................11

        1.  Plaintiff Sufficiently Pleads Parallel Conduct ...............................................11

            i.  Defendants repeatedly implemented price increases in a lockstep manner........... 12
            ii.  Multiple Defendants also engaged in parallel capacity reduction. ........................ 20
            iii.  Defendants' parallel price increases are not independent economic actions......... 22

        2.  Defendants' Alternative Explanation for Their Parallel Price Increases May Not Be Credited and Is Refuted by the Complaint...................................................24

    B.  Plus Factors Further Support the Existence of a Conspiracy...........................26

        1.  Actions Against Self-Interest ....................................................................26

        2.  Trade Associations ....................................................................................29

        3.  Market Characteristics ..............................................................................31

        4.  Prior Antitrust Violations...........................................................................33

    C.  Defendants May Not Rely on Documents Outside the Complaint ...................34

        1.  The Extrinsic Materials are not Incorporated by Reference ...........................34
        2.  Judicial Notice Does Not Permit the Extrinsic Materials For Their Truth or to Draw Inferences Against Plaintiff ....................................................................36

    D.  Plaintiff's Claim Is Timely ..........................................................................38

V.    CONCLUSION................................................................................................... 40

i

**TABLE OF AUTHORITIES**

**Cases**

*188 LLC v. Trinity Indus., Inc.*,
   300 F.3d 730 (7th Cir. 2002) ................................................................... 36

*Abbott Lab. v. Adelphia Supply USA*,
   No. 15-cv-5826, 2017 WL 5992355 (E.D.N.Y. Aug. 10, 2017) ............................. 29

*ABN AMRO, Inc. v. Cap. Int'l Ltd.*,
   No. 04 C 3123, 2007 WL 845046 (N.D. Ill. Mar. 16, 2007) ........................ 34, 35, 38

*Baker v. F&F Inv.*,
   420 F.2d 1191 (7th Cir. 1970) ................................................................. 39

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................ 10, 11

*In re Blood Reagents Antitrust Litig.*,
   266 F. Supp.3d 750 (E.D. Pa. 2017) ........................................................... 17

*In re Blood Reagents Antitrust Litig.*,
   756 F. Supp.2d 623 (E.D. Pa. 2010) ........................................................... 17

*Burtch v. Milberg Factors, Inc.*,
   662 F.3d 212 (3d Cir. 2011) ................................................................... 17

*Carlson v. CSX Transp., Inc.*,
   758 F.3d 819 (7th Cir. 2014) ................................................................. 23

*Catalano, Inc. v. Target Sales, Inc.*,
   446 U.S. 643 (1980) ........................................................................... 20

*City of Moundridge v. Exxon Mobil Corp.*,
   No. CIV.A. 04-940, 2009 WL 5385975 (D.D.C. Sept. 30, 2009) ........................... 17

*City of Rockford v. Mallinckrodt ARD, Inc.*,
   360 F. Supp.3d 730 (N.D. Ill. 2019) ........................................................... 10

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962) ........................................................................... 11

*Craftsmen Limousine, Inc. v. Ford Motor Co.*,
   363 F.3d 761 (8th Cir. 2004) ................................................................. 11

*Deere & Co. Repair Serv. Antitrust Litig.,*
    703 F. Supp. 3d 862 (N.D. Ill. 2023) ............................................................ 26, 27

*Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.,*
    85 F. Supp.3d 1007 (E.D. Wis. 2015) ............................................................ 39, 40

*Forgue v. City of Chicago,*
    873 F.3d 962 (7th Cir. 2017) ............................................................ 10

*Fortres Grand Corp. v. Warner Bros. Ent. Inc.,*
    947 F. Supp.2d 922 (N.D. Ind. 2013) ............................................................ 36

*Gen. Elec. Capital Corp. v. Lease Resolution Corp.,*
    128 F.3d 1074 (7th Cir. 1997) ............................................................ 36

*Hennessy v. Penril Datacomm Networks, Inc.,*
    69 F.3d 1344 (7th Cir. 1995) ............................................................ 36

*In re Auto. Parts Antitrust Litig.,*
    No. 12-md-02311, 2014 WL 4209588 (E.D. Mich. Aug. 26, 2014) ............................ 34

*In re Auto. Parts Antitrust Litig.,*
    No. 12-md-02311, 2018 WL 1138422 (E.D. Mich. Jan. 16, 2018) ............................ 19

*In re Baby Food Antitrust Litig.,*
    166 F.3d 112 (3d Cir. 1999) ............................................................ 17, 18

*In re Broiler Chicken Antitrust Litig.,*
    290 F. Supp.3d 772 (N.D. Ill. 2017) ............................................................ passim

*In re Concrete & Cement Additives Antitrust Litig.,*
    No. 24-MD-3097 (LJL), 2025 WL 1755193 (S.D.N.Y. June 25, 2025) ............................ 16

*In re Copper Antitrust Litig.,*
    436 F.3d 782 (7th Cir. 2006) ............................................................ 39, 40

*In re Corrugated Container Antitrust Litig.,*
    556 F. Supp. 1117 (S.D. Tex. 1982) ............................................................ 8

*In re Currency Conversion Fee Antitrust Litig.,*
    264 F.R.D. (S.D.N.Y. 2010) ............................................................ 21

*In re Dealer Mgmt. Sys. Antitrust Litig.,*
    313 F. Supp.3d 931 (N.D. Ill. 2018) ............................................................ 10

iii

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
  360 F. Supp. 3d 788 (N.D. Ill. 2019) ................................................................. 23

*In re Delta/Airtran Baggage Fee Antitrust Litig.*,
  733 F. Supp.2d 1348 (N.D. Ga. 2010) ................................................................ 22

*In re Disposable Contact Lens Antitrust*,
  215 F. Supp. 3d 1272 (M.D. Fla. 2016) ............................................................. 27

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*,
  28 F.4th 42 (9th Cir. 2022) ................................................................................. 27

*In Re European Gov't. Bonds Antitrust Litig.*,
  No. 19 Civ. 2601(VM), 2020 WL 4273811 (S.D.N.Y. July 23, 2020) ................... 15

*In re Fasteners Antitrust Litig.*,
  No. 08-md-1912, 2011 WL 3563989 (E.D. Pa. Aug. 12, 2011) ............................ 19

*In re Florida Cement & Concrete Antitrust Litig.*,
  746 F. Supp. 2d 1291 ........................................................................................... 17

*In re Folding Carton Antitrust Litig.*,
  75 F.R.D. 727 (N.D. Ill. 1977) .............................................................................. 8

*In re Folding Carton Antitrust Litig.*,
  557 F. Supp. 1091 (N.D. Ill. 1983) ....................................................................... 8

*In re Folding Carton Antitrust Litig.*,
  687 F. Supp. 1223 (N.D. Ill. 1988) ....................................................................... 8

*In re Fragrance Direct Purchaser Antitrust Litig.*,
  No. 2:23-02174, 2025 WL 579639 (D.N.J. Feb. 21, 2025) ................................... 14

*In re Generic Pharms. Pricing Antitrust Litig.*,
  338 F. Supp. 3d 404 (E.D. Pa. 2018) ................................................................... 27

*In re High Fructose Corn Syrup Antitrust Litig.*,
  295 F.3d 651 (7th Cir. 2002) ......................................................................... 11, 33

*In re Linerboard Antitrust Litig.*,
  305 F.3d 145 (3d Cir. 2002) .................................................................................. 9

*In re Loc. TV Advert. Antitrust Litig.*,
  No. 18C6785, 2020 WL 6557665 (N.D. Ill. Nov. 6, 2020) ........................ 15, 29, 31

iv

*In Re Manufactured Home Lot Rents Antitrust Litig.*,
  No. 23-cv-06715, 2025 WL 3485693 (N.D. Ill. Dec. 4, 2025) .............................................. 23

*In re Passenger Vehicle Replacement Tires Antitrust Litig.*,
  767 F. Supp.3d 681 (N.D. Ohio 2025) ................................................................. 14, 29, 36

*In re Plasma–Derivative Protein Therapies Antitrust Litig.*,
  764 F. Supp.2d 991 (N.D. Ill. Feb. 9, 2011) ....................................................................... 22

*In re Polyurethane Foam Antitrust Litig.*,
  152 F. Supp.3d 968 (N.D. Ohio 2015) ................................................................................ 16

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  580 F. Supp.2d 896 (N.D. Cal. 2008) .................................................................................. 34

*In re Text Messaging Antitrust Litig.*,
  630 F.3d 622 (7th Cir. 2010) .................................................................................... passim

*In re Text Messaging Antitrust Litig.*,
  782 F.3d 867 (7th Cir. 2015) ............................................................................................... 28

*In re Text Messaging Antitrust Litig.*,
  No. 08-cv-7082, 2009 WL 5066652 (N.D. Ill. Dec. 10, 2009) ........................................... 18

*In re Turkey Antitrust Litig.*,
  642 F. Supp.3d 711 (N.D. Ill. 2022) ....................................................................... passim

*Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*,
  665 F.3d 930 (7th Cir. 2012) ............................................................................................... 38

*Kleen Prods. LLC v. Georgia-Pac. LLC*,
  910 F.3d 927 (7th Cir. 2018) .................................................................................. 22, 23, 31

*Kleen Products LLC v. International Paper*,
  276 F. Supp.3d 811 (N.D. Ill. 2017) ............................................................................ 20, 28

*Kleen Prods. LLC v. Packaging Corp. of America*,
  775 F. Supp.2d 1071 (N.D. Ill. 2011) ..................................................................... passim

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007) ............................................................................................................. 20

*Macias v. Bakersfield Rest., LLC*,
  54 F. Supp.3d 922 (N.D. Ill. 2014) ..................................................................................... 35

*Mays v. Dart*,
  974 F.3d 810 (7th Cir. 2020) ............................................................................................... 37

v

*McCabe v. Crawford & Co.*,
   210 F.R.D. 631 (N.D. Ill. 2002) ............................................................ 35

*Miami Prods. & Chem. Co. v. Olin Corp.*,
   449 F. Supp.3d 136 (W.D.N.Y. 2020) .................................................... 14

*Monsanto Co. v. Spray-Rite Service Corp.*,
   465 U.S. 752 (1984) ......................................................................... 11, 21

*MultiPlan Health Ins. Provider Litig.*,
   789 F. Supp.3d 614 (N.D. Ill. 2025) ......................................... 20, 26, 31

*Ninth Ave. Remedial Grp. v. Allis Chalmers Corp.*,
   974 F. Supp. 684 (N.D. Ind. 1997) ........................................................ 35

*Olson v. Bemis Co.*,
   800 F.3d 296 (7th Cir. 2015) ................................................................. 34

*Realtek Semiconductor Corp. v. MediaTek, Inc.*,
   769 F. Supp.3d 1067 (N.D. Cal. 2025) .................................................. 37

*Ross v. Am. Express Co.*,
   35 F. Supp.3d 407 (S.D.N.Y. 2014) ...................................................... 33

*Ross v. Citigroup, Inc.*,
   630 F. App'x 79 (2d Cir. 2015) .............................................................. 34

*Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*,
   971 F.2d 37 (7th Cir. 1992) .............................................................. 31, 32

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
   801 F.3d 412 (4th Cir. 2015) ............................................................ 16, 21

*Starr v. Sony BMG Music Ent.*,
   592 F.3d 314 (2d Cir. 2010) .................................................................. 32

*Superior Beverage Co. v. Owens-Illinois, Inc.*,
   No. 83C0512, 1988 WL 99216 (N.D. Ill. Sept. 22, 1988) ..................... 39

