**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ARTUSO PASTRY FOODS CORP., individually and on behalf of all others similarly situated,

Plaintiff,

v.

PACKAGING CORPORATION OF AMERICA, INTERNATIONAL PAPER COMPANY, SMURFIT KAPPA NORTH AMERICA LLC, WESTROCK CP, LLC, GEORGIA-PACIFIC LLC, CASCADES INC., CASCADES USA INC., CASCADES HOLDING US, INC., PRATT INDUSTRIES, INC., AND GREIF INC.,

Defendant(s).

Case No. 1:25-cv-00856

Judge Mary M. Rowland

**MEMORANDUM OPINION AND ORDER**

For the reasons stated herein, Defendants' Joint Motion to Dismiss, Pratts' Individual Motion to Dismiss, and PCA's Individual Motion to Dismiss are each DENIED.

## I. Background

### A. The Containerboard Industry

Plaintiff Artuso Pastry Foods Corp. alleges that Defendants conspired from November 1, 2020, to the Present (the "Class Period") to artificially inflate the prices of containerboard, the inputs of containerboard, and the finished packaging products made from containerboard and used throughout the economy to package, transport,

and store goods. Compl. at ¶¶37-39.[1] Containerboard is comprised of corrugating medium and linerboard and is the principal raw material used to manufacture products like cardboard boxes and product displays. *Id.* at ¶38.[2] The Complaint refers to these products collectively as "Containerboard Products." *Id.*

Americans consume tens of millions of Containerboard Products each day. *Id.* at ¶37. Defendants, the leading manufacturers of Containerboard Products, are alleged to combine linerboard and corrugating medium to make containerboard, which they sell as its own product or convert into finished packaging products. *Id.* at ¶¶37-45.

Parties agree that the Containerboard Products industry is highly concentrated. While in the mid-nineties, the five largest companies only accounted for approximately 42% of the market, *id.* at ¶98, in 2022, just five Defendants allegedly accounted for approximately 74%. *Id.* at ¶¶46-47, 97-111. Today, Defendants are alleged to control 85% or more of the market for Containerboard Products. ¶47. The Complaint further alleges that the industry is vertically consolidated, and that Defendants participate at multiple stages of the production process. ¶¶ 43-44, 97-111.

[1] The Court accepts well-pleaded factual allegations in the operative complaint (Dkt. 1) as true when considering a motion to dismiss. *See Lax v. Mayorkas*, 20 F.4th 1178, 1181 (7th Cir. 2021).

[2] Linerboard is a strong, smooth packaging material that is made from virgin or recycled fiber or a blend of the two; corrugating medium is the wavy material used as the inner layer of most cardboard boxes. *Id.* at ¶¶39-40. A principal input of both linerboard and corrugating medium is new or recycled wood pulp. *Id.* Containerboard Products are alleged to be highly interchangeable at each stage of the production process. Id. at ¶¶125, 136. Further, because containerboard, linerboard, and corrugating medium are inputs of finished packaging products, the Complaint alleges that increases in their prices increase the prices of finished packaging products as well. *Id.* at ¶44.

**B. Parties**

Plaintiff is a direct purchaser of containerboard products who allegedly purchased these products at artificially high prices.[3] Plaintiff filed its Complaint on July 29, 2025, naming twelve defendants: Cascades Inc., Cascades USA Inc., and Cascades Holding US, Inc. (collectively, "Cascades"); International Paper Company ("International Paper"); Georgia-Pacific LLC ("Georgia-Pacific"); Graphic Packaging International, LLC ("GPI"); Greif Inc. ("Greif"); Packaging Corporation of America ("PCA"); Pratt Industries, Inc. ("Pratt"); Smurfit WestRock plc ("Smurfit WestRock"); Smurfit Kappa North America LLC ("Smurfit Kappa"); and WestRock CP, LLC ("WestRock CP"). Plaintiff dismissed GPI without prejudice on September 24, 2025, [111], and Smurfit WestRock on October 17, 2025, pursuant to Rule 41(a)(1).[4] [113].

---

[3] Plaintiff brings claims on behalf of a class defined as: "All persons who purchased Containerboard Products directly from one or more Defendants within the United States and its territories from November 1, 2020, until the present."

[4] The Complaint describes conduct by "WestRock", defined as WestRock Company, Smurfit Westrock plc's predecessor prior to its 2024 merger, as well as WestRock CP, Smurfit Kappa, and "Smurfit WestRock," defined as Smurfit WestRock plc, WestRock CP, and Smurfit Kappa. No Defendant objected to Plaintiff's characterization of these entities. Plaintiff's Opposition brief clarifies that while Smurfit WestRock plc announced certain conduct described in the complaint, its alleged U.S. sales and operating subsidiaries, WestRock CP and Smurfit Kappa, "necessarily" implemented that conduct. [129] at 3 n.4. Plaintiff may use its opposition brief at the motion to dismiss stage to clarify factual allegations already contained in the complaint. *See Help at Home Senior Care, Inc. v. Aall Care in the Home, LLC*, 260 F.3d 748, 752-53 (7th Cir. 2001); *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). Because Plaintiff used the term "Smurfit WestRock" to encompass these entities in its Complaint, which Plaintiff also alleges possess parent-subsidiary or sister corporate relationships to each other, the Court will adopt Plaintiff's framing. In the light most favorable to the Plaintiff, it is plausible that these relationships create sufficient unity of identity. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771-72 (1984) (finding that parents and subsidiaries cannot conspire under Section 1 because they have a "complete unity of interest"); s*ee also Rohlfing v. Manor Care, Inc.,* 172 F.R.D. 330, 344 (N.D. Ill. 1997) (citing *Bell Atl. Bus. Sys. Servs. v. Hitachi Data Sys. Corp.*, 849 F. Supp. 702, 706 (N.D. Cal. 1994) (collecting cases showing that two wholly-owned sister companies have sufficient unity of interest that they cannot conspire under Section 1).

### C. Defendants' Pricing and Production

Plaintiff alleges that Defendants participated in seven rounds of parallel price increases beginning in late 2020, generally preceded by public price-increase announcements one to two months before the increases took effect. Compl. at ¶54 (table). Six of those rounds are pleaded with sufficient specificity to identify participating Defendants and the timing of the increases; the Court accords substantially less weight to the third-in time increase that allegedly occurred in mid-to-late 2021.

The first alleged price increase became effective on November 1, 2020. *Id.* Six Defendants—Cascades, Georgia-Pacific, International Paper, PCA, Pratt, and WestRock—are alleged to have participated. *Id.* This price increase was the first in the industry in approximately two and a half years. *Id.* at ¶55. Five of the six participating Defendants announced this first increase on September 25, 2020; WestRock announced on September 30. *Id.* The alleged increases were identical: $50 per ton for both linerboard and corrugating medium. *Id.* at ¶¶54-55.

Cascades, International Paper, and PCA are alleged to have implemented the second well-pleaded increase on March 1, 2021, with Greif following on March 4. *Id.* at ¶54. All four announced this increase, of $60-70 dollars for both linerboard and corrugating medium, during February 2021. *Id.* at ¶56.[5] The third well-pleaded

[5] Plaintiff's chronology also identifies an "industry-wide" price increase that allegedly occurred in mid-to-late 2021. *Id.* at ¶57. That allegation is materially less specific than the allegations concerning the six rounds above. To show this increase, Plaintiff relies on a WestRock price increase effective in mid-July 2021 and on unspecified "industry reports" that other firms followed, including one stating that the industry experienced its third industry-wide price increase by August 2021. *Id.* The Complaint does not identify which Defendants participated, other than stating that "other major producers took similar actions." *Id.* Further, the Complaint does not identify with specificity when exactly this price

increase became effective March 1, 2022. *Id.* at ¶54 (Table). Cascades, International Paper, PCA, and WestRock are alleged to have participated. *Id.* All four announced their increases in January 2022. *Id.* at ¶58. A nearly two-year lull then followed before the next alleged industry-wide increase. *Id.* at ¶59.

The fourth well-pleaded increase became effective on January 1, 2024, and involved Cascades, International Paper, PCA, and Pratt. *Id.* at ¶54 (table). All four announced increases during December 2023. *Id.* at ¶59. The fifth well-pleaded increase became effective June 1, 2024, and involved Georgia-Pacific, International Paper, Pratt, and WestRock, with Cascades following two days later. *Id.* at ¶54 (table). These increases were announced during May 2024. *Id.* at ¶60. The sixth became effective in January 2025 and involved Georgia-Pacific, Greif, International Paper, PCA, and Smurfit WestRock. *Id.* at ¶¶54, 61. The announcements of the sixth well-pleaded increase occurred in close succession: PCA announced on November 20, 2024; International Paper and Georgia-Pacific on November 25; WestRock on November 27; and Greif on December 5. *Id.* at ¶54 (table). Unlike the earlier rounds, the 2025 increases differed somewhat by type of linerboard and geographic region, although the alleged increases for corrugating medium remained closely aligned, ranging from approximately $80 to $100 per ton. ¶54 (table).

---

increase occurred. *Compare id.* at ¶54 (table) (showing an industry-wide increase on 10/1/21) *with id.* at ¶57 (suggesting third price increase happened by August 2021). The Court therefore does not give this allegation the same weight as the six well-pleaded rounds described above. *See In re Concrete & Cement Additives Antitrust Litig.*, 2025 WL 1755193, at *16 (S.D.N.Y. June 25, 2025) (finding "allegations about market-wide price increases do not show that any particular Defendant or group of Defendants, was engaged in an anticompetitive conspiracy.").