*Swanson v. Citibank, N.A.*,
   614 F.3d 400 (7th Cir. 2010) ............................................................ 10, 24

*Tichy v. Hyatt Hotels Corp.*,
   376 F. Supp.3d 821 (N.D. Ill. 2019) ...................................................... 36

*Tierney v. Vahle*,
304 F.3d 734 (7th Cir. 2002) .................................................................................. 35

*U.S. Bd. of Oral Implantology v. Am Bd. of Dental Specialties*,
390 F. Supp.3d 892 (N.D. Ill. 2019) ...................................................................... 26

*U.S. Football League v. Nat'l Football League*,
842 F.2d 1335 (2d Cir. 1988) ................................................................................. 33

*United States v. Serta Assocs.*,
296 F. Supp. 1121 (N.D. Ill. 1968) ........................................................................ 18

*Vasquez v. Indiana Univ. Health, Inc.*,
40 F.4th 582 (7th Cir. 2022) ................................................................................... 38

*Washington Cty. Health Care Auth. v. Baxter Int'l Inc.*,
328 F. Supp.3d 824 (N.D. Ill. 2018) ...................................................................... 31

*Westinghouse Electric Corp. v. Gulf Oil Corp.*,
588 F.2d 221 (7th Cir. 1978) .................................................................................. 20

## Rules

Fed. R. Civ. P. 8(a)(2) ..................................................................................................... 10

Fed. R. Evid. 201(b) ................................................................................................. 36, 37

## Other Authorities

*Behavioral Economists at the Gate: Antitrust in the Twenty-First Century*,
38 Loy. U. Chi. L.J. 513 (2007) ............................................................................. 34

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 2111d1 ................................................................................. 21

## I.     INTRODUCTION

This is a straightforward antitrust case about a conspiracy to raise prices of Containerboard Products[1] in the United States. Defendants, who collectively control more than 85% of the domestic market, engaged in a coordinated price fixing scheme from November 1, 2020 to the present (the "Relevant Period"). Defendants implemented at least seven parallel price increases during the Relevant Period. Additionally, certain Defendants also reduced output and adopted a "value over volume" strategy in furtherance of the conspiracy. Through their conspiracy, Defendants successfully raised prices of Containerboard Products by over 30% during the Relevant Period and sold millions of units of their price-fixed products every day. As a result, Plaintiff, and others who purchased from Defendants, overpaid for Containerboard Products.

This Court must determine whether Plaintiff plausibly alleges that these price increases were the result of a conspiracy, rather than a result of natural market forces. Plaintiff more than plausibly alleges that Defendants participated in an unlawful conspiracy, for at least the following reasons:

*First,* Plaintiff plausibly alleges parallel conduct. The high degree of coordination of Defendants' price increases, at times announcing the *exact same* dollar amount increase on linerboard or corrugating medium on the *exact same* day, supports the existence of a conspiracy. Indeed, there is no plausible explanation *other* than price-fixing for such perfectly coordinated action.

*Second,* adding fuel to the anticompetitive fire, Defendants International Paper, Greif and WestRock *also* engaged in parallel output restrictions by closing containerboard manufacturing

---

[1] "Containerboard Products" are containerboard, linerboard, and finished packaging products made therefrom.

1

facilities despite high capacity utilization, and each expressly adopted a self-described "value over volume" strategy. These coordinated output restraints not only constitute their own independent *per se* violations of Section 1 of the Sherman Act but also heightened the impact of Defendants' coordinated price increases. Further, Defendants' output restrictions are actions against self-interest supporting the plausibility of Plaintiff's price-fixing allegations.

*Third,* multiple additional plus factors support Plaintiff's allegations of conspiracy. The Containerboard Products industry is highly concentrated and has a long history of antitrust violations. Containerboard Products are highly fungible and price inelastic. Moreover, industry conferences and trade associations provided Defendants with ample opportunities to conspire and share non-public information with one another.

In sum, this is a classic case of price-fixing pled through compelling circumstantial evidence. Circumstantial evidence is "the lifeblood of antitrust law since direct evidence is rarely available to prove the existence of a conspiracy to fix prices." *In re Turkey Antitrust Litig.*, 642 F. Supp.3d 711, 722 (N.D. Ill. 2022) (quotation omitted). Faced with these facts, Defendants are left to rely on inapposite caselaw from the summary judgment stage to prop up their beleaguered arguments and cast blame on a red herring—"economic distortions" from COVID-19. At the pleading stage, courts do not weigh competing explanations, and Plaintiff needs only to allege a plausible conspiracy. Defendants' cost-based rationale fails because raw material prices declined while profits and stock performance rose, undermining any claim that rising costs drove higher prices. Their demand-based defense is equally unconvincing: corrugated box shipments increased only 6% between 2019 and 2021, before falling, a pattern inconsistent with sustained and significant price hikes. Most tellingly, rather than expanding output to meet alleged continuing relative high demand, certain Defendants restricted capacity in parallel—behavior that directly

2

contradicts their own justification and strongly supports the plausibility of a conspiracy. As set forth herein, Plaintiff plausibly alleges that Defendants violated Section 1 of the Sherman Act. Defendants' motions should be denied.

## II.    FACTUAL BACKGROUND

### A.  The Containerboard Products Industry

Containerboard is the principal material used to make corrugated products, such as cardboard boxes and product displays. ¶[2]38.  Containerboard is comprised of corrugating medium and linerboard. *Id.* Linerboard is the smooth outer layer of cardboard, and corrugating medium is the wavy inner layer.  ¶ 40-41.  Americans use tens of millions of Containerboard Products[3] each day, such as shipping boxes, food packaging, moving boxes, and more. ¶ 37.

Defendants are the largest manufacturers of Containerboard Products in the United States. As of 2022, Defendants International Paper, Westrock (predecessor to Smurfit Westrock), PCA, Georgia-Pacific and Pratt had a staggering combined 74% market share. ¶ 46. This share has increased to 85% or more as a result of the Smurfit Westrock[4] merger in 2024, International

---

[2] All citations to ¶ shall refer to Plaintiff's Class Action Complaint (ECF No. 1).

[3] "Containerboard Products" refers to linerboard, corrugating medium, and finished products made from linerboard and/or corrugating medium.

[4] Smurfit Westrock plc, the Irish parent company of WestRock CP, LLC, was voluntarily dismissed from this action without prejudice on October 17, 2025. See ECF No. 113. The Complaint alleges that Smurfit Westrock plc announced U.S. region-specific containerboard price increases in November 2024 ($70/ton in the Western U.S. and $50/ton in the Eastern U.S. for white-top linerboard). ¶ 61. The Complaint also alleges that Smurfit Westrock plc announced the closure of the St. Paul, Minnesota CRB mill and the shutdown of production at the Forney, Texas containerboard mill, reducing capacity by more than 500,000 tons. ¶ 67. Because these actions were directed at U.S. pricing and production, they necessarily were implemented through the company's U.S. sales and operating entities, including WestRock CP, LLC and Smurfit Kappa North America LLC. In addition, the U.S. entities participated in some of the same key industry associations and conferences alleged in the Complaint (e.g., the Fibre Box Association and the World Containerboard Organisation) that provided opportunities for coordination among containerboard competitors. Therefore, the Complaint's allegations concerning U.S. market pricing, capacity, and collusion apply equally to WestRock CP, LLC and Smurfit Kappa North America LLC,

3

Paper's acquisition of DS Smith in 2025 (¶ 47) and PCA's acquisition of Defendant Greif's containerboard business in 2025.[5] Defendants primarily sell containerboard and corrugating medium as finished products, such as cardboard boxes and merchandise displays, although containerboard, linerboard and corrugating medium are also sold in bulk rolls or sheets. ¶ 43.

### B. Defendants' Coordinated Price Increases

During the Relevant Period, Containerboard Products experienced unprecedented price increases. ¶¶ 51-54. Prices of solid fiber boxes increased 33%, and containerboard and linerboard experienced similar increases. ¶¶ 51-52. This rise was the direct result of Defendants' seven coordinated price increases and cannot be explained by market forces. Defendants do not even attempt to account for how, on multiple occasions, multiple Defendants announced the *exact same increase* on the *exact same day.*

*First Price Increase.* On September 25, 2020, International Paper announced a $50 increase on linerboard and corrugating medium. ¶ 55. The same day, PCA, Georgia-Pacific, Pratt, and Cascades announced an **identical** $50 increase. Just five days later, WestRock announced an identical increase. *Id.*

*Second Price Increase.* In early February 2021, PCA and Greif announced price increases of $70 per ton on corrugating medium and $60–$70 per ton on linerboard. ¶ 56. The following week, International Paper and Cascades issued near-identical price increases, with all four companies setting effective dates in early March 2021. *Id.*

*Third Price Increase.* In June 2021, WestRock announced a $50 per ton increase on all

---

notwithstanding Smurfit Westrock plc's dismissal.

[5] *See* Packaging Dive, *PCA completes $1.8B acquisition of Greif's containerboard business*, Sept. 2, 2025, https://www.packagingdive.com/news/packaging-corporation-america-completes-acquisition-greif-containerboard-business/758894/ (last visited 12/18/2025).

linerboard products and a $70 per ton increase on certain corrugating medium grades, effective mid-July. ¶ 57. Industry reports indicated that other major producers followed with an industry-wide increase of $50 on linerboard effective October 1, 2021. An industry publication reported that the ten months from November 2020 to August 2021 was "the fastest price run-up ever in US and North American industry." *Id.*

*Fourth Price Increase*. In late January 2022, the three largest containerboard producers in North America—International Paper, WestRock, and PCA—each announced $70 per ton price increases. ¶ 58. Cascades also raised prices, planning a $40 per ton increase on corrugating medium. *Id.* All increases took effect on March 1, 2022. *Id.*

*Fifth Price Increase.* In December 2023, Pratt, Cascades, WestRock, International Paper, and PCA simultaneously announced significant hikes on linerboard and corrugating medium. ¶ 59. Linerboard increases ranged from $70 to $75 per ton, while corrugating medium rose by $100 to $110 per ton. All companies set January 1, 2024, as the effective date. *Id.*

*Sixth Price Increase*. In May 2024, International Paper, WestRock, Georgia-Pacific, Cascades, and Pratt coordinated price increases for early June. ¶ 60. International Paper announced a $50 per ton increase on linerboard and an $80 per ton increase on corrugating medium, effective June 1. *Id.* WestRock, Georgia-Pacific, and Pratt each announced matching increases of $50 per ton on linerboard and $80 per ton on medium, also effective June 1. *Id.* Cascades announced slightly higher increases—$60 per ton for linerboard and $80 per ton for medium—effective June 3. *Id.*

*Seventh Price Increase.* Between November 20 and December 5, 2024, PCA, International Paper, Georgia-Pacific, Smurfit Westrock, and Greif announced significant price increases, all effective on January 1, 2025, ranging from $60-90 per ton on linerboard and $80-$100 per ton on

corrugating medium. ¶ 61. Georgia-Pacific announced a $90 per ton increase on corrugating medium and a $60 to $90 per ton increase on linerboard, depending on grades and regions. ¶¶ 54, 61. Smurfit Westrock announced a $60 per ton increase for unbleached kraft and recycled linerboard, along with tiered white-top increases of $70 per ton in the West and $50 per ton in the East. ¶ 61. Greif implemented a $70 per ton increase on linerboard and a $100 per ton increase on medium. *Id.*

### C. Defendants' Capacity Restrictions

At the same time Defendants were increasing prices, Defendants WestRock, International Paper, and Greif closed containerboard mills and pulp machines, reducing production capacity, despite high demand and capacity utilization.