The Complaint alleges that, in most of these rounds, Defendants increased prices of linerboard and corrugating medium by the same or nearly the same amount. *Id.* International Paper participated in all six adequately pleaded rounds. *Id.* Cascades participated in five: all but the sixth. *Id.* PCA also participated in five: all but the fifth. *Id.* WestRock or its successor, Smurfit WestRock, are alleged to have participated in four. *Id.* Georgia-Pacific and Pratt are each alleged to have participated in three rounds, while Greif is alleged to have participated in two. *Id.* Plaintiff alleges that these increases raised the average price of Containerboard Products by approximately 30% during the class period. *Id.* at ¶2.

In addition to parallel price increases, Plaintiff alleges that three Defendants, Greif, International Paper, and the WestRock entities, participated in capacity restrictions. *Id.* at ¶¶62-75. The WestRock entities announced the closure of corrugated medium manufacturing operations in October 2022, and capacity restriction at two mills, a coated recycled board mill and a containerboard mill on April 30, 2025. *Id.* at ¶¶62, 67. WestRock also announced the closure of a paper mill on August 23, 2023, "eliminating production of approximately 600,000 annual tons of pulp," as well as "25,000 annual tons of specialty-grade capacity." *Id.* at ¶63. International Paper allegedly announced two capacity restrictions: closing a containerboard mill and ceasing production on two pulp machines on October 18, 2023, and closing another containerboard mill on February 13, 2025. *Id.* at ¶¶64, 66. Greif announced two output restrictions as well. On January 29, 2025, Greif announced the closure of a mill that produced both containerboard and a type of

linerboard, as well as a machine that produced that same type of linerboard. *Id.* at ¶65. On May 1, 2025, Greif announced the closure of another mill producing linerboard. *Id.* at ¶68.

At some point during the Class Period, these same three Defendants, Greif, International Paper, and Smurfit WestRock, are also alleged to have transitioned to a value-over volume business model that, Plaintiff says, "would be irrational in a competitive market, where increased prices would drive customers to competitors." *Id.* at ¶¶70-75. International Paper referenced this change in a 2024 earnings call, Greif recognized it in a comment on its 2022 financial results, and Smurfit WestRock acknowledged it during a Q1 2025 conference call. *Id.* at ¶¶70-73.

Plaintiff finally alleges demand and input cost trends that, it argues, show that the price increases were not justified by economic trends. *Id.* at ¶¶76-90. On the other hand, Defendant argues that these trends serve as an obvious explanation for the price increases and output restrictions. [118] at 18-21. The Court examines these facts and arguments as necessary below, *infra* Section III.C.

## II. Standard

"To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quoting *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014)); *see also* Fed. R. Civ. P. 8(a)(2). A court deciding a Rule 12(b)(6) motion "construe[s] the complaint in the light most

favorable to the plaintiff, accept[s] all well-pleaded facts as true, and draw[s] all reasonable inferences in the plaintiff's favor." *Lax*, 20 F.4th at 1181. However, the court need not accept as true "statements of law or unsupported conclusory factual allegations." *Id.* (quoting *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586 (7th Cir. 2021)).

Dismissal for failure to state a claim is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). Deciding the plausibility of the claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

Where the plausibility standard is applied in a case involving violations of the Sherman Act Section 1, it takes on a specific tact. Agreements to restrain trade are illegal *per se* under the Sherman Act Section 1, even if perhaps reasonable. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940). *Per se* agreements to restrain trade are also unlawful regardless of the scheme's success. *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655-56 (7th Cir. 2002) (failing to distinguish between the existence of a conspiracy and its efficacy" as a "trap" to be avoided).

Violations of Section 1 may be established through direct or circumstantial evidence. *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628-29 (7th Cir. 2010) (*Text Messaging I*). Plaintiff here alleges no direct evidence. Therefore, the Court examines whether Plaintiff's allegations of circumstantial evidence "'nudge[] their

claims across the line from conceivable to plausible.'" *Kleen Prods., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1075 (N.D. Ill. 2011) (*Kleen I*) (citing *Twombly*, 550 U.S. at 570).

*Twombly* instructs that the plausibility of allegations supporting a Section 1 violation through circumstantial evidence must be evaluated given the ever-present possibility of lawful "identical, independent action." 550 U.S. at 548, 556-57 (2008). This showing can be difficult in concentrated markets where firms may reach supracompetitive prices without explicit agreement. *See Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927, 931 (7th Cir. 2018) ("*Kleen III")* ("tacit collusion is easy" in oligopolistic markets). Oligopolists may rationally refrain from competing aggressively on price, "preferring to share the profits [rather] than to fight with each other." *Joe Sanfelippo Cabs, Inc. v. City of Milwaukee*, 839 F.3d 613, 615 (7th Cir. 2016). The same harmful economic result—higher prices and lower output—can follow either lawful conscious parallelism or an unlawful agreement. *See* 6 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1429b (4d ed., May 2026 update).

Still, price fixing conspiracies strike at the "central nervous system of the economy." *Socony-Vacuum*, 310 U.S. at 224 n.59. To address these conspiracies, Congress drafted the antitrust laws with the express purpose of encouraging private enforcement." *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1002 n.10 (N.D. Ill. 2011) (citing *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979)) (cleaned up). On the other hand, "antitrust discovery can be expensive," and plaintiffs bringing implausible allegations should not be permitted to abuse the

system. *Twombly*, 550 U.S. at 546. The plausibility standard strikes the balance: Given the possibility of independent lawful action, complaints that merely allege that Defendants acted in parallel do not allege a plausible conspiracy. *Id.* Instead, "further factual enhancement" is required. *Id.* at 557 In the Seventh Circuit, this enhancement is provided by "plus factors:" considerations that make agreement, rather than independent conduct, a more plausible inference. *See, e.g.*, *In re Turkey Antitrust Litig.*, 642 F. Supp. 3d 711, 722 (N.D. Ill. 2022); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 793, 797 (N.D. Ill. 2017); *Plasma-Derivative*, 764 F. Supp. 2d at 998-1002. "Sufficient circumstantial evidence may include 'a mixture of parallel behaviors, details of industry structure, and industry practices, that facilitate collusion.'" *In re Turkey*, 642 F. Supp. 3d at 722 (citing U*.S. Bd. of Oral Implantology v. Am Bd. of Dental Specialties*, 390 F. Supp. 3d 892, 902–03 (N.D. Ill. 2019) (citing *Text Messaging I*, 630 F.3d at 627)). Thus, a plaintiff must allege both parallel behavior and plus factors sufficient to show that "discovery may reveal the smoking gun or bring to light additional circumstantial evidence." *See Text Messaging I*, 630 F.3d at 629.

The Supreme Court in *Twombly* also explained what it did not hold, cautioning against "impos[ing] a probability requirement at the pleading stage." *Id.* at 556. At summary judgment, a plaintiff must come forward with evidence sufficient to permit a reasonable jury "to reject the hypothesis that the defendants foreswore price competition without actually agreeing to do so." *High Fructose Corn Syrup*, 295 F.3d at 661. But at the pleading stage, "the mere existence of an alternative explanation

for Defendants' conduct" does not destroy the plausibility of a conspiracy claim. *Broiler Chicken I*, 290 F. Supp. 3d at 801. "[T]he Supreme Court did not intend for courts to weigh the plausibility of a plaintiff's conspiracy claims against the plausibility of the defendants' alternative explanation for their conduct." *Id.* at 801; *compare Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 720 (7th Cir. 2010) (holding a Plaintiff must introduce evidence that "must tend to rule out" the possibility of independent action) *with Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) (It is "not necessary to stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences.").[6] Given the differences in these standards, summary judgment decisions can be of "limited value [at the motion to dismiss stage] because more is required of plaintiffs at [the summary judgment stage]." *In re Manufactured Home Lot Rents*, 2025 WL 3485693, at *7 n.7 (discussing *Broiler Chicken*, 290 F. Supp. 3d at 801; *Plasma-Derivative*, 764 F. Supp. 2d at 1002).

Therefore, this Court examines Plaintiff's allegations as the case law requires. A showing of parallel conduct alone is not enough; further factual enhancement via

[6] *Kleen III*, which both parties cite, is illustrative. 910 F.3d 927. In *Kleen II*, the district court granted summary judgment in favor of defendants because plaintiffs had not presented evidence that "tended to exclude the possibility that the alleged conspirators acted independently." *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 818 (N.D. Ill. 2017), *aff'd sub nom. Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927 (7th Cir. 2018) (internal citations omitted). The Seventh Circuit affirmed "[b]ecause the evidence proffered by [plaintiffs did] not *tend to exclude* the possibility [Defendants] engaged only in tacit collusion." *Kleen III*, 910 F.3d at 942. However, at the motion to dismiss stage, where this litigation is now, the same court required only that "[plaintiffs] provide additional contextual factors that support a plausible inference of an agreement even if they do not 'exclude every plausible interpretation of the facts that does not support their theory of liability.'" *Kleen I*, 775 F. Supp. 2d at 1078 (citing *In re Potash Antitrust Litig.*, 667 F.Supp.2d 907, 936–37 (N.D.Ill.2009)).

plus factors must tilt Plaintiff's allegations of conspiracy into plausibility. But to impliedly impose a requirement that Plaintiff must plead facts tending to exclude conscious parallelism would inappropriately raise the pleading standard beyond that required by *Twombly* and Seventh Circuit law.