**WestRock.** On October 6, 2022, WestRock announced that it would permanently close its corrugated medium manufacturing operations in St. Paul, Minnesota by early November 2022, resulting in the elimination of 200,000 annual tons of corrugating medium. ¶ 62. On August 23, 2023, WestRock announced that it would permanently cease operations at its paper mill in Tacoma, Washington, eliminating production of approximately 600,000 annual tons of pulp and 25,000 annual tons of specialty-grade capacity. ¶ 63. On April 30, 2025, Smurfit Westrock announced that it would close its coated recycled board mill in St. Paul, Minnesota, and stop production at its containerboard mill in Forney, Texas, reducing containerboard and coated recycled board ("CRB") (a type of linerboard) capacity by more than 500,000 tons. ¶ 67.

**Greif.** On January 29, 2025, Greif announced that it would permanently cease production on the Number 1 Paperboard Machine (A1), a non-integrated uncoated recycled paperboard asset, in Austell, Georgia, by the end of March and permanently close its containerboard and uncoated recycled paperboard mill in Fitchburg, Massachusetts, by the end of May. ¶ 65. These closures

6

collectively reduced Greif's containerboard capacity by 100,000 tons and its uncoated recycled paperboard (a type of linerboard) capacity by 90,000 tons. *Id*. On May 1, 2025, Greif announced that it would permanently close its paperboard mill in Los Angeles by June 2025, removing 50,000 tons of CRB and 22,000 tons of Uncoated Recycled Paperboard ("URB") linerboard from the market. ¶ 68.

**International Paper.** From 2021 to 2024, International Paper's total capacity fell from 13,805,000 short tons to 12,984,000 short tons. ¶ 69.

### D. Defendants' "Value Over Volume" Strategy

International Paper, Greif, and Smurfit Westrock all used the identical phrase to describe their pricing strategy: "value over volume."

*Greif*. Commenting on its 2022 financial results, Greif President and CEO Ole Rossgard commented that "[w]e believe these outstanding results are driven by the high engagement among our teams, our focus on delivering legendary customer service and **our consistent commitment to a value-over-volume approach**[.]" ¶ 72. On its Q1 2025 conference call on February 28, 2025, Rossgard explained, "[a]nd with regard to competition, **basically we focus on value over volume**[…]" *Id.*

*International Paper.* International Paper's 2024 Annual Report explained, "[o]ur Go-to-Market **value over volume** reset was largely complete in 2024 and we expect the final unfavorable impacts to volume to be behind us later in 2025." ¶ 71.

*Smurfit Westrock.* On its Q1 2025 conference call, Smurfit Westrock Group CFO Kenneth Bowles, commenting on the company's financial growth, explained "[t]he performance reflects not only our relentless focus on cost, quality and efficiency, but the incremental benefits of our synergy program and some early-stage benefits of our operational changes, including our operating

model and all underpinned by **our strategy of value over volume**." Anthony Smurfit, Group CEO, similarly commented "we still feel very comfortable and happy with **our value over volume** approach." ¶ 73.

### E. Prior Industry Collusion

Defendants have a long history of fixing the prices of containerboard and other products, ¶¶ 112-121. International Paper, PCA, and Georgia-Pacific were defendants in an alleged nationwide class action price-fixing conspiracy among manufacturers of folding cartons from 1960 to 1974. ¶ 115. *See In re Folding Carton Antitrust Litig.*, 75 F.R.D. 727 (N.D. Ill. 1977), 557 F. Supp. 1091, 1093 (N.D. Ill. 1983), and 687 F. Supp. 1223 (N.D. Ill. 1988). Prior to trial, the class settled for approximately $200 million. ¶ 115.

PCA, International Paper, Stone Container Corporation, and Georgia-Pacific were also involved in a price fixing cartel relating to corrugated containers and corrugated cardboard sheets from 1964-1975. ¶ 117. Most firms settled before a verdict was rendered; the sole defendant remaining at the time of the verdict was found liable for participating in a price fixing conspiracy over corrugated containers and corrugated sheets from 1964-1975. ¶ 117. *See In re Corrugated Container Antitrust Litig.*, 556 F. Supp. 1117, 1125 (S.D. Tex. 1982).

In 1978, a federal grand jury in the Southern District of Texas indicted 14 companies and 26 individuals, including International Paper, Weyerhaeuser Corporation, and Stone Container Corporation (a predecessor to Smurfit Westrock) for participating in a conspiracy east of the Rocky Mountains to fix prices of corrugated containers and sheets. *See United States v. International Paper Co.*, No. H-78-11 and *United States v. Boise Cascade Corp.*, No. H-78-12. ¶ 116. International Paper, Weyerhaeuser Corporation, and Stone Container Corporation and almost all the other defendants pleaded nolo contendere. ¶ 116.

In 1998, Stone Container Corp. (a predecessor of Smurfit Westrock) entered into a consent agreement with the Federal Trade Commission ("FTC") in which it pledged to refrain from fixing prices of linerboard. ¶ 118. Smurfit-Stone, International Paper, Georgia-Pacific, and PCA participated in a price-fixing cartel of containerboard from 1993-1995. *See In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. 2002).

Subsequently, in 2010, *Kleen Prods. LLC v. Packaging Corp. of America*, No. 10-cv-05711 (N.D. Ill.) was filed. There, Defendants PCA, International Paper, Cascades, Georgia-Pacific, and Smurfit-Stone, and others were alleged to have colluded to fix prices of containerboard products through coordinated capacity restraints (output restrictions) and price increases. ¶ 120. International Paper settled these claims for $354 million. *Id.*

Most recently, in 2019, Smurfit Kappa Italia S.p.A., International Paper Italia S.r.l., and DS Smith (acquired by International Paper in 2025) faced fines in Italy by the Italian Competition Authority ("ICA") for anticompetitive conduct involving jointly defining sales prices and other commercial parameters between 2005 and 2017. ¶ 121. The ICA found two agreements. The first was a "single, complex and continuous agreement between 2005 and 2017, to share the market and jointly define sales prices and other commercial parameters, such as payment terms" that involved Smurfit Kappa, DS Smith and others. *Id*. The second was a "single, complex and continous [sic] agreement between 2005 and 2017, to share the market and jointly define sales prices and other commercial parameters, such as payment terms" that involved Smurfit Kappa, DS Smith, International Paper and others. DS Smith, which was acquired by International Paper in 2025, was a leniency applicant and avoided a fine. *Id*. Smurfit Kappa was fined 124 million euros and International Paper was fined 29 million euros. Both fines were slightly reduced on appeal and are pending further appeal. *Id*.

### III.    LEGAL STANDARD

An antitrust complaint needs only make "'a short and plain statement of the claim showing that the pleader is entitled to relief . . . and the grounds upon which it rests.'"  Fed. R. Civ. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  In deciding whether Plaintiff clears this modest bar on a motion to dismiss, the Court must "accept all well-pleaded facts as true and draw reasonable inferences in the plaintiff's favor." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp.3d 931, 938 (N.D. Ill. 2018) (citing *Forgue v. City of Chicago,* 873 F.3d 962, 966 (7th Cir. 2017).

For a Section 1 Sherman Act claim, a plaintiff must plead facts plausibly suggesting (1) a contract, combination, or conspiracy (i.e., an agreement); (2) a resulting unreasonable restraint of trade in a relevant market; and (3) an accompanying antitrust injury. *See City of Rockford v. Mallinckrodt ARD, Inc*., 360 F. Supp.3d 730, 753 (N.D. Ill. 2019). Although a plaintiff must plead more than facts that are merely consistent with an agreement, *Twombly* does not "impose a probability requirement at the pleading stage." *Twombly*, 550 U.S. at 556. Plaintiff need only allege "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id*.  "[I]t is not necessary to stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences." *Swanson v. Citibank, N.A*., 614 F.3d 400, 404 (7th Cir. 2010); *see In re Broiler Chicken Antitrust Litig*., 290 F. Supp.3d 772, 801 (N.D. Ill. 2017) ("*Broiler*") (existence of "alternative explanation" does not "destroy the plausibility of Plaintiffs' conspiracy claims").

Finally, courts must consider allegations in their entirety—not in isolation.  "[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore Co. v. Union Carbide & Carbon*

*Corp.*, 370 U.S. 690, 699 (1962) (citation omitted). Courts should avoid Defendants' "trap" of "suppos[ing] that if no single item of evidence presented by the plaintiff points unequivocally to conspiracy, the evidence as a whole cannot" do so. *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002).

Indeed, plaintiffs can (and almost always do) allege antitrust conspiracies without the smoking gun of direct evidence, because defendants "typically cannot be relied on to confess that they have entered into an unlawful agreement." *Craftsmen Limousine, Inc. v. Ford Motor Co.,* 363 F.3d 761, 771 (8th Cir. 2004); *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010) ("Direct evidence of conspiracy is not a *sine qua non*, however. Circumstantial evidence can establish an antitrust conspiracy.") (citing *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984)). "Parallel behavior" of competitors following the same course of conduct "can be circumstantial evidence of an agreement not to compete." *Broiler,* 290 F. Supp.3d 772, 789 (N.D. Ill. 2017) (citing *Twombly*, 550 U.S. at 553). But allegations of parallel conduct "must be placed in a context that raises a suggestion of a preceding agreement." *Id*. Such "factual enhancement" is referred to as plus factors. *Id.* Therefore, Plaintiff may successfully plead a *per se* claim by plausibly alleging both parallel conduct and the existence of plus factors.

## IV.   ARGUMENT

### A.   Plaintiff Plausibly Alleges an Agreement

#### 1.   Plaintiff Sufficiently Pleads Parallel Conduct

Plaintiff alleges that Defendants orchestrated two mutually reinforcing schemes aimed at driving up the prices of Containerboard Products. First, Defendants implemented lockstep price increases, raising prices in close succession—often within days of one another or even on the same day—despite the absence of cost pressures or shifts in demand that would justify such hikes.