## III. Analysis

A plaintiff relying on circumstantial evidence must adequately allege parallel conduct and additional plus factors that make the inference of agreement plausible. The Court therefore does not ask whether Defendants have identified an innocent explanation for the alleged parallelism, but whether the allegations, viewed in the light most favorable to Plaintiff, plausibly suggest an agreement. *See Plasma-Derivative*, 764 F.Supp.2d at 1002 (holding that to dismiss whenever Defendants make "a somewhat convincing case that all of plaintiffs' allegations can be explained as behavior perfectly in line with the firms' independent self-interest … would not comport with *Twombly* or Rule 8.").

### A. Parallel Behavior

Parallel behavior includes conduct that "would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties," but instead indicates "the sort of restricted freedom of action and sense of obligation that one generally associates with agreement." *Text Messaging I*, 630 F.3d at 628. Parallel conduct may reflect either parallel price increases or parallel output restrictions. *See*

*Kleen I*, 775 F. Supp. 2d at 1077 n.6 (citing *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 594-95 (7th Cir. 1984)).

Plaintiff's allegations of parallel conduct include six well-pleaded price increases, as well as alleged output restrictions via mill closures and "value-over-volume" strategies. Plaintiff's response brief clarifies that the parallel price increases and parallel output restraints each independently "constitute their own independent *per se* violations of Section 1 of the Sherman Act." [129] at 1-2.

*1) The Plausibility of Plaintiff's Parallel Pricing Allegations*

Plaintiff's well-pleaded allegations regarding six lockstep or nearly lockstep price increases are sufficient on their face to show parallel conduct. *See Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 902 (N.D. Ill. 2009) ("[T]he fact that multiple instances of parallel conduct are alleged makes it far less likely that a business justification exists for all the acts taken in total.") (cleaned up); *Kleen I* ("[C]onsistent parallel price increases are enough to make a threshold showing of conscious parallelism."); *Broiler Chicken*, 290 F. Supp. 3d at ("all at once" behavior is parallel plus behavior that supports a plausible inference of conspiracy); *In re Turkey*, 642 F. Supp.3d at 723-26 (finding allegations of two distinct periods of coordinated supply reductions, followed by two rounds of price increases, sufficiently alleged parallel conduct).

Defendants' objections to the adequacy of Plaintiff's parallel conduct allegations fall into two buckets. First, Defendants argue that Plaintiff has not adequately alleged parallel output restrictions. *See* [117] at 13-14; [120] at 2-3; [122]

at 3-4. According to Defendants, this deficiency not only cuts against the parallelism of Plaintiff's alleged *per se* output restriction conspiracy but also renders the parallel pricing conduct alleged in Plaintiff's Complaint implausible as a matter of law and economic logic. *Id.* Second, Defendants argue that Plaintiff's allegations of parallel conduct are not parallel enough to allow a plausible inference of conspiracy. The latter argument takes several tacks. Defendants argue that variations in Plaintiff's allegations undermine the plausibility of the alleged parallel conduct, including variation in the timing of price increase announcements or implementation, in the individual or cumulative amounts of price increases, in participation in each round of price increases, and in the Containerboard products on which prices were increased.

The Court finds that Plaintiff adequately pleads parallel pricing conduct by Defendants. While the Court will consider alleged output restrictions as a plus factor, Plaintiff has not adequately alleged parallel conduct regarding those output restrictions.

Regarding Defendants' first argument: a *per se* antitrust conspiracy can be established by *either* price fixing or by output restrictions. *See Kleen I*, 775 F. Supp. 2d at 1077 n.6, 1078. Defendants advance a creative argument that Plaintiff must plead both to meet the parallel conduct requirement at the pleading stage. According to Defendants, both must be plausibly plead because "an effort to raise prices cannot succeed without a corresponding reduction in supply," *Westinghouse Electric Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 226 (7th Cir. 1978), and because an "agreement to fix prices is not separate or separable from a mutual understanding to reduce output."

*Kleen II*, 276 F. Supp. 3d 811, 827 (N.D. Ill. 2017). But Defendants' argument does not follow from their authorities that reiterate economics 101 apothegms regarding the relationship between price increases and output restrictions. But these apothegms well predate *Twombly*; the fact that price and supply are economically linked does not render parallel supply restrictions an additional pleading requirement for a price-fixing conspiracy. *See, e.g.*, *Kleen I*, 775 F. Supp. 2d at 1078 ("Even without any parallel capacity reductions, consistent parallel price increases are enough to make a threshold showing of conscious parallelism."). Supply restrictions can constitute an agreement itself, can be a method of implementing an agreement to fix prices, or can be the effect of an agreement. To fail to distinguish between these contingencies would be to fall into the "trap" proscribed by Seventh Circuit authority. *See High Fructose Corn Syrup,* 295 F.3d at 655-56. The law prohibits *per se* any agreement to fix price. It does not require Plaintiff to also plead economically related consequences of that agreement to show parallel conduct.

The Court next turns to Defendants' second argument, that Plaintiff's allegations show pricing conduct that is not sufficiently parallel to meet their pleading requirement. Defendants' arguments are unconvincing. Taken together, Defendants' objections that Plaintiff's allegations do not show parallelism would require a plaintiff to plead perfectly lockstep conduct, with every Defendant acting at the same time, in the same manner, on the same products, and in the same amounts.

The first discrepancy Defendants identify is that different subsets of Defendants participated in each price increase, and that no price increase includes

all Defendants. *See* [118] at 11-16. However, an alleged conspiracy may plausibly encompass different participants acting at different times. Indeed, this flexibility may make a conspiracy easier to conceal and permit more firms to participate. *Broiler Chicken*, 290 F. Supp. 3d at 792 (citing *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 428 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29, 2015), *cert. denied*, 136 S.Ct. 2485 (2016)). As such, parallel conduct need not equate with every participant acting in every instance. *See id.* at 791 ("[A]ll at once behavior" is not required to show parallel behavior; nor is "uniformity in 'methods and amounts.'"); *In re Turkey*, 642 F. Supp. 3d at 723; *see also In re MultiPlan Health Ins. Provider Litig.*, 789 F. Supp. 3d 614, 637 (N.D. Ill. 2025) ("[C]oncurrent adoption of a price-fixing scheme is not required to prove parallel conduct."). In *In re Turkey,* the Court found a conspiracy to reduce output plausible even though plaintiffs had not alleged that each defendant implemented their output restrictions at the "exact same time." 642 F. Supp. 3d at 722-26. Rather, it was sufficient that plaintiffs alleged that each defendant had participated in similar conduct in each of four roughly two-year periods. *Id.* at 725-26 (comparing allegations with those in *Broiler Chicken*, 290 F. Supp. 3d at 791; *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 769–70 (D. Minn. 2020)).

Plaintiff here alleges two periods of price increases separated by a two-year lull. Considering Plaintiff's allegations as a whole and making reasonable inferences in the light most favorable to the Plaintiff, each Defendant is alleged to have participated in price increases during each period, from September 2020 to January

2022 and from December 2023 to January 2025. The only Defendants not alleged to have so participated are GPI, which Plaintiff dismissed, and Smurfit Kappa, which, reading the Complaint in the light most favorable to the Plaintiff, is a subsidiary that could not have implemented its parent's, Smurfit WestRock plc's, announced price increases until its parent entity was created in the merger of WestRock Corp. with Smurfit Kappa Group in 2024. Compl. at ¶19.

Even considering each individual round of price increases separately does not undermine the plausibility of conscious parallelism. The first round of price increases included all Defendants alleged to be active in the conspiracy at that time except Greif. The price increases taking place over the six months between June 1, 2024, and January 1, 2025, included all Defendants alleged to be active in the conspiracy at that time. Thus, the fact that the Complaint alleges different subsets of Defendants participating in different rounds of price increases does not negate the adequacy of Plaintiff's allegation of parallel conduct. *See In re Turkey*, 642 F. Supp. 3d at 722-23 (finding parallelism where "eight of the ten Defendants allegedly participated" in each round of conduct).

The second discrepancy in the allegations of parallel conduct identified by Defendants is that some Defendants in each round may have announced or implemented their price increases at slightly different times during the conspiracy period. *See* [118] at 12-16. However, Plaintiff need not plead perfect simultaneity to show parallelism. "It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators."

*Interstate Circuit v. United States*, 306 U.S. 208, 227 (1939). Courts applying *Twombly* recognize that simultaneity is not required to plead parallel conduct. *Broiler Chicken*, 290 F. Supp. 3d at 791 (collecting cases); *Mish Int'l Monetary Inc. v. Vega Cap. London, Ltd.*, 596 F. Supp. 3d 1076, 1093 (N.D. Ill. 2022).

Plaintiff alleges six price increases occurring on the same day, although for two of these price increases, a single Defendant lagged two or three days behind in implementing them. *See* Compl. at ¶54 (table). Further, Plaintiff alleges that these price increases were simultaneously announced by all participating Defendants either on the same day, as in the first price increase,[7] or close in time. *See id.*; *id.* at ¶56 (announcements of second price increase occurred within two week period); *id.* at ¶58 (participating Defendants announced third price increase in "late January"); *id.* at ¶59 (announcements of fourth price increase were "simultaneous[]"); *id.* at ¶60 (announcements of fifth price increase occurred in May 2024); *id.* at ¶61 (announcements of the sixth price increase occurred "within a narrow window and set uniform effective dates").

These price increases and announcements are sufficiently lockstep to show parallel conduct. For instance, in *Kleen I*, the Court found sufficient allegations of parallel conduct where defendants allegedly increased prices multiple times over a roughly five-year period. 775 F. Supp. 2d at 1077-80. *Broiler Chicken* likewise found plausible parallel conduct where production restrictions occurred during separate periods over several years. 290 F. Supp. 3d at 791-92. And *Plasma-Derivative* found

[7] Five of six Defendants participating in the first price increase announced on the same day. One, WestRock, announced five days later.

sufficient allegations of parallel conduct where defendants made "production cuts, strategic acquisitions, and plant closures" over a two-year period. 764 F. Supp. 2d at 996; *see also In re Turkey*, 642 F. Supp. 3d at 722-23 (finding parallel conduct where conduct occurred within four separate roughly two-year windows).