Second, multiple Defendants pursued a self-described "value over volume" strategy, deliberately curbing output during periods of high capacity utilization (between 87% and 95% during the entire Relevant Period) to stabilize or elevate prices. Viewed together, these coordinated actions reflect a calculated conspiracy to distort competitive market forces and extract supracompetitive profits.

i. **Defendants repeatedly implemented price increases in a lockstep manner.**

Containerboard prices remained relatively stable throughout the 2010s. ¶ 50. However, due to Defendants' seven coordinated price increases, detailed in the chart below, prices of Containerboard Products during the Relevant Period surged by more than 30%. ¶¶ 51-52.

| Price Increase No. | Defendant | Announcement Date | Effective Date | Price Increase | |
|---|---|---|---|---|---|
| | | | | Linerboard | Corrugating Medium |
| **2025** | | | | | |
| 7 | Greif | 12/5/2024 | 1/1/2025 | $70 | $100 |
| | Smurfit Westrock | 11/27/2024 | 1/1/2025 | $60 (unbleached kraft & recycled) $70 (white top, West Region) $50 (white top, East Region) | $80 |
| | International Paper | 11/25/2024 | 1/1/2025 | $70 | $90 |
| | Georgia-Pacific | 11/25/2024 | 1/1/2025 | East region $60 (kraft) $60 (white top) $90 (recycled) West region $80 (kraft) | $90 |

| | | | | $90 (white top) $90 (recycled) | |
|---|---|---|---|---|---|
| | PCA | 11/20/2024 | 1/1/2025 | $70 | $90 |
| **2024** | | | | | |
| 6 | Cascades | 5/2024 | 6/3/2024 | $60 | $80 |
| | Georgia-Pacific | 5/2024 | 6/1/2024 | $50 | $80 |
| | Pratt | 5/2024 | 6/1/2024 | $50 | $80 |
| | WestRock | 5/2024 | 6/1/2024 | $50 | $80 |
| | International Paper | 5/2024 | 6/1/2024 | $50 | $80 |
| 5 | International Paper | 12/2023 | 1/1/2024 | $70 $50 (white-top) | $110 |
| | WestRock | 12/2023 | 1/1/2024 | $70 $30 (white-top) | $110 |
| | Cascades | 12/2023 | 1/1/2024 | $70 $50(white-top) | $110 |
| | PCA | 12/2023 | 1/1/2024 | $70 | $100 |
| | Pratt | 12/2023 | 1/1/2024 | $75 | $110 |
| **2022** | | | | | |
| 4 | International Paper | 1/2022 | 3/1/2022 | $70 | $70 |
| | WestRock | 1/2022 | 3/1/2022 | $70 | $70 |
| | PCA | 1/2022 | 3/1/2022 | $70 | $70 |
| | Cascades | 1/2022 | 3/1/2022 | | $40 |
| **2021** | | | | | |
| 3 | Industry-wide | | 10/1/2021 | $50 | |
| | WestRock | 6/11/2021 | 7/15/2021 | $50 | $70 |
| 2 | Cascades | 2/2021 | 3/1/2021 | $60 | $70 |
| | International Paper | 2/2021 | 3/1/2021 | $60 | $60 |
| | Greif | 2/2021 | 3/4/2021 | $60 | $70 |
| | PCA | 2/2021 | 3/1/2021 | $70 | $70 |
| **2020** | | | | | |

| | 1 | WestRock | 9/30/2020 | 11/1/2020 | $50 | $50 |
|---|---|---|---|---|---|---|
| | | PCA | 9/25/2020 | 11/1/2020 | $50 | $50 |
| | | Georgia-Pacific | 9/25/2020 | 11/1/2020 | $50 | $50 |
| | | Pratt | 9/25/2020 | 11/1/2020 | $50 | $50 |
| | | Cascades | 9/25/2020 | 11/1/2020 | $50 | $50 |
| | | International Paper | 9/25/2020 | 11/1/2020 | $50 | $50 |

Courts have held that such repeated, synchronized price hikes are sufficient to establish parallel pricing. *Kleen Prods. LLC v. Packaging Corp. of America,* 775 F. Supp.2d 1071, 1078 (N.D. Ill. 2011) ("*Kleen I*"). *See also Miami Prods. & Chem. Co. v. Olin Corp.,* 449 F. Supp.3d 136, 161 (W.D.N.Y. 2020) ("[I]t is adequate at the motion to dismiss stage to plead parallelism through a pattern of frequent price increases in similar intervals and amounts.*"); In re Fragrance Direct Purchaser Antitrust Litig.,* No. 2:23-02174, 2025 WL 579639, at *8 (D.N.J. Feb. 21, 2025) ("[A] showing of parallel pricing requires only evidence that defendants 'acted similarly,' not evidence that they charged the same prices or engaged in identical conduct."); *In re Passenger Vehicle Replacement Tires Antitrust Litig.*, 767 F. Supp.3d 681, 702 (N.D. Ohio 2025).

Plaintiff's allegations of parallel price increases are reinforced by economic evidence—specifically, the FRED Producer Price Index for containerboard products—which shows a dramatic surge in prices beginning in 2020, the onset of the alleged conspiracy. After a decade of relative price stability throughout the 2010s, containerboard prices rose approximately 30% during the Relevant Period. ¶¶ 50-52. Defendants argue that reliance on the industry-wide Producer Price Index is insufficient to support an inference of parallel conduct, claiming the index fails to reflect individualized pricing by each Defendant. *See* Mem. at 11–12. This argument misstates the relevance of aggregate data at the pleading stage. Courts have consistently held that aggregated statistics are relevant *when paired with specific factual allegations*. For example, in *In re European*

*Gov't Bonds Antitrust Litig.*, No. 19 Civ. 2601(VM), 2020 WL 4273811, at *17 (S.D.N.Y. July 23, 2020) the court found that average pricing data supported the plausibility of a conspiracy when combined with allegations linking conduct to individual defendants. *See also In re Loc. TV Advert. Antitrust Litig.*, No. 18C6785, 2020 WL 6557665, at *8 (N.D. Ill. Nov. 6, 2020) (same). Indeed, courts permit antitrust plaintiffs (who do not yet have the benefit of discovery at the pleading stage) to "connect the aggregate data to the presence of a potential conspiracy." *Id.*

Plaintiff alleges specific examples of Defendants' participation in coordinated price increases and output restrictions, as well as numerous plus factors. When these Defendant-specific allegations are viewed together with Producer Price Index charts (¶¶ 51-52), this aggregate data shows compelling economic evidence of the conspiracy's broad impact across the Containerboard Products market and reinforces the plausibility of the alleged conspiracy. Given that Defendants collectively control over 85% of the market, Defendants' assertion that such dramatic, market-wide price increases occurred independently of their conduct defies economic logic and improperly seeks to shift the pleading standard by inviting the Court to draw inferences in ***Defendants'*** favor—an approach squarely at odds with the standard on a motion to dismiss.

Defendants claim that their coordinated price hikes cannot be considered "parallel" because no single round of increases included every Defendant, nor did any announcement involve an identical set of participants. *See* Mem. at 12. But Defendants fail to cite a single case holding that allegations of parallel pricing must reflect perfect correspondence across all participants to be actionable. Indeed, they cannot, because this is not required. On the contrary, in *In re Polyurethane Foam Antitrust Litig.*, the court, at summary judgment, rejected defendants' attempt to undermine the evidence of parallel pricing finding that *substantial similarity in business behavior,* such as identical or near-identical price increases, could support an inference of parallel conduct, even if

not all defendants issued price increase announcements in each quarter. 152 F. Supp.3d 968, 983 (N.D. Ohio 2015).

This makes perfect sense, because sophisticated actors in a price-fixing conspiracy often deliberately avoid moving in perfect lockstep to avoid detection by customers and regulators. *See SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412 at 428 (4th Cir. 2015) ("[I]f the defendants employed different courses of action, then their conspiracy might better avoid detection."); *Broiler.*, 290 F. Supp.3d 772, 792 (N.D. Ill. 2017) ("Permitting flexibility, where possible, in the means of effectuating price increases, would enable a greater number of producers to participate in the conspiracy, and might help to conceal the collusive nature of their conduct."). Indeed, each Defendant participated in at least one round of price increases in parallel with its co-conspirators during the Relevant Period—which is all that is required to plausibly allege parallel conduct. *In re Turkey Antitrust Litig.*, 642 F. Supp.3d at 722–23, (finding allegations of coordinated supply reductions during two distinct periods, followed by two rounds of price increases while maintaining supply restraints—allegations that ultimately implicated every Defendant in at least one phase of the alleged conspiracy—sufficiently alleged parallel conduct). [6]

---

[6] The cases cited by Defendants are readily distinguishable. In *In re Concrete & Cement Additives Antitrust Litig.*, the court found that the alleged price increases did not constitute parallel conduct because they occurred in different amounts, at widely different times, and, most importantly, covered different geographic regions. No. 24-MD-3097 (LJL), 2025 WL 1755193, at *14–15 (S.D.N.Y. June 25, 2025) Indeed, over the entire class period, only one Defendant was alleged to have announced a price increase specifically tied to products in North America. *Id*, at 15. That is plainly not the case here. Plaintiff has sufficiently alleged that Defendants engaged in lock-step price increases—sometimes simultaneously—concerning Containerboard Products in the United States. Defendants also mischaracterized the holding in *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212 (3d Cir. 2011). The issue there was not that the conduct occurred at "different time periods," but rather that the defendants were alleged to have taken inconsistent actions—declining, decreasing, and even increasing credit to Factory 2–U. *Id.* at 228. By contrast, here all Defendants raised their prices in an extreme parallel fashion during the Relevant Period. Similarly, Defendants distort the holding in *In re Florida Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291. The court did not reject the existence of parallel conduct; instead, it found that plaintiffs' description of the price increases required qualification due to differences in timing and amounts. *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp.2d 1291, 1309 (S.D. Fla. 2010). The allegations here are far

The same logic defeats Defendants' argument that their price increases were not "parallel" because the cumulative amount of those increases varied among them.[7] Again, defendants' actions need not be identical in all respects to be parallel. *See In re Blood Reagents Antitrust Litig.*, 756 F. Supp.2d 623, 630 (E.D. Pa.) (citing *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 132 (3d Cir. 1999)). Individual conspirators may differ in timing, magnitude, or even how they denominate their increases. *See Broiler*, 290 F. Supp.3d at 792; *City of Moundridge v. Exxon Mobil Corp.*, No. CIV.A. 04-940, 2009 WL 5385975, at *5 (D.D.C. Sept. 30, 2009) ("Price-fixing can occur even though the price increases are not identical in absolute or relative terms."). Indeed, courts have found parallel conduct plausible even where price increases varied far more than those alleged here. *See, e.g., In re Blood Reagents Antitrust Litig.*, 266 F. Supp.3d 750, 769-770 (E.D. Pa.) (finding parallel conduct, *inter alia,* when one competitor raised prices by 125% while others raised them by between only 58% and 90%).

Defendants point to the "two-year lull" between January 2022 and December 2023, claiming that no public records show parallel price increase announcements during that period. This assertion is both factually inaccurate and legally irrelevant. Plaintiff has specifically alleged parallel conduct during those years, including coordinated output reductions among multiple Defendants. *See* ¶ 62-64. Moreover, once again, antitrust conspiracies need not manifest parallel conduct uniformly across every year of the conspiracy. It would be irrational to require parallel

---

stronger: Plaintiff identifies instances where Defendants implemented simultaneous price increases for the same product in the same amount.

[7] In fact, merely aggregating the amounts from Defendants' price increase announcements cited in the Complaint and asserting that their cumulative totals differ is misleading. The Complaint references only publicly available announcements, which should not be interpreted as all price increases during the Relevant Period. To disregard the evident pattern of parallel, coordinated increases and instead focus on aggregated totals improperly invites inferences in Defendants' favor—contrary to the applicable pleading standard.

conduct to occur consistently throughout the entire conspiracy period. The law does not demand such regularity of parties violating the antitrust laws. Courts routinely recognize that conspiratorial behavior may ebb and flow depending on market conditions and the conspirators' strategic needs. *See, e.g., In re Turkey Antitrust Litig.*, 642 F. Supp.3d at 722–23 (finding sufficient allegations of parallel conduct over a seven-year period despite gaps in certain years); *Broiler*, 290 F. Supp.3d at 791 (N.D. Ill. 2017) (upholding allegations of a continuous conspiracy from 2008 to 2012, even though parallel conduct was only alleged in select years); *In re Text Messaging Antitrust Litig.*, No. 08-cv-7082, 2009 WL 5066652, at *5 (N.D. Ill. Dec. 10, 2009) (finding two instances of parallel pricing over four years sufficient to plead parallel conduct).

More importantly, antitrust law prohibits not only horizontal agreements to raise prices but also coordinated efforts to stabilize prices at artificially high levels. *United States v. Serta Assocs.*, 296 F. Supp. 1121, 1123 (N.D. Ill. 1968). Here, Defendants neither claim, nor could they plausibly argue, that they reduced prices to competitive levels during 2022 and 2023—despite declining demand and falling input costs. ¶¶ 83, 85. The continuous supracompetitive pricing of containerboard products during this period further supports the existence and persistence of the alleged conspiracy.