Moreover, while Defendants insist that Plaintiff has at best alleged follow-the-leader pricing conduct, [118] at 16-17, such conduct is sufficiently parallel to meet the required showing at the pleading stage. *See Plasma-Derivative*, 764 F. Supp. 2d at 1000 ("[I]nterdependence can be inferred from parallel conduct that is sequential rather than simultaneous."). Further, the Court would not be reading Plaintiff's allegations in the light most favorable to it by classifying its allegations as merely follow-the-leader. Plaintiff does not allege that one Defendant in each round of increases raised prices, with others following after long intervals. Instead, the factual allegations describe repeated, close-in-time announcements followed by price increases almost always effective on the same day.

Similarly, the alleged two-year lull between the March 2022 and January 2024 price increases does not render the Complaint's chronology implausible. Indeed, *In re Turkey* found a conspiracy plausibly alleged despite multiple lulls between parallel conduct. 642 F. Supp. 3d at 722-23; *see also Broiler Chicken*, 290 F. Supp. 3d at 783 (finding parallel conduct despite a lull from early 2009 to early 2011). Here, Plaintiff similarly alleges that Defendants' parallel conduct continued through the lull via artificial stabilization of prices. The question for the Court is then whether the alleged conduct before and after the lull, considered together with the alleged maintenance

of prices during it, make an inference of an agreement plausible. As in *Turkey*, the Court finds that the alleged lull does not undermine the plausibility of the six surrounding well-pleaded rounds of parallel price increases. 642 F. Supp. 3d at 722-26; *see also Broiler Chicken*, 290 F. Supp. 3d at 790-91.

The third discrepancy Defendants identify, that they are alleged to have in some instances raised prices on different products, also does not defeat Plaintiff's showing of parallelism. *See* [118] at 6, 12-13, [134] at 3 n.2. The alleged conspiracy spans the vertically integrated stream of Containerboard Products. *See* Compl. at ¶¶2, 44; [129] at 18-19. As discussed above, linerboard and corrugating medium are inputs into containerboard, which in turn is used to manufacture finished packaging products. An increase in the price of these inputs can therefore be a way to operationalize inflating the price of finished products. To the extent that different Defendants may have raised prices on different inputs shows only that they may have employed different means to achieve the same alleged objective. But an alleged variation in method of achieving a conspiracy including Containerboard Products writ large does not render those allegations implausible. *See Broiler Chicken*, 290 F. Supp. 3d at 792 (finding flexibility in methods did not render alleged conduct nonparallel).

The fourth discrepancy Defendants identify, variation in the cumulative amount of price increases, also fails to undermine the showing of parallelism. *See* [118] at 6 (Table 3). While significant differences in cumulative amounts of price increases can make a conspiracy less plausible, they do not establish that the

underlying conduct was not parallel. Courts have found parallel conduct adequately alleged despite substantially greater differences among defendants' cumulative price increases.[8] *See In re Manufactured Home Lot Rents Antitrust Litig.*, No. 23-cv-06715, 2025 WL 3485693, at *13 (finding parallel conduct where defendants' cumulative increases ranged from 0 to 15% or 2 to 14%, although this variation rendered the conspiracy significantly less plausible); *see also In re Blood Reagents Antitrust Litig.*, 266 F. Supp. 3d 750, 769-71 (E.D. Pa. 2017) (finding parallel conduct where competitors raised prices by varying amounts); *City of Moundridge v. Exxon Mobil Corp.*, No. CIV.A. 04-940, 2009 WL 5385975, at *5 (D.D.C. Sept. 30, 2009) ("Price-fixing can occur even though the price increases are not identical in absolute or relative terms.") (citing *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 132 (3d Cir. 1999)). As such, these differences show only that Defendants profited from the alleged increases in different amounts; it does not establish that the underlying increases were insufficiently parallel.

Here, Plaintiff alleges parallel price increases, closely timed price-increase announcements, and supply reductions. In each round of price increases, multiple Defendants allegedly raised prices by the same or nearly the same amount. Announcements of price increases generally occurred within a relatively short period

---

[8] The Court notes that Table 3 in Defendants' memorandum does not consider the Complaint's well-pleaded facts in the light most favorable to Plaintiff. [118] at 6. GPI was dismissed from this action. And the Complaint alleges a unity of identity between Smurfit Kappa, Smurfit WestRock, and WestRock. *See* Comp. at ¶22. Accounting for this, the greatest discrepancy in cumulative price increases is Greif's $130 per ton on linerboard compared to PCA's $330 per ton, the WestRock entities' $360 per ton, and International Paper's $370 per ton. *See* [118] at 6 (Table 3). But the cumulative amount for most Defendants is similar or identical. *See id.* (showing similar cumulative price increases for many Defendants: the Westrock entities and International Paper both cumulatively raised corrugating medium prices by $460 per ton, with PCA raising prices by $380, and Cascades by $350).

before the corresponding increases took effect, and Plaintiff alleges that the announcements themselves were closely clustered. These iterated instances of virtually simultaneous parallel pricing allegations, considered together, "make[] it far less likely that a business justification exists for all of the acts taken in total." *Standard Iron Works*, 639 F. Supp. 2d at 902; *but see Manufactured Home Lot Rents*, 2025 WL 3485693, at *13 (dismissing complaint where minimally compelling plus factors failed to push plaintiffs' "barely" alleged parallel conduct into plausibility).

*2) The Plausibility of Plaintiff's Parallel Output Restriction Allegations*

Plaintiff also alleges parallel output restrictions as constituting their own conspiracy in violation of Section 1. While the Court finds that Plaintiff's Complaint does not plausibly allege a separate output conspiracy, the Court will consider these allegations as additional circumstances that make the alleged price-fixing conspiracy more plausible.

Plaintiff alleges seven mill closures over approximately three years, involving only three Defendants—International Paper, Greif, and WestRock. *See* Compl. at ¶¶62-69. Plaintiff also alleges the adoption of a "value-over-volume" strategy by these same three Defendants: International Paper in Q4 of 2023, Greif, "while commenting on its 2022 financial results," and WestRock on a Q1 2025 conference call. *Id.* at ¶¶70-73. The Complaint does not allege comparable supply reductions by the remaining Defendants. Some of the alleged closures, particularly the 2025 closures, were clustered within a three-month period: Greif announced closures on January 29 and April 1, International Paper on February 13, and WestRock on April 30, 2025. That

clustering could perhaps support a finding of parallel supply restrictions among those three Defendants. *See In re Turkey*, 642 F. Supp. 3d at 722-26; *Broiler Chicken*, 290 F. Supp. 3d at 790-92. However, Plaintiff's alleged conspiracy regarding output restrictions comprises all Defendants, most of whom are not alleged to have engaged in any output restrictions or a "value-over-volume" business strategy. The Court therefore declines at this stage to find a separately plausible output conspiracy based on the supply allegations.

In sum, the Court finds that Plaintiff has adequately alleged an agreement regarding parallel pricing conduct, but not as to output restrictions.

**B. Plus Factors**

Parallel conduct alone is insufficient to plausibly allege a price-fixing conspiracy. *See Text Messaging I*, 630 F.3d at 627-29. "Absent additional 'factual enhancement' or a 'circumstance pointing toward a meeting of the minds,' an allegation of parallel conduct 'stops short of the line between possibility and plausibility.'" *Broiler Chicken*, 290 F. Supp. 3d at 789 (quoting *Twombly*, 550 U.S. at 557). For circumstantial evidence to plausibly indicate an agreement, Plaintiff must therefore allege "context that raises a suggestion of a preceding agreement—often called plus factors." *In re MultiPlan Health Ins. Provider Litig.*, 789 F. Supp. 3d 614, 637 (N.D. Ill. 2025) (quoting *Twombly*, 550 U.S. at 557) (cleaned up).

Typical plus factors include "whether the parallel acts were against the economic self-interest of the parties, the market structure of the relevant markets, and whether there were opportunities to collude." *Tiz, Inc. v. S. Glazer's Wine &*

*Spirits, LLC*, No. 22 CV 1648, 2024 WL 2785142, at *17 (N.D. Ill. May 30, 2024). Other recognized factors include an abrupt departure from prior business practices, coincidence in the timing of conduct, statements suggesting collective action, and supracompetitive profits. *Standard Iron Works*, 639 F. Supp. 2d at 893-94. This list is not exhaustive, and each plus factor is not evaluated in isolation. "When deciding whether an agreement is reasonably inferable, the Court considers plus factors—alongside allegations of parallel conduct—as a whole." *Tiz*, 2024 WL 2785142, at *17; *see also Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts."). Importantly, at the pleading stage, plus factors need not "exclude every plausible interpretation of the facts that does not support their theory of liability." *Kleen I*, 775 F. Supp. 2d at 1078 (citing *Potash,* 667 F. Supp. 2d at 936-37).