Defendants contend that Plaintiff does not allege that increases on the prices of linerboard and corrugating medium resulted in price increases for finished containerboard products. Mem. at 13. Not so. Plaintiff specifically alleges Producer Price Index charts showing tandem price increases during the Relevant Period on: (a) corrugated and solid fiber boxes (finished packaging products); (b) containerboard; and (c) linerboard. ¶¶ 51-52. Moreover, as Defendants themselves acknowledge (Mem. at 3), the Complaint specifically alleges that linerboard and corrugating

medium are essential inputs in the production of finished Containerboard Products.[8] ¶¶ 38-44. Accordingly, increases in the prices of these inputs *a fortiori* lead to higher prices for finished goods. ¶ 44. This factual allegation must be credited at the pleading stage, even absent further detail—despite Defendants' erroneous and *counterfactual* claim. In fact, Plaintiff does offer additional support. This evidence, at the pleading stage, suffices to show that Defendants' conspiracy affected the entire spectrum of Containerboard Products.

Finally, Defendants' argument that the Complaint does not identify any price increases by Smurfit Kappa (*see* Mem. at 12) is unavailing. Smurfit Westrock plc's price increase announcement in November 2024 was U.S.-specific, and even broken out by region for white-top linerboard ($70/ton in the Western U.S. and $50/ton in the Eastern U.S. for white-top linerboard). ¶ 61. U.S.-based price changes would necessarily have been implemented through U.S. sales and operating entities such as Smurfit Kappa.

In sum, Plaintiff is not required to demonstrate that all Defendants implemented identical price increases at the same time, for the same products, in perfect harmony throughout the Relevant Period. That is a caricature of the law. *See Broiler,* 290 F. Supp. at 792 (holding that parallel conduct does not require uniformity in method or magnitude). The price increase announcements that Plaintiff details are more than sufficient to plausibly allege parallel conduct among Defendants.

---

[8] Even assuming, *arguendo*, that Plaintiff had not alleged price increases for finished containerboard products, that omission would not defeat the plausibility of the alleged conspiracy—particularly at the pre-discovery stage. Courts have repeatedly rejected arguments that plaintiffs must delineate product categories with precision at the pleading phase. *See In re Fasteners Antitrust Litig.*, No. 08-md-1912, 2011 WL 3563989, at *10 (E.D. Pa. Aug. 12, 2011) (rejecting the argument that plaintiffs "conflated different products" and finding the conspiracy allegations plausible); *In re Auto. Parts Antitrust Litig.*, No. 12-md-02311, 2018 WL 1138422, at *4 (E.D. Mich. Jan. 16, 2018) ("A plaintiff is not required to plead the precise boundaries of a product market prior to discovery.").

### ii.    Multiple Defendants also engaged in parallel capacity reduction.

Defendants argue that Plaintiff must show both price increases ***and*** output restrictions to allege a plausible price fixing conspiracy. This, too, is not required by law. It is well-established that an agreement to fix prices, standing alone, is a *per se* violation of Section 1 of the Sherman Act. *See e.g. In re MultiPlan Health Ins. Provider Litig.,* 789 F. Supp.3d 614, 629 (N.D. Ill. 2025) *citing Catalano, Inc. v. Target Sales, Inc*., 446 U.S. 643, 647 (1980) ("a competitor price-fixing agreement cannot be justified, period—price fixing is illegal per se."); *Kleen I,* 775 F. Supp. 2d at 1078 ("Even without any parallel capacity reductions, consistent parallel price increases are enough to make a threshold showing of conscious parallelism.").[9] Separately, output restrictions are themselves *per se* violations. "A horizontal cartel among [competitors] that decreases output **or** reduces competition in order to increase price is, and ought to be, *per se* unlawful. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,* 551 U.S. 877, 893 (2007) (emphasis added).

Here, the fact that at least three defendants—WestRock, International Paper, and Greif— ***did restrict output*** while operating at elevated utilization rates significantly bolsters the plausibility of the alleged conspiracy. These output cuts are economically irrational in a competitive market, particularly during periods of strong demand, and support an inference of coordinated conduct aimed at sustaining inflated prices.

Pratt and PCA argue that the absence of allegations that they engaged in capacity

---

[9] None of the authorities cited by Defendants undermine this point. In *Westinghouse Electric Corp. v. Gulf Oil Corp*., the Seventh Circuit held that an agreement to restrict production constitutes a price-fixing arrangement, and that conspiracies to fix prices and conspiracies to restrict output should not be treated as distinct offenses. 588 F.2d 221, 226 (7th Cir. 1978). The court, however, did not require Plaintiffs to allege output restrictions in order to state a viable price-fixing claim. Likewise, in *Kleen Products LLC v. International Paper,* the court observed that pricing and output are inherently linked: when prices rise, demand falls, and supply correspondingly decreases. 276 F. Supp.3d 811, 827–28 (N.D. Ill. 2017). That economic logic explains why some Defendants reduced output to reinforce their coordinated price-increase efforts. But *Kleen* does not impose a requirement that every Defendant engage in output reduction for a plaintiff to plead a plausible price-fixing conspiracy.

reductions warrants dismissal of the claims against them. But as the court noted in *In re Currency Conversion Fee Antitrust Litig.*, "the law does not require every defendant to participate in the conspiracy by identical means throughout the entire class period" (264 F.R.D. at 114 (S.D.N.Y. 2010)). *See also Kleen I,* 775 F. Supp. 2d at 1078 n.8 ("Variations in the size of capacity reductions do not disprove the existence of a conspiracy."). The fact that some Defendants did not restrict output does not undermine the plausibility of a conspiracy in which all Defendants "had a conscious commitment to a common scheme designed to achieve [the] unlawful objective" of supracompetitive prices for Containerboard Products. *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. at 764.

Indeed, the notion that defendants may have used different methods to raise prices is not only plausible—it is expected. *See* Phillip E. Areeda & Herbert Hovenkamp*, Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 2111d1 ("[O]utput and price are the two elements of a firm's decision making most directly relevant to the degree of competition in a market. . . . [E]ffective collusion in most settings requires participants to come to some kind of understanding about output, price, or both."). As the Fourth Circuit observed in *SD3, LLC v. Black & Decker*, 801 F.3d at 427–28, "sophisticated parties like the defendants could well understand the red flags that would be raised" by simultaneous and identical conspiratorial acts.

It is particularly inappropriate for Pratt and PCA to rely on materials outside the complaint—or embedded in documents merely mentioned in the complaint—to argue that they expanded capacity during the Relevant Period. But even assuming *arguendo* that the Court could consider these materials, the documents cited by Pratt and PCA merely show that they opened new paper mills or upgraded existing facilities during the Relevant Period. See Pratt Mem. at 3–4; PCA Mem. 3. These allegations do not establish that either Defendant actually expanded its total

production capacity; they may have simultaneously reduced capacity elsewhere. At most, the materials raise a factual dispute regarding whether Pratt and PCA cut or maintained their production capacity during the Relevant Period—a dispute that is not appropriate for resolution at the motion to dismiss stage.

In sum, Plaintiff has alleged a coherent and plausible conspiracy supported by parallel pricing, strategic output restrictions despite elevated capacity utilization, and adoption of a "value over volume" strategy. The law does not require uniform conduct among conspirators, nor does it demand output restriction by all conspirators as a prerequisite to alleging price-fixing. Defendants' argument is therefore legally and factually unavailing.

### iii. Defendants' parallel price increases are not independent economic actions.

Defendants attempt to justify their parallel price increases by characterizing them as "follow-the-leader pricing," which they claim is typical in an oligopolistic market. Mem.at 16-17. However, Defendants' argument distorts the legal framework governing parallel conduct. Courts have recognized that "interdependence can be inferred from parallel conduct that is sequential rather than simultaneous." *In re Plasma–Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1000 (N.D. Ill. Feb. 9, 2011). Thus, it is "both improper and imprudent" to dismiss price-fixing claims solely on the speculative assumption that Defendants' conscious parallelism defense—or any other defense—might later prove valid after discovery. *In re Delta/Airtran Baggage Fee Antitrust Litig.*, 733 F. Supp.2d 1348, 1363 (N.D. Ga. 2010). This principle holds even if the conduct could theoretically result from firms independently observing and mimicking each other's pricing decisions. *Plasma–Derivative Protein Therapies*, 764 F. Supp.2d at 1000.

In support of their erroneous arguments, Defendants rely heavily on the Seventh Circuit's decision in *Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927 (7th Cir. 2018) ("*Kleen II*"), a

summary judgment ruling. This reliance is misplaced. As the court explained in *In Re Manufactured Home Lot Rents Antitrust Litig.*, No. 23-cv-06715, 2025 WL 3485693, at *7 (N.D. Ill. Dec. 4, 2025), "summary judgment decisions cited by defendants are of limited value, because more is required of plaintiffs at that stage.".The Seventh Circuit has cautioned against applying "too demanding a standard" at the pleading stage by prematurely importing summary judgment considerations. *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 827 (7th Cir. 2014).

In *Kleen II*, the plaintiffs had the benefit of full discovery, and only after evaluating the complete evidentiary record did the Seventh Circuit conclude that the parallel pricing evidence did not exclude the possibility of independent action. However, at the motion to dismiss stage, plaintiffs are not required to "exclude the possibility of independent conduct." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 360 F. Supp. 3d 788, 797 (N.D. Ill. 2019). Defendants overlook the fact that in the earlier phase of the same litigation, Judge Shadur—applying the appropriate Rule 12(b)(6) standard—rejected the identical argument that parallel pricing in a concentrated industry necessarily implies lawful conduct. Instead, he found that such assertions "do not refute the obvious plausibility of Plaintiffs' threshold showing." *Kleen I,* 775 F. Supp. 2d at 1078.

More critically, even the Seventh Circuit in *Kleen II* identified WestRock's supply restrictions—such as mill closures during the class period—as "the most compelling evidence of collusion." 910 F.3d at 939. Although WestRock offered multiple "plausible" explanations, the court found these insufficient to overcome the inference of conspiracy. *Id.* The issue in *Kleen II* was timing: WestRock's bankruptcy discharge occurred just before the end of the class period, shielding it from liability for pre-discharge conduct. However, all of WestRock's supply restrictions occurred before that discharge, meaning plaintiffs fell short on presenting evidence for WestRock's involvement in the conspiracy post-discharge. *Id.* at 940–41. Plaintiff alleges that at

least four Defendants engaged in capacity reductions during the Relevant Period—while prices and capacity utilization were both high. These allegations mirror the type of conduct the Seventh Circuit found compelling even under the more stringent summary judgment standard.

Perhaps most telling is the remarkable timing of Defendants' price increases. On September 25, 2020, five major producers—PCA, Georgia-Pacific, Pratt, Cascades, and International Paper—each announced an identical $50 increase for linerboard and corrugating medium to take effect on the same date: November 1, 2020. This marked the first price hike in over two years, and critically, there was no identifiable "leader" initiating the move. In other words, there was nobody to follow. Such uniformity is not required by law, but it strongly suggests "parallel plus" behavior— the type of coordinated behavior the Seventh Circuit recognized as suggestive of collusion in *In re Text Messaging Antitrust Litig.*, 630 F.3d at 628. The Defendants' alignment defies coincidence and would require a touch of magic to occur absent prior agreement.

### 2. Defendants' Alternative Explanation for Their Parallel Price Increases May Not Be Credited and Is Refuted by the Complaint

Defendants argue there are "obvious alternative explanations" for their highly parallel price increases—namely, that the COVID-19 pandemic led to elevated input costs and increased demand. Mem. at 18–21. This effort fails on both legal and factual grounds.