Plaintiff identifies several factors supporting the inference of a conspiracy. The Court finds that the nature of the parallel conduct and Defendants' alleged departure from prior business practices both substantially support the inference of conspiracy. Additionally, alleged supply restrictions are particularly persuasive as to the existence of a conspiracy involving at least WestRock, International Paper, and Greif. Further, the structure of the market provides contextual support for the inference of a conspiracy. Moreover, the fact that one price increase occurred close in time to a conference attended by most of the Defendants participating in that price increase also supports the inference of a conspiracy. Outside that allegation, the other alleged

opportunities for collusion Plaintiff describes are essentially neutral. The Court also notes that, for the most part, the alleged parallel conduct is inadequately explained by the market factors that Defendants describe, including variations in demand and input prices. The fact that these "obvious alternative explanations" do not justify the price increases that Plaintiff describes also helps support the plausibility of the conspiracy. *See* Compl. at ¶¶76-90; Opp at 24-26; *High Fructose*, 295 F. 3d at 660-61, 665-66 (the fact that prices during the conspiracy period "cannot be fully explained by causes consistent with active competition, such as changes in the price of corn" to be so probative as to suggest the district court appoint their own expert to evaluate them); *Cf. Text Messaging I*, 630 F. 3d 622 (price increases "in the face of steeply falling costs" supported the inference of conspiracy).

*1) Parallel Plus Conduct and Abrupt Change in Business Practice*

Plaintiff alleges conduct that is not just parallel, but substantially synchronous. Further, some of this conduct is alleged to constitute abrupt changes in Defendants' business practices. Where competitors repeatedly move in close temporal and substantive lockstep, that conduct itself can be its own plus factor, known as "parallel plus" behavior. *Broiler Chicken*, 290 F. Supp. 3d at 790-91; *see also Text Messaging I*, 630 F.3d at 628 (recognizing that "parallel plus" behavior can be particularly suggestive of agreement) (discussing *Twombly*, 550 U.S. at 557 n.4). When such parallel conduct may also be an abrupt change from past business practice, it is especially suggestive of an agreement. *See Standard Iron Works*, 639 F. Supp. 2d at 899-900 (discussing "dramatic change" in the steel industry). For

instance, in *Kleen I*, the court found that "allegations of significant market consolidation," combined with a move away from an established method of operating constituted the kind of "'marked change in [D]efendants' behavior in the market ... that have been held sufficient to make an antitrust conspiracy plausible.'" 775 F. Supp. 2d at 1080 (quoting *Standard Iron Works*, 639 F. Supp. 2d at 900); *see also Text Messaging I*, 630 F.3d at 628; *Tichy v. Avon Prods., Inc.*, 376 F. Supp. 3d 842, 857 (S.D.N.Y. 2019) (recognizing that a departure from established practice may suggest collusion).

Plaintiff here alleges repeated, close-in-time, nearly identical price increases, often preceded by allegedly simultaneous or close-in-time public announcements. The first adequately pleaded round is striking: after approximately two and a half years without an industry price increase, six Defendants implemented on the same day a $50-per-ton increase on both linerboard and corrugating medium, with five announcing those increases on the same day and the sixth announcing just five days later. Compl. at ¶¶54-55. Similarly, Plaintiff alleges that five Defendants "simultaneously" announced price increases of $70-75 on certain linerboard products and $30-50 on others, as well as $100-110 increases on corrugating medium, after a two-year lull in December 2023. *Id.* The four other alleged rounds of increases present similar facts, although with somewhat less participation and somewhat greater variation in timing and amounts. *Id.* at ¶¶54-61. Overall, the Court finds that Defendants are alleged to have repeatedly moved in close temporal lockstep, representing "parallel plus" behavior.

Additionally, the fact that alleged price increases were publicly announced is significant. *See Broiler Chicken*, 290 F. Supp. 3d at 798-99 (finding public announcements regarding production cuts render a conspiracy more plausible even though they also had purposes apart from conspiracy). A firm that publicly announces a price increase before that increase takes effect gives its competitors an opportunity to decide whether to follow, decline to follow, or undercut the announced price. In other words, a firm could, in principle, capture additional market share where price increase announcements were successive by action or inaction; that is by declining to raise its price or by raising it by less than its competitors. Despite this opportunity to gain market share, Plaintiff alleges that Defendants largely both announced and implemented price increases in close succession. Although Defendants may ultimately be able to show that each firm made their price increases independently while rationally expecting its competitors to follow, at the pleading stage the Court must draw reasonable inferences in Plaintiff's favor. Furthermore, the fact that Plaintiff alleges two abrupt lockstep price increases after extended periods of pricing lulls also helps support the inference of conspiracy. *See Standard Iron Works*, 639 F. Supp. 2d at 900 ("[P]arallel and drastically novel conduct in the context presented … suggests some sort of preceding agreement among the actors involved.").

Even more persuasive is the fact that three Defendants shifted their business strategies to "value over volume." Compl. at ¶¶70-75. Plaintiff alleges International Paper shifted its business strategy in 2023 or 2024, initially causing "unfavorable impacts" to volume. *Id.* at ¶¶70-71. Greif acknowledged the change in strategy in

discussing 2022 financial results and, in a Q1 2025 earnings call, where a Greif executive stated: "And with regard to competition, basically we focus on value over volume." *Id.* at ¶72. Smurfit WestRock likewise acknowledged its change in strategy on its Q1 2025 conference call, stating that its performance reflected "some early-stage benefits of our operational changes, including our operating model and all underpinned by our strategy of value over volume." *Id.* at ¶73. These allegations, read in the light most favorable to Plaintiff, indicate that three Defendants, including the two largest in the industry, departed from their prior business strategies during the class period. Further, Plaintiff alleges that this shift "would be irrational in a competitive market, where increased prices would drive customers to competitors." *Id.* at ¶74. Whether or not Plaintiff is correct, their allegation of "a marked change" in business strategy helps support the inference of a conspiracy. *See Kleen I*, 775 F. Supp. 2d at 1080.

*2) Conduct Against Independent Self-Interest*

Alleged actions that would be against each firm's independent self-interest in a competitive market, but that make sense in the counterfactual world of an unlawful agreement, can help make the inference of conspiracy more plausible. *See Kleen I*, 775 F. Supp. 2d at 1078-80. Plaintiff alleges that Defendants acted against their own self-interest by engaging in supply restrictions and by increasing their prices. The Court finds both allegations support the plausibility of the alleged agreement, although the former more strongly than the latter.

Conduct against self-interest can be a somewhat unusual plus factor at the pleading stage. After all, conduct consistent with an agreement, such as following a rival's price increase, can also be economically rational under conscious parallelism. *See Kleen III*, 910 F.3d 927. When conduct can be explained by independent self-interest, this plus factor can thus be less persuasive. *See Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 842 (N.D. Ill. 2018). The more risky, synchronized, or difficult to reverse the conduct, however, the stronger the plausibility of the inference becomes. *See Text Messaging I*, 630 F.3d at 628 (holding synchronous behavior can indicate collusion). In particular, "[t]he risk involved in leading a supply reduction suggests that purely interdependent supply decisions are unlikely." *Plasma-Derivative*, 764 F. Supp. 2d at 1001-02. Notably, the court in *Kleen I* found that mill closures in the Containerboard Products industry moved plaintiffs' allegations in that case toward plausibility "because they cannot be easily reversed" and because "absent an agreement, the first firm to move takes a significant risk that competitors won't follow." 775 F. Supp. 2d at 1079 (citing *Plasma-Derivative*, 764 F. Supp. 2d at 1001-02); *see also Kleen III*, 910 F.3d at 940 (describing a Defendant's mill closures as "perhaps the most compelling evidence of collusion").

Here, Plaintiff alleges that WestRock, International Paper, and Greif closed mills and thereby reduced capacity during the relevant period. Compl. at ¶¶62-69. Unlike a price announcement, a mill closure is not readily reversed. And where, as Plaintiff alleges here, the industry is capital intensive and operates at high capacity-utilization rates, *id.* at ¶¶89-90, deliberately removing production capacity carries a

substantial risk. If competitors continue supplying the market, the firm that cuts capacity can lose sales without securing a corresponding increase in price. *See Kleen I*, 775 F. Supp. 2d at 1079; *Kleen III*, 910 F.3d at 940.

Against this, Defendants argue that the supply restrictions involved different products, [118] at 6-7, and that the alleged supply restrictions were not in fact against their independent self-interest as these restrictions can be explained by falling demand and rising input prices. *Id.* at 18-21.

First, the fact that the supply reductions involved different products does not reduce their probative value here because the products in question are almost all themselves Containerboard Products or tied to Containerboard Products as inputs. *See* Compl. at ¶¶62-68 (closed facilities produced various inputs and outputs within the vertically integrated industry for Containerboard Products). Thus, the alleged output restrictions are plausibly in furtherance of a conspiracy involving Containerboard Products writ large. *See id.* at ¶44.[9]

Second, Plaintiff has adequately alleged that mill closures would have been against Defendants' individual self-interest absent a conspiracy. Plaintiff alleges that the mill closures were risky as they occurred during periods of elevated capacity utilization, meaning that there would be comparatively little excess capacity available at Defendants' other mills to take up demand if it rose. Compl. at ¶125. Further, the Complaint alleges that many closures, especially those in 2025, were

[9] However, unlike the other products produced at the closed mills, the Complaint does not tie the products produced at the WestRock paper-mill whose closure was announced on August 23, 2023, "pulp" and "specialty-grade capacity", to the Containerboard Products at issue. *Id.* at ¶63.

clustered within a three-month period and occurred amidst even demand. *Id.* at ¶¶65-68, 85 (fig. 10). The Complaint further alleges that, prior to those 2025 closures, the price of Original Corrugated Cardboard ("OCC") had declined from the third quarter of 2024 to the fourth quarter of 2024. These market conditions support a reasonable inference that the mill closures were not simply the obvious byproduct of a declining market.