As a matter of law, at the pleading stage, Plaintiff need only allege a plausible conspiracy— not one that is *more probable* than Defendants' alternative explanations. *Swanson* 614 F.3d at 404. Courts in this Circuit have consistently rejected defendants' attempts to defeat plausibility by offering innocent explanations for parallel conduct. For example, in *Broiler*, the court held that defendants' explanation—that production cuts were due to high feed costs and the Great Recession—did not defeat the plausibility of plaintiffs' conspiracy claims. 290 F. Supp. 3d 772, 802. The court declined to credit this innocent explanation over the plaintiffs' theory, reasoning

that weighing of evidence is not appropriate at the pleading stage. *Id*. Similarly, in *Kleen I*, the court held that defendants' "contentions may be plausible—but that does not negate the plausibility of Plaintiffs' competing version." 775 F. Supp. 2d at 1079-80.

Moreover, Plaintiff directly *refutes* the "alternative explanation" offered by Defendants. Defendants attempt to justify their parallel price increases by pointing to a temporary rise in the price of Old Corrugated Cardboard (OCC) during the Relevant Period. Mem. at 18-19. But Plaintiff alleges that OCC prices declined sharply in 2022 and only slightly increased in 2024 to levels comparable to those in 2018. Figure 8-9. Despite this, Containerboard Product prices in 2024 remained substantially *higher* than in 2018, which undermines Defendants' claim that raw material costs explain the price increases. More importantly, Defendants' financial performance undermines their cost-based justification: their profits rose even as sales remained flat (¶ 92), and their stock prices outpaced the broader market (¶ 93). These facts are inconsistent with a market where rising costs are driving price increases.

Defendants' attempt to justify their parallel price increases by pointing to increased demand is even less convincing. There was only a modest 6% rise in corrugated-box shipments between 2019 and 2021 (¶ 82). Defendants reframe this as a "massive increase" of 23.7 billion square feet (more than three times the area of Chicago) (Mem. at 20) driven by a 40% surge in online shopping (Mem. at 8), but this rhetorical flourish does not alter the underlying reality: a 6% uptick in demand cannot reasonably account for a 15% increase in linerboard prices and a 20% increase in containerboard prices. ¶ 86. Furthermore, prices remained elevated even as demand dropped by 35.7 billion square feet between 2021 and 2023—an even more "massive" decline by Defendants' own analogy. Figure 10. These facts further erode the credibility of Defendants' demand-based explanation.

25

Finally, if there truly was a massive increase in demand during the Relevant Period, one would expect Defendants, as rational economic actors, to expand capacity to meet that demand. Instead, they engaged in parallel capacity restrictions. This conduct directly contradicts their own argument and further supports Plaintiff's allegations of coordinated behavior. In sum, Defendants' alternative explanations are not only legally insufficient to defeat Plaintiff's claims at the pleading stage, but they are also factually implausible and internally inconsistent.

### B.     Plus Factors Further Support the Existence of a Conspiracy

It is well established that "[c]ircumstantial evidence can establish an antitrust conspiracy. *In re Text Messaging Antitrust Litig.,* 630 F.3d at 629 (citations omitted). This circumstantial evidence supporting the existence of a conspiracy may include "a mixture of parallel behaviors, details of industry structure, and industry practices, that facilitate collusion." *U.S. Bd. of Oral Implantology v. Am Bd. of Dental Specialties*, 390 F. Supp.3d 892, 902–03 (N.D. Ill. 2019) (citing *Text Messaging*, 630 F.3d at 627). When analyzing plus factors, "courts must look at the course of conduct of the alleged conspiracy as a whole" as "the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts." *In re Deere & Co. Repair Serv. Antitrust Litig.,* 703 F. Supp. 3d 862, 908 (N.D. Ill. 2023).

#### 1.  Actions Against Self-Interest

"Actions that would not be in the self-interest of competitors absent an agreement indicate an agreement, as it is irrational for a competitor to work against its own interests without assurances that others will do the same." *In re MultiPlan Health Ins. Provider Litig.,* 789 F. Supp.3d at 639. Plaintiff alleges that: (a) each of the Defendants participated in parallel price increases; (b) WestRock, International Paper, and Greif, decreased capacity despite high demand (¶¶ 62-69, 89); and (c) Smurfit Westrock, International Paper and Greif explicitly adopted a "value

over volume" strategy. ¶¶ 70-73. Each of these actions against self-interest support the plausibility of a price-fixing conspiracy.

As the court explained in *Deere*, 703 F. Supp.3d at 908, "'[n]o single reasonable manufacturer would drastically increase its prices and restrict its available sales without assurances that others would follow suit.*"* (quoting *In re Disposable Contact Lens Antitrust,* 215 F. Supp. 3d 1272, 1297 (M.D. Fla. 2016)). Defendants would be disadvantaged if they unilaterally significantly raised prices as they would lose business to competitors who did not also raise prices. *See, e.g. In re Generic Pharms. Pricing Antitrust Litig.,* 338 F. Supp. 3d 404, 448 (E.D. Pa. 2018) (finding allegations that defendants dramatically increased the price of drugs "not correlated with similar changes in demand or manufacturing costs" was an action against self-interest supporting plausibility of conspiracy).

Likewise, unilateral adoption of a "value over volume" strategy would be self-sabotaging. No rational single firm would adapt a strategy of producing less of a product, and selling it at a higher price, without assurances its competitors would do the same.[10] Plaintiff alleges that during the entire Relevant Period, the containerboard industry as a whole had a high capacity utilization rate, ranging from a low of 87% in 2023 to a high of 95% during 2021. ¶ 89. Yet, despite these elevated utilization levels, WestRock, International Paper, and Greif reduced capacity —a decision

---

[10] *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.,* 28 F.4th 42, 50 (9th Cir. 2022), cited by Defendants, is unavailing. There, Plaintiffs alleged that three manufacturers reduced their production of DRAM during the same year, but did not allege parallel pricing, as Plaintiff has here. Further, Ninth Circuit has adopted a standard of "extreme action against self-interest," which is not the standard used by courts in this Circuit *Compare In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.,* 28 F.4th 42, 50 (9th Cir. 2022) ("Plaintiffs have not established that Defendants' supply cuts were the "extreme action against self-interest" contemplated by this circuit as a plus factor.") *with In re Deere & Co. Repair Serv. Antitrust Litig.,* 703 F. Supp.3d 862, 908 (N.D. Ill. 2023 ("the inference that a horizontal 'agreement'—a shared understanding of a common goal—exists among and between the Dealerships is supported by the fact that going it alone is against their individual self-interest").

that runs contrary to their unilateral self-interest absent collusion.

Defendants' reliance on *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 870 (7th Cir. 2015) is inapposite. In *In re Text Messaging Antitrust Litig.*, the Court of Appeals, at the summary judgment stage, found plaintiffs presented only "circumstantial evidence consistent with an inference of collusion […] equally consistent with independent parallel behavior." *Id.* at 879. While the court discussed alternative explanations for defendants' conduct, it was only after discovery had revealed no "smoking gun" of a conspiracy, and the court noted that the conduct at issue was "consistent with tacit as well as express collusion." *Id.* at 871, 877. At the motion to dismiss stage, in contrast, Plaintiff's theory may not be "weigh[ed] . . . against the plausibility of the defendants' alternative explanation for their conduct." *Broiler*, 290 F. Supp. 3d at 801. Importantly, at the motion to dismiss stage, the Seventh Circuit recognized that allegations that defendants increased their prices in the face of falling costs was "anomalous behavior" that supported the plausibility of conspiracy. *In re Text Messaging Antitrust Litig.*, 630 F.3d at 628.

Defendants' reliance on *Kleen Prods. LLC v. Int'l Paper,* 276 F. Supp. 3d 811 (N.D. Ill. 2017), *aff'd sub nom. Kleen Prods.* 910 F.3d 927 is similarly flawed. There, also at the summary judgment stage, "[p]laintiffs fault[ed] Defendants for not cutting prices in response to falling demand during a period of economic downturn dubbed the Great Recession." 276 F. Supp. 3d at 823. The court explained that in such circumstances, competitors in an industry with inelastic demand would not be incentivized to cut prices. *Id.* at 824-825. However, Plaintiff does not allege that Defendants failed to cut prices due to falling demand.[11] Rather, Plaintiff alleges that

---

[11] Defendant's citation to *In re Passenger Vehicle Replacement Tires Antitrust Litig.*, 767 F. Supp.3d 681, 708 (N.D. Ohio 2025) (Mem. at 22) is misleading. The selected quotation omits the phrase "without more" shown here: "[M]erely alleging that a firm should lower prices to increase market share, **without more,** cannot be sufficient to serve as a plus factor that raises an inference of collusion." *In re Passenger Vehicle Replacement Tires Antitrust Litig.*, 767 F. Supp.3d 681, 708 (N.D. Ohio 2025) *quoting Abbott*

Defendants matched each other's price increases, sometimes on the exact same day, and publicly announced a "value over volume" strategy and output restrictions that would be irrational absent collusion. These are sufficiently alleged actions against self-interest at the motion to dismiss stage, where it is inappropriate to weigh competing explanations for Defendants' conduct. *See In re Loc. TV Advert. Antitrust Litig.,* 2020 WL 6557665, at *9 (N.D. Ill. Nov. 6, 2020) ("Raising prices in the face of lower demand could be against Defendants' self-interest in the absence of collusion. While there may be explanations for the price increase other than collusion, Plaintiffs only have to allege what is plausible at this stage.").

### 2. Trade Associations

Plaintiff alleges as another plus factor that Defendants participated in trade associations and their events, through which they (a) exchanged nonpublic information with one another and (b) had ample opportunities to conspire. ¶¶ 126-134. For example, the International Corrugated Case Association ("ICCA") is an industry group that facilitates the advancement of the corrugated packaging industry. ¶ 129. Executives of Cascades, Georgia-Pacific, International Paper, PCA, Pratt, and Smurfit Westrock are all leadership members of ICCA. *Id.* ICCA members receive access to industry statistics, including information related to production and shipments reported quarterly by country/region. *Id.* Defendants Cascades, Georgia-Pacific, International Paper, PCA, Pratt and Smurfit Westrock also belong to the World Containerboard Organisation ("WCO"). ¶ 130. Members of WCO have access to industry statistics, analysis and market surveys on the development of shipments and consumption, production and capacity utilization and serves to "*coordinate the industry position*." *Id.* (emphasis added). Similarly, the Fiber Box Association

---

*Lab. v. Adelphia Supply USA,* No. 15-cv-5826, 2017 WL 5992355, at *11 (E.D.N.Y. Aug. 10, 2017) (emphasis added). Plaintiffs' have alleged "more" here – parallel price increases and parallel adoption of "value over volume" strategies and output restrictions. ¶¶ 50-75.

("FBA") collects and distributes data concerning its members' shipments, consumption and inventory. *Id.* The FBA executive committee includes executives from Pratt, Greif, Smurfit Westrock, and International Paper, and its Board of Directors includes executives from these companies as well as from Georgia-Pacific and PCA. ¶ 133.

Sharing non-public information relating to production, shipments, and capacity utilization, as Defendants have done here through multiple trade associations, is a plus factor. *See, e.g. In re Turkey Antitrust Litig.*, 642 F. Supp.3d at 727 (allegations that Defendants were members in a trade group where they shared "information on production capacities and levels" was a plus factor). Further, "[w]hen a trade association 'urge[s] its members to substitute 'co-opetition' for competition,' participation in the association may be a plus factor." *Id.* (citing *Text Messaging,* 630 F.3d 628).