Moreover, it would be inappropriate for the Court to weigh Defendants' explanation for mill closures against Plaintiff's on a motion to dismiss. *See Broiler Chicken*, 290 F. Supp. 3d at 801. Indeed, the economic conditions relied on by Defendants to explain mill closures can also support the inference of a conspiracy. A firm facing weak demand may independently rationalize shutting capacity, but such economic conditions can also incentivize conspiracy. *See id.* at 802 (holding that "a dire economic climate" can incentivize firms to "collude[] to reduce output and stabilize [prices] precisely to salvage profit—indeed, stay in business… .") (citing *In re Sulfuric Acid Antitrust Litig.*, 743 F.Supp.2d 827, 870 (N.D. Ill. 2010)). In fact, this is what Plaintiff alleges: that supply reductions formed part of "coordinated efforts to stabilize prices at artificially high levels." [129] at 18.

Additionally, Defendants dispute the extent to which they did in fact cut output. [134] at 2-4.[10] In particular, two Defendants point to documents outside the

[10] Defendants argue that Plaintiff's allegations of supply restrictions against three Defendants impliedly concedes that the other Defendants either "maintained or increased their capacity." *Id.* at 3. The Court may not draw an inference in favor of Defendants from Plaintiff's silence. Further, Plaintiff does in fact contest whether the other Defendants maintained supply. [129] at 21-22 ("At most, the materials raise a factual dispute regarding whether Pratt and PCA cut or maintained their production capacity during the Relevant Period.").

complaint to argue that they in fact increased supply during the class period. *See* [121] at 2-5; [123] at 3-4; [134] at 2-4. Whether Plaintiff's allegations regarding output restrictions are true is a factual dispute more appropriate for the summary judgment stage.[11]

The Court therefore finds that Plaintiff's allegations of output restrictions by WestRock, International Paper, and Greif strongly support the inference of conspiracy.

The Court also finds that Plaintiff's allegations that price increases would be against Defendants' independent self-interest lend some support to the inference of a conspiracy. Plaintiff alleges that, in a commodity industry with price-sensitive customers, "it would be economically irrational for any individual manufacturer to significantly increase its prices for Containerboard Products without assurance that other manufacturers would do the same." Compl. at ¶124. On the other hand, Defendants correctly observe that, in a concentrated industry, a firm may rationally follow another's increase without prior agreement. While this plus factor may lose probative force at the summary judgment stage, *see Kleen III*, 910 F.3d at 935,

[11] The Court declines to consider the extrinsic materials offered by Defendants. Incorporation by reference is a "narrow exception," principally suited to cases where a document omitted by the Complaint, such as sections of a contract at issue, forms the basis of the plaintiff's claim. *See Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998); *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002).

Defendants request the Court to take judicial notice of website materials, and of the COVID-19 pandemic, to infer certain facts about the Containerboard Products market. [134] at 7-8, 19; [136] at 2-3. However, Plaintiff reasonably disputes these inferences. *See* [129] at 21-22, 36-37. As such, notice would be improper. *See Gen. Elec. Capital Corp.*, 128 F.3d at 1081-83 (finding "indisputability" a prerequisite to judicial notice); *Standard Iron Works*, 639 F. Supp. 2d 896-97 ("While Defendants [pointed] to competing sources to contradict Plaintiffs' allegations … I have assumed the well-plead factual allegations in the complaint to be true.").

inferences must now be drawn in the plaintiff's favor. *See Text Messaging I*, 640 F.3d at 627-28.

*3) Structure of the Market*

The structure of the market provides a modest plus factor in Plaintiff's favor. Defendants do not dispute that the industry is highly concentrated. *See* [118] at 23-24. Indeed, they rely on that concentration to explain why independent follow-the-leader pricing may be economically rational. *Id.* Parties' dispute is therefore not about the market's structure but about what inferences arise from this structure.

Oligopolistic markets make both lawful conscious parallelism and explicit coordination easier. *See Kleen III*, 910 F.3d at 935. Especially when they are commodity markets with high inelasticity of demand. *See Kleen II,* 276 F. Supp. 3d at 823. Even so, courts routinely consider market structure as a plus factor that provides "contextual support" making a price-fixing conspiracy is plausible. *See Kleen I*, 775 F. Supp. 2d at 1080-81; *Text Messaging I*, 630 F.3d at 627-28 ("[I]ndustry structure that facilitates collusion constitutes supporting evidence of collusion."); *In re Turkey*, 642 F. Supp. 3d at 727 (noting that high market concentration and high barriers to entry "provide additional context that supports claims of a conspiracy to fix prices"); *In re MultiPlan*, 789 F. Supp. 3d at 642 (holding "general allegations concerning the structure of a market are insufficient alone to plausibly allege a price-fixing agreement," but market circumstances that make an agreement possible remain relevant where other facts plausibly suggest agreement).

The Containerboard industry has several characteristics that make it ripe for coordinated conduct. Plaintiff alleges substantial concentration among sellers, high barriers to entry, inelastic demand, standardized and fungible commodity products, and substantial fixed costs. Compl. at ¶¶96, 125, 135-43. Plaintiff also alleges that Defendants presently control 85% or more of the Containerboard Products market, *id.* at ¶47, in line with market concentration that courts have found add plausibility to conspiracy allegations. *Broiler Chicken*, 290 F. Supp. 3d at 779 (defendants controlled 88.8% of broiler production); *In re Turkey*, 642 F. Supp. 3d at 727 (defendants controlled approximately 80% of turkey production and processing). Further, Plaintiff alleges that Containerboard Products are standardized commodities with limited differentiation, making price competition particularly important, as well as highly inelastic demand. Compl. at ¶¶6, 96, 139-40, 142-43. And Plaintiff alleges substantial barriers to entry, including capital-intensive operations, access to raw materials, and transportation costs. *Id.* at ¶¶135-37. Each of these make the Containerboard market more conducive to collusion. *See Plasma-Derivative*, 764 F. Supp. 2d at 1002; *see also In re Turkey*, 642 F. Supp. 3d at 727-28.

Defendants' correctly note that these conditions can also facilitate lawful conscious parallelism. But on a motion to dismiss, a competing explanation does not permit the Court to decide that because a concentrated market can produce conscious parallelism, it cannot also support an inference of agreement. The more appropriate conclusion is that market structure is a modest plus factor: it supports Plaintiff's theory but cannot carry the burden by itself. *See In re Turkey*, 642 F. Supp. 3d at 727-

28; *but see Wash. Cnty.*, 328 F. Supp. 3d at 832 ("[P]arallel conduct in an oligopolistic market is not particularly probative of collusion").

*4) Opportunities for Collusion*

Finally, Plaintiff alleges that the numerous opportunities for Defendants' executives to interact through trade associations, industry conferences, and other industry events help support the inference of conspiracy. Compl. at ¶¶126-34. Trade-association membership and attendance at industry events are weak as a plus factor absent facts connecting them to the alleged unlawful conduct. *See Text Messaging II*, 782 F.3d at 878; *see also Washington County*, 328 F. Supp. 3d at 843 (allegations that defendants belonged to trade organizations "unspectacular").

Plaintiff's allegations concerning membership in these organizations merely suggest that these firms had the opportunity to talk to one another. Plaintiff does note that these organizations, especially the Fibre Box Association, provided Defendants access to certain information and market data, Compl. at ¶¶126-34, and that the World Containerboard Organisation allegedly "coordinates industry position." *Id.* at ¶¶130, 133. Yet Plaintiff does not allege that Defendants unlawfully exchanged price or output information at these meetings, that the information Defendants had access to was nonpublic or competitively sensitive, or that the meetings themselves produced any allegedly unlawful agreement. The mere fact that competitors attend the same industry events is, without more, a neutral plus factor showing opportunity to collude that exists in virtually every concentrated industry. *See Washington County*, 328 F. Supp. 3d at 843.

One of Plaintiff's allegations does however strongly support the inference of conspiracy. Plaintiff alleges that the December 2023 Fastmarkets conference was followed a mere three weeks later by a round of closely coordinated price announcements. Six Defendants—Cascades, International Paper, Smurfit Kappa, Greif, PCA, and WestRock—are alleged to have attended the conference. Compl. at ¶79. Three weeks later, "International Paper, WestRock, PCA, Pratt, and Cascades all announced a $100-110 price increase for corrugating medium and a $70-75 price increase for linerboard." *Id.* The overlap between these two events is incomplete: Smurfit Kappa and Greif are not alleged to have participated in that price increase, and Pratt is alleged to have increased prices without attending the conference. Still, the temporal proximity between an industry meeting attended by four of five alleged conspirators who then announced and implemented a lockstep price increase provides "factual heft" in support of the inference of an agreement. *Standard Iron Works*, 639 F. Supp. 2d at 895 (quoting *Hackman v. Dickerson Realtors, Inc.*, 557 F. Supp. 2d 938, 944 (N.D. Ill. 2008)).[12]

In sum, while most of Plaintiff's allegations regarding this plus factor do not by themselves support the inference of a conspiracy, the timing of the December 2023 Fastmarkets conference helps significantly in moving the needle.[13]

---

[12] The other conference Plaintiff emphasizes does not provide similar support. Plaintiff alleges that the first round of price increases in 2020 followed the Fastmarkets RISI Asian Conference, attended by WestRock and Smurfit Kappa. Compl. at ¶77. But Smurfit Kappa is not alleged to have participated in that price increase, so the only alleged participant in the price increase who attended the conference was WestRock.

[13] Plaintiff alleges that certain Defendants or their predecessors are antitrust recidivists. Compl. at ¶¶3, 112-17. The Court gives these allegations no weight. Settlements do not establish the truth of the allegations resolved by settlement absent admissions by the defendant. *See Washington Cnty.*, 328 F.