Further, industry events provided opportunities to conspire. These events included the 2020 Fastmarkets RISI Asian Conference attended by Smurfit Kappa and WestRock, immediately after which each Defendant announced a $50 price increase for containerboard and linerboard (¶ 77); the 2024 International Containerboard Conference (ICCA) and Forest Products North America Conference, held in tandem and hosted by RISI, Inc., and attended by executives from Graphic Packaging, Smurfit Westrock, Cascades and Greif (¶ 128); and FBA's annual meetings, including its 2025 Annual Meeting in Naples, Florida, attended by Pratt, Smurfit Westrock, International Paper, Cascades and Greif. ¶ 133. "Although opportunities to cooperate in trade associations are not ipso facto evidence of a conspiracy, when one considers them in the broader context, evidence of these opportunities 'plausibly help[s] to fill-out the picture' of an alleged conspiracy." *In re Turkey Antitrust Litig.*, 642 F. Supp.3d at 727.

Defendants argue (Mem. at 25) that Plaintiff has not specifically alleged that Defendants

discussed price or output at industry meetings, but that is not required. *See In re Loc. TV Advert. Antitrust Litig.,* 2020 WL 6557665, at *10 n.6 (rejecting defendants' argument that plaintiffs did not allege what information was exchanged at industry meetings, explaining, "the Court does not look to evidence to which Plaintiffs do not have access and instead only concerns itself with the plausibility of the allegations in the pleadings.").

### 3. Market Characteristics

"[M]arket circumstances that make an agreement possible are relevant when considering whether the plaintiffs otherwise plausibly allege an agreement. *In re MultiPlan Health Ins. Provider Litig.*, 789 F. Supp. 3d at 642. As the Northern District of Illinois previously concluded, "the structure of the containerboard industry provides some additional contextual support for the plausibility of a conspiracy." *Kleen I,* 775 F. Supp. 2d at 1081.[12] "[A]n 'industry structure that facilitates collusion constitutes supporting evidence of collusion.'" *In re Loc. TV Advert. Antitrust Litig.,* No. 2020 WL 6557665, at *10 quoting *Text Messaging,* 630 F.3d at 627-28.[13] The Containerboard Products industry (i) is concentrated, (ii) has high barriers to entry, and (iii) concerns commodity products, all of which are factors supporting the plausibility of Plaintiff's allegations.

*First*, Plaintiff alleges (and Defendants do not dispute) that five producers accounted for over 74% of the market for Containerboard Products in 2022, and now control 85% or more of

---

[12] Defendants attempt to argue that the market structure of the Containerboard Products industry "makes it easier for companies either to form a cartel or to follow the leader independently" *Kleen Prods.*, 910 F.3d at 935 (emphasis in original) and relying on *Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 50 (7th Cir. 1992). Both of these are summary judgment decisions. Once again, weighing plausible explanations is not permitted at the motion to dismiss stage.

[13] As the *Local TV* court recognized*, Washington Cty. Health Care Auth. v. Baxter Int'l Inc.*, 328 F. Supp.3d 824, 843 (N.D. Ill. 2018), cited by Defendants, stands for the proposition that "'industry structure alone cannot get the complaint across the finish line,' not that it is an irrelevant consideration" *Local TV,* 2020 WL 6557665, at *10 quoting *Washington Cty.*, 328 F. Supp.3d at 841.

this market. This concentration supports a plausible inference of a conspiracy. *See In re Turkey Antitrust Litig.*, 642 F. Supp.3d at 727 ("Defendants and the five named Co-Conspirators control approximately 80 percent of turkey production and processing."); *In re Text Messaging Antitrust Litig.,* 630 F.3d at 628 (market structure where four Defendants sold 90% of U.S. text messaging services supported plausibility of conspiracy); *Broiler,* 290 F. Supp.3d at 796 (market structure where 17 conspirators controlled 88.8% of market sufficient to support conspiracy); *Starr v. Sony BMG Music Ent.,* 592 F.3d 314, 324 (2d Cir. 2010) (Defendants' 80% market share recognized as a plus factor). [14]

*Second*, Plaintiff alleges that the Containerboard Products industry has significant entry barriers, requiring significant capital for intensive start-up costs, access to a reliable supply of raw materials, and high transportation costs. ¶ 136. Academics have recognized that the capital-intensive nature of the industry restricts entrants. *Id.* High barriers to entry further support the plausibility of the conspiracy. *See, e.g., In re Turkey Antitrust Litig.,* 642 F. Supp. 3d at 727 (high capital costs to entry recognized as a plus factor supporting conspiracy).

*Third*, Containerboard Products are commodity products. ¶ 142. Containerboard sheets and linerboard sheets from one manufacturer are interchangeable with another manufacturer's containerboard or linerboard sheets. *Id.* Likewise, finished boxes come in standard sizes and are interchangeable with each other. *Id.* Further, Containerboard Products have inelastic demand (meaning consumers will continue to buy them as prices rise) as no reasonable substitutes exist. ¶ 141. Commodity products with "inelastic demand and price-based competition […] provide

---

[14] Defendants cite *Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.,* 971 F.2d 37, 50 (7th Cir. 1992) in support of their argument that follow the leader pricing in an oligopolistic market does not violate the antitrust laws. However, *Reserve Supply* is a summary judgment decision and therefore irrelevant to the issue here - whether a concentrated market is a plus factor supporting the existence of an antitrust conspiracy at the motion to dismiss stage.

additional context that supports claims of a conspiracy to fix prices." *In re Turkey Antitrust Litig.,* 642 F. Supp.3d at 727 (citing *Broiler,* 290 F. Supp.3d at 780 ("Commodity industries are particularly susceptible to agreements that violate antitrust laws.")). *See also In re High Fructose Corn Syrup Antitrust Litig.,* 295 F.3d 651, 656-57 (7th Cir. 2002) (Posner, J.) (recognizing that highly standardized products facilitate collusion).

The market characteristics of the Containerboard Products industry demonstrate that it is ripe for collusion.

### 4. Prior Antitrust Violations

The Containerboard Products industry is no stranger to anticompetitive conduct. As described above, Defendants and/or their predecessors have a notorious history of antitrust violations over the past 85 years, including criminal and civil litigation in the U.S. and elsewhere concerning the very same products at issue in this litigation. ¶ 112-121. Defendants' prior antitrust violations support the plausibility of a conspiracy. *In re High Fructose Corn Syrup Antitrust Litig.,* 295 F.3d at 661 (noting that the defendant conceded fixing prices on other products at the same time as the conspiracy alleged). "Evidence of '[p]rior antitrust violations and the history of competition in a market' may be used to show the 'intent, motive and method of a conspiracy under Section 1' so long as there is a 'direct, logical relationship' between the collateral conspiracy and the instant conspiracy." *See Ross v. Am. Express Co.*, 35 F. Supp.3d 407, 449 (S.D.N.Y. 2014) (quoting *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1371 (2d Cir. 1988)), *aff'd sub nom. Ross v. Citigroup, Inc.,* 630 F. App'x 79 (2d Cir. 2015); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp.2d 896, 903 (N.D. Cal. 2008) (stating guilty pleas of price fixing in the Dynamic Random Access Memory (DRAM) market "support an inference of a conspiracy in the SRAM industry" when some of the same actors "were responsible for

marketing both SRAM and DRAM"). A number of industries, including dairy, gypsum, fertilizers and cement, have long histories of price-fixing recidivism. Maurice E. Stucke, *Behavioral Economists at the Gate: Antitrust in the Twenty-First Century*, 38 Loy. U. Chi. L.J. 513, 567-68 (2007). Thus, an indicator that firms in a market will engage in illegal collusion is that they have done so in the past. The argument is not simply "if it happened there, it could have happened here," as Defendants suggest (*see* Mem. at 28). Rather, Plaintiff here makes detailed allegations of parallel conduct, including price-fixing and capacity restrictions, that mirrors prior conduct by the same participants and "plausibly extend[s] the conspiracies uncovered." *In re Auto. Parts Antitrust Litig.,* No. 12-MD-02311, 2014 WL 4209588, at *3 (E.D. Mich. Aug. 26, 2014).

## C. Defendants May Not Rely on Documents Outside the Complaint

On a motion to dismiss, a court confines its review to the allegations in the complaint and its attachments. The Seventh Circuit recognizes only two narrow exceptions that allow a court to consider materials beyond the complaint at the pleading stage: (1) documents referenced in the complaint and central to the plaintiff's claims, and (2) information subject to proper judicial notice. *See Olson v. Bemis Co.*, 800 F.3d 296, 305 (7th Cir. 2015); *ABN AMRO, Inc. v. Cap. Int'l Ltd.*, No. 04 C 3123, 2007 WL 845046, at *5 (N.D. Ill. Mar. 16, 2007). Neither are present here.

### 1. The Extrinsic Materials are not Incorporated by Reference

For a court to consider a document as incorporated by reference on a motion to dismiss, it must be (1) referenced in the complaint, (2) central to the plaintiff's claim, and (3) properly authenticated or "concededly authentic." *ABN AMRO*, 2007 WL 845046, at *5.. Where any of these elements are not met, the document may not be considered incorporated by reference. *See, e.g., Macias v. Bakersfield Rest., LLC*, 54 F. Supp.3d 922, 927 (N.D. Ill. 2014) (declining to consider documents attached to defendant's motion to dismiss because the documents were neither

central to, nor required, to resolve plaintiff's claims); *Ninth Ave. Remedial Grp. v. Allis Chalmers Corp.*, 974 F. Supp. 684, 687 (N.D. Ind. 1997) (declining to consider exhibits attached to a motion to dismiss because plaintiff's general reference in the complaint to defendants' PRP status under CERCLA was insufficient to make those documents central to the claim).

Defendants ask the court to consider the following materials outside the four corners of the Complaint: International Paper's 2025 10-K (Mem. at 19), Cascades' 2021 and 2022 10-Ks (Mem. at 19), International Paper's February 1, 2024 earnings call (Provance Decl. Ex. 1), Smurfit Westrock's May 1, 2025 Earnings Call (Provance Decl. Ex. 2), PCA's website (PCA Mem. at 3), and Pratt's website (Pratt Mem. at 3–4). These materials may not be considered.

The Seventh Circuit has made clear that incorporation by reference is a narrow exception and usually applies in a suit for breach of contract where the claim *arises from* the document itself. *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002). Outside of that context, courts evaluate centrality by asking whether, "but for" the document, the claim would exist. *See, e.g., McCabe v. Crawford & Co.*, 210 F.R.D. 631, 639 (N.D. Ill. 2002) (considering a rental agreement attached to the motion to dismiss because it is referred to in the complaint, and "but for the contract…, [Plaintiff's] claims would not exist"). Here, Plaintiff's antitrust claim does not *arise from* Defendants' public disclosures. Plaintiff's claim is based on price-fixing in the Containerboard Products market. That claim would exist even if Defendants had never filed annual reports, conducted earnings calls, or made announcements on their websites. Thus, they are not "central" to Plaintiff's claim within the meaning of the doctrine, and the exception does not apply.[15]

---

[15] Defendants' authorities only confirm this point. Defendants rely on *Tichy* to suggest that courts may consider materials that "relate to, and provide a fuller picture of, the [matter] Plaintiff cites in her complaint" at the motion to dismiss stage. *Tichy v. Hyatt Hotels Corp.*, 376 F. Supp.3d 821, 846 (N.D. Ill. 2019). But in *Tichy*, the "matter" was branded-keyword search results, and the court permitted consideration of additional search-results precisely because they "directly" relate to "Plaintiff's theory

### 2. Judicial Notice Does Not Permit the Extrinsic Materials For Their Truth or to Draw Inferences Against Plaintiff

Federal Rule of Evidence 201 strictly limits judicial notice to adjudicative facts that are beyond dispute. Fed. R. Evid. 201. "A court may take judicial notice of an adjudicative fact that is both 'not subject to reasonable dispute' and either (1) 'generally known within the territorial jurisdiction of the trial court' or (2) 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997) (citing Fed. R. Evid. 201(b)). The Seventh Circuit has emphasized that "indisputability is a prerequisite" to judicial notice and that Rule 201 must be applied strictly because judicial notice deprives parties of the opportunity to contest a fact. *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1354 (7th Cir. 1995); *Gen. Elec. Capital Corp.*, 128 F.3d at 1083.