**C. Obvious Alternative Explanations**

Defendants argue that the plausibility of Plaintiff's allegations is defeated by the existence of obvious, nonconspiratorial explanations, including increased demand resulting from the COVID-19 pandemic and changes in input costs, particularly the price of Old Corrugated Cardboard ("OCC"). [118] at 1–2, 18-20. *Twombly* requires courts to consider "obvious alternative explanations" when deciding whether the facts alleged plausibly suggest agreement. 550 U.S. at 567. And an increase in demand or input costs can, of course, result in higher prices without any agreement among competitors. *See Broiler Chicken*, 290 F. Supp. 3d at 802. However, the "obvious explanation" provided by Defendants must be obvious in order to undermine the plausibility of an agreement. The mere existence of a plausible alternative does not require dismissal. *Id.* at 801–02; *see also Swanson*, 614 F.3d at 404 ("Plausibility in this context does not imply that the district court should decide whose version to believe, or which version is more likely than not.") (cleaned up); *Plasma-Derivative*, 764 F. Supp. 2d at 1002 ("It is not necessary that the factual allegations tend to exclude the alternative explanation offered by defendants."). Instead, for an obvious explanation to defeat the plausibility of a conspiracy, that explanation must "fatally undermine" or otherwise bely the plausibility of Plaintiff's conspiracy claims. *Broiler Chicken,* 290 F. Supp. 3d at 801-02

Supp. 3d at 841-42. The only prior cases where liability was established are very remote in time, and the allegations concerning a foreign competition authority's fine does not establish wrongdoing by Defendants in the U.S. market. Nor do Plaintiff's allegations lay out any factual continuity between previous lawsuits and the alleged conspiracy here.

In *Broiler Chicken,* defendants invoked the Great Recession and high feed costs as obvious explanations for alleged production cuts. *Id.* The *Broiler Chicken* court agreed that Defendants' explanations were plausible but rejected the premise that their plausibility required dismissal because "Defendants [were] ask[ing] the Court to undertake a weighing of evidence that is not appropriate at the pleading stage." *Id.* Here too, Defendants' alternative explanations, increased demand and high input costs, do not track Defendants' alleged price increases closely enough to furnish an obvious and comprehensive explanation of the alleged conspiracy.

*1) Demand*

Defendants emphasize the increase in demand for corrugated packaging products during the early portion of the alleged conspiracy as an explanation for price increases. That output increased from 2019 through 2021 is uncontested: Plaintiff alleges that corrugated-box shipments increased approximately 6%. Compl. at ¶86.[14] Defendants attribute this increase to a surge in online shopping during the COVID-19 pandemic. [118] at 8, 20. Plaintiff responds that the absolute size of the increase obscures the relevant comparison: demand increased approximately 6%, while linerboard and corrugating-medium prices allegedly increased approximately 15% and 20%, respectively. [129] at 25; Compl. at ¶86.

It is plausible that some portion of Defendants' early price increases could have resulted from increased demand, especially given that the parties agree that demand for Containerboard Products is highly inelastic. However, Plaintiff's Complaint

[14] The parties use output changes as a proxy for shifts in demand. As neither party contests this inference, the Court will adopt it for the purposes of this order.

accounts for this possibility, alleging that the "uptick" in increased demand does not account for the increase in prices. [129] at 25. Whether this is true likely depends on the robust econometric evidence typically provided by experts in price fixing conspiracy cases. *See High Fructose Corn Syrup*, 295 F.3d at 660-61, 665 (discussing why similar economic circumstantial evidence could necessitate the court to appoint its own expert). The potential need for robust economic evidence to resolve this issue counsels against deciding it on the pleadings. A motion to dismiss is not the proper time for such an analysis.[15]

*2) Input Costs*

Defendants next argue that changes in input costs explain the alleged price increases. They focus principally on OCC, which the Complaint itself identifies as an important input into Containerboard Products. However, the facts alleged in the Complaint do not make Defendants' explanation so obvious that it undermines the plausibility of Plaintiff's competing account.

The Complaint's figures show an uneven relationship between OCC prices and alleged price increases. The first figure shows OCC prices rising sharply into early or mid-2020, then falling sharply into mid-to-late 2020 before stabilizing or increasing more slowly toward the end of that year. Compl. at ¶84 (fig. 8). The first alleged coordinated price increase occurred in mid-to-late 2020. *Id.* at ¶¶54–55 (the increase

[15] Further, shifts in demand do not provide an obvious explanation for Defendant's alleged conduct as the alleged shifts do not closely correlate with all of Defendants' price increases. *See, e.g.*, Compl. at ¶¶54-61, 85-86; *Cf. In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 448 (E.D. Pa. 2018) (crediting plaintiffs' claims that "price increases were not correlated with similar changes in demand or manufacturing costs").

was announced in September 2020, effective November 1, 2020). Thus, the first price increase was announced and implemented while the price of this central input was falling or relatively stable.

Likewise, the second figure shows a lack of correlation between OCC prices and Defendants' alleged prices.[16] The second figure shows that the rise in OCC prices leveled off by approximately the second or third quarter of 2024 and soon reversed. *Id.* at ¶84 (fig. 9). Yet Defendants announced a round of price increases in May 2024, effective in June, *id.* at ¶60, with another round of increases announced from November 20 through December 5, 2024, implemented in January 2025. *Id.* at ¶61. Here too, input costs do not provide such an "obvious explanation" for Defendants' price increases that the plausibility of an agreement is fatally undermined.[17]

Thus, as with demand, input costs may sometimes make Defendants' explanation more plausible, and sometimes the opposite. During certain periods, demand and input costs may even provide contrasting inferences. But neither's fluctuations

[16] Defendants' motion also drew a trendline between the end of 2020 and the beginning of 2022 to illustrate OCC prices in 2021. [118] at 5 (figs. 8–9). The Court cannot credit Defendants' interpretative trendline superimposed onto the two figures taken from Plaintiff's Complaint. While the Complaint's figures support an inference that OCC prices increased at some point during 2021, Compl. at ¶84 (fig. 8 & fig. 9), they also show that OCC prices can sharply increase and decrease over the course of a year, making precise timings important. This imprecision matters because the second alleged price increase was announced in February 2021, and effective in March 2021. *Id.* at ¶¶54 (table), 56. Even Defendants' proposed trendline places that increase only near the beginning of a supposed rise in OCC costs. The Court does not find from the pleadings that increasing OCC costs explain the March 2021 price increase.

[17] Defendants also cite company materials for the proposition that their costs rose in categories other than OCC. *See* [118] at 19-20. In addition to it being improper for the Court to consider these materials, *supra* n. 11, Plaintiff contests the indisputability of these materials. *See* [129] at 36-37; *compare* [118] (citing Cascades' 2022 annual report) *with* Compl. at ¶87, ¶¶144-46 (alleging active concealment, including that Cascades' 2022 annual report falsely claimed price increases were due to effects of the COVID-19 pandemic).

sufficiently correlate with the timing of Defendants' price increases such that they provide an obvious explanation undermining the plausibility of the alleged conspiracy.

**D. The Conspiracy as a Whole**

Considered as a whole, Plaintiff's allegations are sufficient to make the inference of a conspiracy plausible. As the Court's preceding analysis shows, Plaintiff alleges six well-pleaded rounds of substantially parallel increases spanning five years, preceded by close-in-time public announcements, all of which occurred across materially different economic conditions. The first and fourth rounds of those price increases occurred more or less simultaneously, each after approximately two years or more without a price increase. Plaintiff concurrently alleges departures from prior business practices; not just in pricing, but also the adoption by three Defendants of a "value over volume" strategy alleged to be against each Defendant's self-interest. The same three Defendants are alleged to have engaged in relatively risky supply reductions through mill closures, with the three closures in early 2025 clustered within a three-month period. All Defendants are also alleged to have engaged in risky behavior by announcing their price increases before implementing them, in theory giving their competitors the opportunity to gain market share by not matching those price increases. Finally, most Defendants involved in the January 2024 price increase attended the 2023 Fastmarkets Forest Products International Containerboard Conference just three weeks before that increase. All of this conduct occurred in a market structure conducive to conspiracy, and across a variety of market conditions.

As already noted, not every plus factor provides equally strong and unequivocal support for the inference of an unlawful agreement. The Containerboard Product market structure may facilitate lawful conscious parallelism as well as explicit collusion. Trade-association membership and industry meetings represent opportunities to collude but are largely unconnected to wrongful conduct. The price increases themselves are not as probative as the supply restrictions when considered as actions against self-interest because independent follow-the-leader pricing can be economically rational. Still, taken together, and reading Plaintiff's allegations in the light most favorable to it, the inference of conspiracy is plausible.

**B. Individual Defendants**

Next the Court addresses Pratt and PCA's individual motions to dismiss. Both motions rely on the same two arguments. First, Pratt and PCA argue that Plaintiff presents insufficient evidence that they participated in the scheme. *See* [121] at 1-2 (arguing that Pratt is not alleged to have participated in certain price increases or in any output restrictions); [123] at 2 (noting allegations that PCA participated in five price increases, but no allegations involving PCA's participation in output restrictions). Second, Pratt and PCA rely on information not within the four corners of the complaint to argue that they took actions during the conspiracy period that undermine the plausibility of the inference of their participation in the conspiracy. As the latter argument hinges on evidence that that Court may not consider at the pleading stage, the Court addresses the former. *See supra*, n. 11.