Defendants ask the Court to take judicial notice of International Paper's Form 10-K (Mem. at 19), their "common sense" about COVID-19 and demand for product (Mem. at 7-8), information on the U.S. Census Bureau website (Mem. at 8), stock price data (Mem. at 15), and PCA's

---

that Defendants manipulated the results of searches for their branded keywords." *Id*. This case reaffirmed, rather than relaxed, the established Seventh Circuit rule that a document may be considered only if it is both referenced in the complaint and central to the plaintiff's claim. *Id*. (citing *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002)). Likewise, in *Tires*, the court considered "full transcripts" of earnings calls because plaintiffs alleged that defendants used those calls to publicly signal their collusive intent, making the call transcripts "integral to plaintiffs' conspiracy allegations." *In re Passenger Vehicle Replacement Tires Antitrust Litig.*, 767 F. Supp.3d 681, 694 (N.D. Ohio 2025). Additionally, the court *in Fortres Grand Corp.*, the authority Pratt cites in its motion to dismiss, considered the contents of the websites because the websites were part of the challenged conduct. *Fortres Grand Corp. v. Warner Bros. Ent. Inc.,* 947 F. Supp.2d 922, 925 (N.D. Ind. 2013), *aff'd*, 763 F.3d 696 (7th Cir. 2014). By contrast, Plaintiff here makes no allegation tying Defendants' alleged misconduct to the referenced documents defendants. The public filings, transcripts, and the defendants' websites are cited in the Complaint as contextual support, not as the legal basis of the cause of action.

expansion announcement on the government website (PCA Mem. at 3), as if they were all subject to proper judicial notice simply because they appear in public sources. Not so.

Defendants seek judicial notice of a qualitative statement in International Paper's Form 10-K that "[t]he more significant of [the cost changes] include changes in raw material costs, principally wood, recovered fiber and chemical costs; energy costs; freight costs; mill outage costs; salary and benefits costs, including pensions; and manufacturing conversion costs." Mem. at 19. However, management's subjective assessment of the relative "significance" of various cost drivers is not corroborated by any numerical data that would make it indisputable. It is not an objective fact "capable of accurate and ready determination" within the meaning of Rule 201(b). The Court therefore should not take judicial notice of this statement for its truth under Rule 201.

Defendants' COVID-19 "common sense" theory presents the same problem. Courts may not treat disputed causal or economic inferences about COVID-19 as proper subjects of judicial notice. *See, e.g.*, *Realtek Semiconductor Corp. v. MediaTek, Inc.*, 769 F. Supp.3d 1067, 1086 (N.D. Cal. 2025) (declining judicial notice of the alleged pandemic's impacts on supply-chain disruptions because the purported impacts were not indisputable facts); *Mays v. Dart*, 974 F.3d 810, 824 (7th Cir. 2020) (rejecting judicial notice of a CDC report about COVID-19 interventions because its conclusions were not "incontrovertible").

Defendants here ask the Court to judicially accept that (1) COVID-19 caused an "unprecedented" surge in e-commerce; (2) that such a surge translated into increased demand for containerboard; and (3) that this chain of events explains away Defendants' price increases as purely competitive. *See* Mem. at 7-8, 18-21. Each causal step depends on contested issues, such as industry data, timing, geography, products, and the relationship between demand, costs, and prices. These factors are neither "generally known" nor "accurately and readily determined."

Defendants' reliance on U.S. Census Bureau e-commerce figures, historical stock prices, and PCA expansion announcement illustrate the basic distinction between noticing the existence of information and accepting a disputed narrative drawn from it. When courts do take notice of public records, they generally do so only for the fact that the documents exist and say what they say, not to accept the truth of their contested assertions. *See, e.g.*, *ABN AMRO, Inc.,* 2007 WL 845046, at *9 ("[J]udicial notice is generally not for the truth of the matters asserted in a court document"); *Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 943 (7th Cir. 2012) ("The district court took judicial notice of the indisputable facts that those documents exist, they say what they say, and they have had legal consequences. The district court did not rely on the documents as proof of disputed facts in any other sense.").

Here, Defendants attempt to use these materials to disprove supracompetitive pricing, profitability, and capacity restriction. *See* Mem. at 7–8, 15; PCA Mem. at 3. Whether that data supports Defendants' contested narrative is a fact question requiring econometric analysis and a further evidentiary record. Thus, these materials are not appropriately subject to judicial notice.

### D. Plaintiff's Claim Is Timely

Defendants contend that any claims arising from sales prior to July 29, 2021—four years before the filing of the Complaint—are time-barred. Mem. at 28. This contention is misplaced. The Seventh Circuit has consistently held that dismissal under Rule 12 on statute of limitations grounds is strongly disfavored, as such dismissal is only appropriate where a plaintiff has "plead itself out of court" by alleging facts that unequivocally establish untimeliness. *Vasquez v. Indiana Univ. Health, Inc.*, 40 F.4th 582, 588 (7th Cir. 2022). Plaintiff has not done so here.

An antitrust claim accrues when a defendant commits an act that injures the plaintiff's business. *In re Copper Antitrust Litig.*, 436 F.3d 782, 789 (7th Cir. 2006). That rule, however, is

qualified by the discovery rule, which postpones accrual until the plaintiff discovers the injury. *Id.* Plaintiff could not have discovered the concealed price-fixing scheme until shortly before filing suit. In fact, Defendants fail to point to any allegations in the Complaint demonstrating that Plaintiff was on notice of its claims. As courts have recognized, "market conditions standing alone do not put a plaintiff on notice that the prices it paid resulted from an illegal conspiracy." *Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.*, 85 F. Supp.3d 1007, 1012 (E.D. Wis. 2015). Defendants themselves acknowledge that a single price increase announcement would not suffice, arguing only that "Plaintiff had every reason to investigate the ***2020–2021 price fluctuations*** in the four years after they occurred." Mem. at 30 (emphasis added). Even assuming, *arguendo*, that Plaintiff could have been aware of a potential claim at the start of the Relevant Period, Defendants' own argument supports the conclusion that only the cumulative effect of these early price announcements could have triggered notice. The final increase in 2020-2021 occurred on October 1, 2021—fewer than four years before the Complaint was filed. Accordingly, all claims are timely.

Plaintiff's claim is also tolled under the doctrine of fraudulent concealment. Defendants' price-fixing conspiracy was inherently self-concealing, a principle long recognized in this Circuit. *See Superior Beverage Co. v. Owens-Illinois, Inc.*, No. 83C0512, 1988 WL 99216, at *2 (N.D. Ill. Sept. 22, 1988) (citing *Baker v. F&F Inv.*, 420 F.2d 1191, 1199 (7th Cir. 1970)). Defendants' assertion that Plaintiff's concealment allegations are "bare-bones" is unfounded. Plaintiff pled with particularity, identifying the who, what, when, where, and how of concealment. Specifically, Plaintiff alleged that Defendants and their co-conspirators conspired to fix, raise, maintain, and stabilize prices beginning November 1, 2020, and that they carried out this scheme through industry meetings cloaked in legitimacy, which served as cover for unlawful coordination. Plaintiff also set forth specific dates and identified attendees of those meetings, supplying the level of detail

39

required to establish Defendants' active concealment. This is precisely the type of particularized pleading courts have deemed sufficient. *See Fond Du Lac*, 85 F. Supp.3d at 1012.

Plaintiff further alleged that Defendants offered pretextual justifications for their parallel price increases, asserting that the increases were driven by COVID-19 created demand dynamics. ¶¶ 145–46. Defendants even reiterated this same claim in their present motion. Mem. at 7-8. Citing out-of-circuit authorities, Defendants argue that reliance on non-conspiratorial explanations is insufficient to show concealment, but the Seventh Circuit recognizes that pleading false alternative explanations for price increases adequately alleges concealment. *See Copper*, 436 F.3d at 791 (finding evidence including "publicly offered innocent alternative explanations to explain away events related to the price-fixing conspiracy, knowing that they were misleading" sufficient to establish fraudulent concealment at summary judgment).

Defendants further accuse Plaintiff of failing to allege reasonable diligence, but Plaintiff had no reason to investigate because Defendants actively concealed the conspiracy through false explanations. Courts have rejected arguments that plaintiffs failed to allege diligence where defendants lied about reasons for price increases. *See Fond Du Lac*, 85 F. Supp.3d at 1012 (rejecting defendants' argument that plaintiffs did not allege "reasonable diligence" with particularity because "defendants allegedly lied about the reason for the price increases"). Therefore, Plaintiff's claim is timely under the discovery rule and Defendants' fraudulent concealment bars any statute of limitations defense.

## V.    CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss should be denied in their entireties.  Should this Court grant Defendants' Motions to Dismiss, in whole or in part, Plaintiff respectfully requests leave to amend its Complaint.

Dated: December 19, 2025          Respectfully submitted,

By: */s/ Nicole A. Veno*
    Vincent Briganti (*pro hac vice*)
    Margaret MacLean (*pro hac vice*)
    Raymond Girnys (*pro hac vice*)
    Nicole A. Veno (*pro hac vice*)
    Katherine Boyd (*pro hac vice*)
    Xin Huang (*pro hac vice*)
    **LOWEY DANNENBERG, P.C.**
    44 South Broadway, Suite 1100
    White Plains, NY 10601
    Phone: (914) 997-0500
    Fax: (914) 997-0035
    vbriganti@lowey.com
    mmaclean@lowey.com
    rgirnys@lowey.com
    nveno@lowey.com
    kboyd@lowey.com
    xhuang@lowey.com

    Christopher M. Burke (*pro hac vice*)
    Amelia F. Burroughs (*pro hac vice*)
    Yifan (Kate) Lv (*pro hac vice*)
    Robin Stemen (*pro hac vice* forthcoming)
    **BURKE LLP**
    402 West Broadway, Suite 1890
    San Diego, CA 92101
    Phone: (619) 369-8244
    cburke@burke.law
    aburroughs@burke.law
    klv@burke.law
    rstemen@burke.law

    *Interim Co-Lead Counsel for Plaintiff*
    *and the Proposed Class*

    Gary D. McCallister ARDC No. 6219649
    **MCCALLISTER LAW GROUP, LLC**
    777 North Michigan Avenue
    #3502
    Chicago, Illinois 60611
    Phone: 312-345-0611
    Fax: 312-345-0612
    gdm@mccallisterlawgroup.com

Eric I. Unrein ARDC No. 6239373
**CAVANAUGH, BIGGS & LEMON, PA**
3200 SW Huntoon Street
Topeka, Kansas 66604
Phone:  785-440-4000
Fax:  785-440-3900
eunrein@cavlem.com

*Counsel for Plaintiff*