For a plaintiff to adequately tie each Defendant to a conspiracy, the Complaint's allegations must show that each made a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Omnicare*, 629 F.3d at 706 (quoting *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984)). A plaintiff cannot impose conspiracy liability on a particular defendant merely because other actors entered an unlawful agreement. *See Bank of America, N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) ("[I]t remains essential to show that a particular defendant joined the conspiracy and knew of its scope."). Still, "[p]articipation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result." *Broiler Chicken I*, 290 F.Supp.3d at 803 (citing *Beltz Travel Serv., Inc. v. Int'l Air Trans. Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980)). This conclusion follows from the principle that connection to a plausible antitrust conspiracy can be established by allegations of overt acts in support of that conspiracy. *See Plasma-Derivative*, 764 F. Supp. 2d at 1003 (allegations against a trade association plausible where plaintiffs alleged it helped defendants conceal the conspiracy); *see also In re Turkey*, 642 F. Supp. 3d at 723–29 (plaintiffs sufficiently pleaded conspiracy allegations against eight of nine defendants). It also follows from the instruction that circumstantial antitrust evidence must be assessed collectively. *See High Fructose Corn Syrup*, 295 F.3d at 655-56 (citing *In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 787 (7th Cir.1999)).

Therefore, given that Plaintiff has plausibly alleged the existence of a common scheme, the Court must examine whether the defendant-specific allegations, viewed against the background of that already-established conspiratorial context and the complaint as a whole, plausibly place Pratt and PCA within the scheme. Plaintiff's "[C]omplaint need not contain detailed 'defendant by defendant' allegations," it just must plausibly allege that each defendant "joined the conspiracy and played some role in it." *Standard Iron Works*, 639 F. Supp. 2d at 900 (cleaned up); *see also id.* at 901 (Each defendant's conduct should be examined "in the overall context of the complaint."). For instance, in *Broiler Chicken*, after finding that plaintiffs had plausibly alleged a conspiracy, the court examined their allegations for whether they "sufficiently alleged each individual defendant's participation in this alleged agreement." 290 F.Supp.3d at 803-04. There, the court found that plaintiffs' allegations regarding each challenged defendant's conduct was sufficient because each challenged defendant was alleged (1) to have cut or restrained production during the relevant period; and (2) to have participated in mechanisms and circumstances connected to the scheme. *Id.*

Here, the Complaint contains sufficient specific allegations against Pratt and PCA to plausibly tie them to the conspiracy. Pratt is alleged to have participated in three of the six well-pleaded lockstep price increases, the 11/1/20, the 1/1/24, and the 6/1/24. *See* Compl. at ¶54 (table). Pratt is alleged to have announced in lockstep or near lockstep its price increases along with other defendants before each well-pleaded price increase. *See id.* Pratt is also alleged to have had an opportunity to collude with

other Defendants at trade associations, including the International Corrugated Case Association, the World Containerboard Organisation, the Fibre Box Association Executive Committee and Board of Directors, and the American Forest & Paper Association. *Id.* at ¶¶129-34.

The allegations connecting PCA to the conspiracy are also sufficient. PCA is alleged to have participated in five of the six well-pleaded lockstep price increases. *See id.* at ¶54 (table). The fourth price increase in particular ties PCA to the alleged conspiracy as it is alleged to have occurred three weeks after the 2023 Fastmarkets Conference attended by PCA's Vice President of Containerboard Sales and Director of Containerboard Sales. *Id.* at ¶79. PCA is also a member of trade associations that give it the opportunity to collude with other Defendants, including the International Corrugated Case Association, the World Containerboard Organisation, the Corrugated Packaging Council, the Fibre Box Association Board of Directors, and the American Forest & Paper Association. *Id.* at ¶¶129-134.

Pratt and PCA's arguments regarding their alleged participation in price increases and output restrictions during the class period "boil down to the contention that Plaintiff's allegations are wrong:" that Pratt and PCA did not agree; that Pratt and PCA did not cut production. *Broiler Chicken*, 290 F.Supp.3d at 803-04. These are factual disagreements that should be tested by discovery. *Id.*

**C. Statute of Limitations**

Defendants also challenge claims arising from sales before July 29, 2021, as untimely. [118] at 28-30; *see* 15 U.S.C. § 15b (providing a four-year statute of limitations for federal Sherman Act claims).

"[T]imeliness is an affirmative defense and thus normally . . . is not properly resolved at the Rule 12(b)(6) stage." *Vasquez v. Ind. Univ. Health, Inc.*, 40 F.4th 582, 588 (7th Cir. 2022). At the pleading stage, a plaintiff must "plead[] itself out of court" by alleging facts that establish untimeliness. *Id.*; *see also Watkins v. United States*, 144 F.4th 937, 940 (7th Cir. 2025) (dismissal is improper unless a plaintiff's claim is "indisputably time-barred") (citing *Small v. Chao*, 398 F.3d 894, 898 (7th Cir. 2005).

Plaintiff argues that claims arising from their pre-July 29, 2021, allegations are timely under the doctrine of accrual and, alternatively, that the limitations period was tolled by Defendants' fraudulent concealment. Defendants have not established that Plaintiff's claims accrued outside the limitations period, so the Court need not reach Plaintiff's alternate theory of fraudulent concealment.

Ordinarily, an antitrust cause of action accrues when a defendant commits an act that injures a plaintiff's business. *Vasquez*, 40 F.4th at 588 (citing *In re Copper Antitrust Litig.*, 436 F.3d 782, 789 (7th Cir. 2006); *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971); *see also Corner Post, Inc. v. Bd. of Governors of Fed. Res. Sys.*, 603 U.S. 799, 800 (2024) (A cause of action accrues "when the plaintiff has a complete and present cause of action.").

This rule "is qualified by the discovery rule, which postpones the beginning of the limitations period from the date when the plaintiff is wronged to the date when

he discovers he has been injured." *Vasquez*, 40 F.4th at 588; *Stark v. Johnson & Johnson*, 10 F.4th 823, 836–37 (7th Cir. 2021) ("[An] unfortunate outcome, by itself, is not sufficient to start the statute of limitations clock. … There must be some other circumstances present that would prompt a reasonable person ... to suspect or investigate a potential wrongful cause."); *Plasma-Derivative*, 764 F. Supp. 2d at 1002 n.10 (plaintiffs "will ordinarily" have to piece together their allegations from publicly available information). For dismissal to be proper at the pleading stage, therefore, a court must "be sure that the undisputed facts show that the operative injury both occurred and was discovered" before the beginning of the limitations period. *Vasquez*, 40 F.4th at 588.

Defendants do not contend that Plaintiff was aware of their injury before July 29, 2021. Rather, they contend that Plaintiff should have been aware of its injury before that date because the Complaint's allegations of parallel conduct rely on information that was publicly available before Plaintiff filed suit. [134] at 14.

Under the discovery rule, the relevant question is not when the facts underlying a claim became public, but whether the Complaint establishes that Plaintiff discovered, or through reasonable diligence should have discovered, its alleged antitrust injury prior to the beginning of the statutory limitations period. *See Vasquez*, 40 F.4th at 588. In *In re Copper,* for instance, the Seventh Circuit reversed summary judgment granted on statute of limitations grounds, concluding that publicly available reports connecting the defendant to the challenged market activity before the limitations period began did not put a diligent plaintiff on notice that this

activity unlawfully injured them. 436 F.3d at 789-91. In particular, the *In re Copper* court found that the public information available prior to the start of the limitations period did not put a diligent plaintiff on notice because it was consistent with ordinary, lawful activity. *Id.*

Here, Defendants argue that the conduct alleged by Plaintiff is plausibly consistent with lawful activity. That possibility alone defeats Defendants' request for dismissal of claims arising from conduct predating July 29, 2021, for statute-of-limitations purposes. The Court also finds persuasive Plaintiff's argument that only the "cumulative effect" of Defendants' price announcements could have triggered notice. [118] at 39.[18]

In sum, nothing in the Complaint establishes that a pattern had developed sufficiently by July 29, 2021, to put Plaintiff on notice that the prices it paid resulted from an unlawful agreement. *See In re Copper*, 436 F.3d at 789; *see also Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.*, 85 F. Supp. 3d 1007, 1012 (E.D. Wis. 2015) ("[M]arket conditions standing alone do not put a plaintiff on notice that the prices it paid resulted from an illegal conspiracy."). Plaintiff's account is plausible enough that Defendants' challenge to timeliness cannot properly be resolved on the pleadings. *See Vasquez*, 40 F.4th at 588 (reversing dismissal where "the complaint presents a plausible account under which [Plaintiffs'] suit is timely."); *cf. Corzo*, 2026

[18] While the Court need not examine Plaintiff's claims of fraudulent concealment, it is especially plausible that a diligent plaintiff would not have investigated Defendants' price increases where, as here, Defendants are alleged to have concealed the real reason for price increases. *See* Complaint at ¶¶144-46; *cf. Corzo v. Brown Univ.*, No. 22 C 125, 2026 WL 91424, at *21 (N.D. Ill. Jan. 12, 2026), *appeal dismissed sub nom. Andrew Corzo v. Cornell University,* No. 26-1275, 2026 WL 2352963 (7th Cir. Mar. 16, 2026) (finding accrual delayed where "much of the publicly available information would dispel, rather than heighten, students' suspicions.").

WL 91424, at *21 ("[W]hat exactly a reasonable [Plaintiff] knew or should have known about [Defendants' conduct] involves questions of material fact that, on this record, the Court cannot resolve.").

## IV. Conclusion

For the stated reasons, Defendants' Joint Motion to Dismiss [117], Pratts' Individual Motion to Dismiss [120], and PCA's Individual Motion to Dismiss [122] are each DENIED.

E N T E R:

Dated: September 4, 2026

Mary M Rowland

MARY M. ROWLAND
United States District Judge